

Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142

+1 212 506 5000
orrick.com

E. Joshua Rosenkranz

E jrosenkranz@orrick.com
D +1 212 506 5380
F +1 212 506 5151

May 30, 2017

***Via ECF***

Honorable Katharine H. Parker
United States District Judge
United States District Courthouse
500 Pearl Street
New York, New York 10007

Re: Citizens Union, et al. v. Governor of the State of New York, et al., No. 16-cv-9592 (RMB)(KHP)

Dear Judge Parker,

On behalf of intervenor the New York State Assembly (the "Assembly"), I write in response to Your Honor's April 25, 2017 order, requesting supplemental letter briefs addressing: (1) the relevance of nonpublic, confidential legislative deliberations to the merits of Plaintiffs' constitutional challenge to the Nonprofit Disclosure Provisions; and (2) whether a waiver of the attorney-client privilege would constitute a waiver of the legislative privilege.

**I. The Documents Sought By The Revised Document Requests Are Not Relevant To Citizens Union's First Amendment Claims.**

Plaintiffs' revised document requests do nothing to cure the fatal deficiency in their position—documents related to the pre-enactment knowledge, intent, and deliberations of the legislative and executive branches have no bearing on a First Amendment challenge to campaign disclosure laws. In their brief in opposition to the Governor's motion for a protective order, in their oral argument before this Court on April 25, and now in their supplemental letter brief, Plaintiffs have been afforded the opportunity to explain why nonpublic, confidential communications among legislators or between legislators and the Governor bear any legal significance to their argument that the Nonprofit Disclosure Provisions are unconstitutional under the First Amendment. Through all this, Plaintiffs have failed to provide a single precedent—from any court, at any time—relying on such evidence to determine the constitutionality of a campaign disclosure requirement or any other regulation of the political process under the First Amendment. They do not even cite a case in which any party has *argued* that such a regulation is more vulnerable to First Amendment challenge because particular facts were or were not before the legislature. This is because such evidence is not relevant.




Under any credible reading, Plaintiffs' revised document requests continue to pursue an impermissible inquiry into legislative motive. Plaintiffs attempt—unpersuasively—to define around this prohibition by casting every step in the deliberative process as a "fact," including "an act of judgment [that] occurs in the formulation" of a "fact." *See* Dkt. 81-1, Exh., Instructions ¶¶1-2. But this effort does not advance Plaintiffs' position because a long line of cases establishes that the legislative privilege encompasses legislative fact-finding processes. *See e.g.*, *SEC v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 236 (S.D.N.Y. 2015) (legislative privilege encompasses legislative "information gathering activities"); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) (same). Because "a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975), an inquiry into what facts a legislature considered while deliberating on legislation *is* an inquiry into legislative deliberations. Asking a state senator, "What 'facts or factual conclusions' did you consider in deciding to vote for X?" is the same as asking, "Why did you vote for X?" Plaintiffs' letter brief makes clear that this is exactly the inquiry they have in mind. *See* Dkt. 81 at 3 ("Citizens Union is requesting factual material to test the pre-enactment evidentiary basis, if any, for the government's various asserted interests in enacting the Nonprofit Disclosure Provisions.").

Plaintiffs' document requests, therefore, remain a search for legislative motives, and as such seek information that is both privileged and irrelevant. In *United States v. O'Brien*, the Supreme Court observed that "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." 391 U.S. 367, 383 (1968). As here, *O'Brien* involved a challenge to a statute under the First Amendment free-speech right. Like the Disclosure Provisions at issue in this case, the statute at issue in *O'Brien* was assessed under a form of heightened scrutiny, which required that the government establish that the statute "furthers an important or substantial governmental interest." *Id.* at 377. *O'Brien*'s bar on "[i]nquiries into congressional motives or purposes," therefore, squarely governs this case. *Id*. at 383. And the Supreme Court and courts of appeals have repeatedly reaffirmed *O'Brien*'s "familiar principle of constitutional law" in subsequent First Amendment cases. *See, e.g.*, *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998) ("it simply is not consonant with our scheme of government for a court to inquire into the motives of legislators") (quotation marks and citations omitted); *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015) ("This Court's precedent applying *O'Brien* recognizes that, when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose."); *In re G. & A. Books, Inc.*, 770 F.2d 288, 297 (2d Cir. 1985) ("A subjective motivation on the part of some proponents of [legislation] does not render it unconstitutional[.]"). Indeed, the Ninth Circuit has issued a writ of mandamus to prohibit a district court from conducting discovery into legislative motives, explaining that "[a]llowing discovery of legislative motives … would not only create a major departure from the precedent rejecting the use of legislative motives, but is also inconsistent with basic analysis under the First Amendment which has not turned on the motives of the legislators,



but on the effect of the regulation." *City of Las Vegas v. Foley*, 747 F.2d 1294, 1298 (9th Cir. 1984).

First Amendment challenges to campaign disclosure laws—consistent with the broader universe of First Amendment free-speech cases—turn almost exclusively on evidence of the *effect* of the regulation. In defending such laws, the state must show "a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010). Because the Supreme Court has repeatedly recognized that "disclosure requirements, as a general matter, directly serve substantial governmental interests," challenges to disclosure laws virtually always hinge on "the extent of the burden that they place on individual rights." *Buckley v. Valeo*, 424 U.S. 1, 68 (1976); *see also Davis v. FEC*, 554 U.S. 724, 744 (2008) (considering evidence of "the actual burden on First Amendment rights"); *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (same); *Ams. for Prosperity Found. v. Harris*, 809 F.3d 536, 538 (9th Cir. 2015) (same). In assessing whether such a burden exists, courts turn to surveys and other similar "evidence suggesting that [the] disclosure laws actually and meaningfully deter contributors." *Family PAC v. McKenna*, 685 F.3d 800, 807 (9th Cir. 2012). And this focus on how the law at issue actually operates is the same regardless of whether plaintiffs assert a facial or as-applied challenge. The only difference is that a facial challenge requires a "showing that [the challenged provisions], as a general matter, expose contributors to harassment, intimidation or retaliation," whereas an as-applied challenge requires only that a specific group show a "'reasonable probability that disclosure of its contributors' names will subject them to threats, harassment, or reprisals.'" *Id.* at 808 (quoting *Citizens United*, 558 U.S. at 367). In either context, because the analysis turns on the laws' actual effects, a legislature's pre-enactment deliberations simply have no relevance.

Tellingly, Plaintiffs have identified no cases holding otherwise. They cite five decisions in the portion of their letter brief addressing the relevance of the documents sought, but none involved disclosure laws or political regulation of any sort. One—*United States v. Virginia*, 518 U.S. 515 (1996)—was not a First Amendment case at all. Instead, it was an Equal Protection case, which simply recited the familiar rule that, under intermediate scrutiny, the justification for a law "must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Id.* at 533. But, in sharp contrast to First Amendment free-speech claims, "proof of … discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). And, in any event, here there is no argument that the legislative rationale that Plaintiffs challenge was invented post hoc in response to litigation: The Governor's interest in "combat[ting] the outsized influence of dark money in politics" was articulated in the Message of Necessity, which was issued before the law was enacted and before this litigation began. Exh. A (ASSEMBLY00100-103).

Another two decisions cited by Plaintiffs involve constitutional challenges to telecommunications regulations. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 211 (1997); *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 160 (2d Cir. 2013). But the Disclosure



Provisions have little in common with such regulations. The legislative justification offered in cases like *Turner Broadcasting*—the need to foster competition in the cable industry—"rested on 'economic' analysis that was susceptible to empirical evidence." *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009). By contrast, campaign disclosure provisions have repeatedly been justified by a broader and more fundamental interest in "'insur[ing] that the voters are fully informed' about the person or group who is speaking," which includes revealing to voters the identity of groups' sources of funding. *Citizens United*, 558 U.S. at 368. The resulting "transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Id.* at 371. At the root of the justification for disclosure requirements, therefore, "is simply a claim that good government requires greater transparency." *Nat'l Ass'n of Mfrs.*, 582 F.3d at 16. As Chief Judge Garland of the D.C. Circuit observed, the notion that "[t]ransparency in government" is a "vital national interest in a democracy … is a value judgment based on the common sense of the people's representatives," which has been "repeatedly endorsed by the Supreme Court as sufficient to justify disclosure statutes" with "no inquiry into whether the legislative record supported" that value judgment. *Id.* at 14, 16.

Finally, Plaintiffs cite two cases involving the "secondary effects" doctrine, used to assess "indecency" ordinances and other similar statutes. *See White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163 (2d Cir. 2007); *New York Youth Club v. Town of Smithtown*, 867 F. Supp. 2d 328 (E.D.N.Y. 2012). In that context, the Second Circuit has indeed held that a city must offer "pre-enactment evidence" in support of the provision at issue, *White River Amusement Pub*, 481 F.3d at 171, although the circuits are currently split on the question, *see DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 830 (7th Cir. 1999). The "secondary effects" doctrine, however, has nothing in common with the analysis applied to campaign disclosure laws. The "secondary effects" doctrine applies to a narrow category of provisions that are on their face content-based, but are treated as "content-neutral" because they are justified as a means "to combat the undesirable secondary effects," such as "to prevent crime, protect the city's retail trade, [and] maintain property values." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48-49 (1986). Because the "secondary effects" doctrine operates to permit certain facially content-based speech restrictions, the Supreme Court has held that asserted concerns with "secondary effects" must be "carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 510 (1981); *see also Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 84 (1976) (Powell, J., concurring) ("[C]ourts must be alert … to the possibility of using the power to zone as a pretext for suppressing expression"). As a result, "secondary effects" cases represent one of the "limited exceptions to the principle that judicial inquiry into legislative motive is to be avoided," since they involve "statutes which on their face directly inhibit or have the inevitable effect of inhibiting freedom of speech or related constitutional rights." *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1259 (4th Cir. 1989); *see also* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 484-95 (1996) ("the secondary effects doctrine fits uneasily with the rest of First Amendment jurisprudence" because the "doctrine requires courts to make independent determinations of the



government's reasons, notwithstanding the difficulties of proof entailed in this effort").

Unlike the facially content-based laws at issue in "secondary effects" cases, disclosure requirements "do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (quotation marks and citation omitted). Indeed, the Court has identified disclosure requirements as "represent[ing] a less restrictive alternative to flat bans on certain types or quantities of speech." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1460 (2014). In contrast to the careful scrutiny with which the Court treats the stated government interests offered in "secondary effects" cases, moreover, the Court has "repeatedly endorsed" the "claim that good government requires greater transparency." *Nat'l Ass'n of Mfrs.*, 582 F.3d at 16. The "secondary effects" cases relied on by Plaintiffs—and the embedded suspicion of articulated government interests found in those cases—therefore have no bearing in the context of campaign disclosure requirements, which the Court has consistently recognized as serving a valid and important government interest.

If this Court determines that Plaintiffs' interest in "test[ing] the pre-enactment evidentiary basis … for the government's various asserted interests in enacting the Nonprofit Disclosure Provisions" warrants piercing the legislative privilege, it will open the door to a flood of discovery demands directed at legislators in every constitutional case. Dkt. 81 at 3. That outcome is no mere hypothetical: As noted at oral argument, months ago, Plaintiffs served on both the Senate and the Assembly extremely broad subpoenas seeking nonpublic legislative deliberations, which Plaintiffs would no doubt seek to revive if this Court pierces the legislative privilege here. The result of allowing such an intrusion into the legislative process would be the dramatic curtailment of deliberative records, lest they become fodder for litigation. Such an outcome strikes at the core of the legislative privilege.

## II. Actions That Would Waive The Attorney-Client Privilege Do Not Waive The Legislative Privilege, And There Has Been No Waiver Of Either Privilege Here.

Even if this Court concludes that no common interest privilege exists between the executive and legislative branches, the legislative privilege still protects communications between the branches. The reason for this is simple: The legislative privilege is substantially broader than the common interest privilege. The common interest privilege applies only to "communications passing from one party to the attorney for another party" when "made in the course of an ongoing common enterprise and intended to further the enterprise…." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). The legislative privilege, by contrast, has been construed "broadly" to apply to all acts that form an "integral part of the deliberative and communicative processes by which Members participate in committee and [floor] proceedings with respect to the consideration and passage or rejection of proposed legislation." *Gravel v. United States*, 408 U.S. 606, 624-25 (1972) (quotation marks and citations omitted). Even if the Assembly and the Governor were not in an "ongoing common enterprise" when they exchanged communications regarding the Disclosure Provisions, they were still unquestionably engaged in the "deliberative and communicative process[]" of enacting legislation, and the legislative



privilege therefore applies.

This conclusion is not only logical, but mandated by the Supreme Court. In *Bogan v. Scott-Harris*, the Court held that the legislative privilege covers communications with executive officials and other non-legislators when these communications relate to "integral steps in the legislative process." 523 U.S. at 55; *see also Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 738 (1980); *Campaign for Fiscal Equity v. State*, 687 N.Y.S.2d 227, 231 (Sup. Ct., N.Y. Cty. 1999). If, as Plaintiffs have suggested, the *legislative* privilege were waived every time documents were conveyed to a party outside the *attorney-client* privilege, *Bogan* would be wrongly decided. It is not. And a long line of cases have since followed the rule that the legislative privilege covers a wide range of activities involving non-legislator third-parties. *See Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) ("Meeting with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation … assist[s] legislators in the discharge of their legislative duty."); *Comm. on Ways & Means*, 161 F. Supp. 3d at 237 (the "controlling principle" for determining whether or not the legislative privilege applies is whether "information is acquired in connection with or in aid of an activity that qualifies as legislative in nature, not what the source of the information is") (citations and quotation marks omitted). Even decisions treating the legislative privilege as qualified rather than absolute recognize that it covers communications with third-parties. *See, e.g.*, *ACORN v. Cty. of Nassau*, No. 05-CV-2301, 2009 WL 2923435, at *6 (E.D.N.Y. Sept. 10, 2009) (legislative privilege protected communications between legislators and an outside consulting firm).

Even Plaintiffs do not fully embrace the sweeping scope of their waiver position. For instance, Plaintiffs somewhat cagily suggest that both privileges are "waived when an otherwise privileged document is disclosed to a third party not covered by the privilege," without identifying any relevant third party who fits that description. Dkt. 81 at 4. There is no question here that the legislature is within the legislative privilege. And even if the Governor had waived the privilege with respect to his own communications as a result of disclosure to some as-of-yet unidentified third party, that would not constitute a waiver of the Assembly's privilege: One party may not waive the legislative privilege on behalf of another. *See, e.g.*, *Favors v. Cuomo*, 285 F.R.D. 187, 211 (E.D.N.Y. 2012).

* * *

As the D.C. Circuit observed, the Supreme Court has repeatedly recognized the validity of the government's interest in promoting greater transparency with "no inquiry into whether the legislative record supported" that value judgment. *Nat'l Ass'n of Mfrs.*, 582 F.3d at 16. For that reason, and because the determination of whether the Nonprofit Disclosure Provisions are substantially related to that important government interest will hinge on the actual effects of the Provisions, the Assembly's nonpublic legislative deliberations have no relevance to Plaintiffs' claims. Furthermore, the Assembly has not waived its legislative privilege. The Governor's motion for a protective order, therefore, should be granted.




Very truly yours,

/s/ E. Joshua Rosenkranz