**CAHILL GORDON & REINDEL LLP**
EIGHTY PINE STREET
NEW YORK, NY 10005-1702

| | | | | |
|---|---|---|---|---|
| L. HOWARD ADAMS | CHARLES A. GILMAN | TELEPHONE: (212) 701-3000 | GEOFFREY E. LIEBMANN | MICHAEL A. SHERMAN |
| ROBERT A. ALESSI | ARIEL GOLDMAN | WWW.CAHILL.COM | BRIAN T. MARKLEY | DARREN SILVER |
| HELENE R. BANKS | JASON M. HALL | | WILLIAM J. MILLER | JOSIAH M. SLOTNICK |
| ANIRUDH BANSAL | WILLIAM M. HARTNETT | | NOAH B. NEWITZ | RICHARD A. STIEGLITZ JR. |
| DAVID L. BARASH | CRAIG M. HOROWITZ | 1990 K STREET, N.W. | MICHAEL J. OHLER | SUSANNA M. SUH |
| LANDIS C. BEST | DOUGLAS S. HOROWITZ | WASHINGTON, DC 20006-1181 | DAVID R. OWEN | ANTHONY K. TAMA |
| BRADLEY J. BONDI | TIMOTHY B. HOWELL | (202) 862-8900 | JOHN PAPACHRISTOS | JONATHAN D. THIER |
| BROCKTON B. BOSSON | DAVID G. JANUSZEWSKI | | LUIS R. PENALVER | SEAN P. TONOLLI* |
| KEVIN J. BURKE | ELAI KATZ | CAHILL GORDON & REINDEL (UK) LLP | KIMBERLY PETILLO-DÉCOSSARD | JOHN A. TRIPODORO |
| JAMES J. CLARK | BRIAN S. KELLEHER | 24 MONUMENT STREET | SHEILA C. RAMESH | GLENN J. WALDRIP, JR. |
| SEAN M. DAVIS | RICHARD KELLY | LONDON EC3R 8AJ | MICHAEL W. REDDY | HERBERT S. WASHER |
| STUART G. DOWNING | CHÉRIE R. KISER* | +44 (0)20 7920 9800 | OLEG REZZY | MICHAEL B. WEISS |
| ADAM M. DWORKIN | JOEL KURTZBERG | | JAMES ROBINSON | S. PENNY WINDLE |
| ANASTASIA EFIMOVA | TED B. LACEY | | THORN ROSENTHAL | DAVID WISHENGRAD |
| JENNIFER B. EZRING | MARC R. LASHBROOK | WRITER'S DIRECT NUMBER | TAMMY L. ROY | COREY WRIGHT |
| JOAN MURTAGH FRANKEL | ALIZA R. LEVINE | | JONATHAN A. SCHAFFZIN | JOSHUA M. ZELIG |
| JONATHAN J. FRANKEL | JOEL H. LEVITIN | 212-701-3621 | JOHN SCHUSTER | DANIEL J. ZUBKOFF |
| PIERRE M. GENTIN | | | | |

*ADMITTED IN DC ONLY

May 30, 2017

Re:  *Citizens Union of the City of New York, et al.* v. *The Attorney General of the State of New York, et al.* (16-cv-09592-RMB)

Dear Judge Parker:

By Order dated April 26, 2017, this Court instructed Plaintiffs Citizens Union of the City of New York and Citizens Union Foundation, Inc. of the City of New York (together, "Citizens Union") to narrow their requests for the production of documents and to submit a letter addressing specific issues identified by the Court. On May 5, 2017 Citizens Union filed new document requests and its accompanying letter [Dkt 81] (the "CU Letter"). We write to respond to the CU Letter, to provide the Court with our responses and objections to the new requests (attached as Exhibit A hereto) and to provide the Court with a privilege log identifying individual documents being withheld on grounds of the legislative privilege, the executive privilege, and/or the attorney-client privilege (attached as Exhibit B hereto).

### I. Citizens Union's Revised Requests Do Not Seek Material Relevant to the Constitutional Inquiry

Citizens Union's view as to what is and is not relevant and thus discoverable information in a case such as this would routinely overcome long-established and continuously enforced privileges that are rooted in both federal and state constitutional provisions. The purpose of the privileges (and immunity) conferred by the Federal and New York Constitutions' Speech and Debate Clauses is to protect legislators and government officials from the very sort of disclosure that Citizens Union seeks: discovery into their mental impressions, work product and motivation. *See United States* v. *Gillock*, 445 U.S. 360, 369 (1980) ("Two interrelated rationales underlie the Speech or Debate Clause: first, the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch, and second, the desire to protect legislative independence.") (citing *Eastland* v. *United States Servicemen's Fund*, 421 U.S. 491, 502–503 (1975)); *United States* v. *Helstoski*, 442 U.S. 477, 491 (1979) ("This Court has reiterated the central importance of the

Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere."); *United States* v. *Brewster*, 408 U.S. 501, 509 (1972) (the privilege protects against "inquiry into legislative acts or the motivation for actual performance of legislative acts") (citation omitted).

Consistent with the legislative privilege, courts have repeatedly emphasized that generally legislation must be examined based on the bill text, legislative history and other publicly available material, without regard to the motivations or actual knowledge of legislators. *See FCC* v. *Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) ("[B]ecause *we never require a legislature to articulate its reasons for enacting a statute*, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.") (emphasis added); *N.Y.* v. *Ferber*, 458 U.S. 747, 758 (1982) (the court "shall not second-guess [New York's] legislative judgment" in the context of upholding New York's prohibition on non-obscene speech involving minors); *United States* v. *O'Brien*, 391 U.S. 367, 384 (1968) (in heightened scrutiny case, noting that the court will not void legislation based on the purpose of individual legislators, which "Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it."); *Allstate Ins. Co.* v. *Serio*, Nos. 97 Civ. 0620(SS)THK, 97 Civ. 0023(SS)THK, 1998 WL 477961, at *5 (S.D.N.Y. Aug. 13, 1998) ("As is traditionally done, inquiry into the constitutionality of § 2160(b) can be conducted on the basis of the statutory scheme, the legislative history, other publicly available material, and all of the factual material produced by SID related to its enforcement of the statute.") (citation omitted).

Citizens Union disagrees. Specifically, Citizens Union insists that it is entitled to determine "whether the government actually considered, ***pre-enactment***, 'substantial evidence' that indicated that 501(c)(3)s making in-kind donations to 501(c)(4)s is a 'real' harm, 'not merely conjectural.'" CU Letter at 3 (citations omitted, emphasis added). That is not the test, as Citizens Union's letter elsewhere concedes. The "challenged statutory provisions", according to Citizens Union, "cannot survive First Amendment scrutiny unless there is 'a substantial relationship between the disclosure requirement and a sufficiently important government interest. . . .'" CU Letter at 1. There is no requirement in constitutional litigation that the government must make that showing by reference to materials that happen to have made their way into the governor's or the legislators' files before the law was enacted. Indeed, to impose such a requirement would make a mockery of the legislative privilege and the protections of the Speech and Debate Clauses.

The cases Citizens Union cites in support of the proposition that it is appropriate to inquire into a legislature's pre-enactment knowledge do nothing to advance its effort to rummage through the files of the Governor and Members of the New York State Senate and Assembly. *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180 (1997) involved a constitutional challenge to the federal statute that required cable system operators to "carry" local broadcast channels. There is no suggestion in the Court's 78-page decision that Members of Congress (or for that matter, the President) were required to submit to discovery of their files to examine their "pre-enactment" knowledge. In examining the reasonableness of Congress' economic judgment that the

CAHILL GORDON & REINDEL LLP

- 3 -

broadcast industry would be imperiled without the "must carry" requirement, the Supreme Court looked to traditional public legislative materials such as formal reports of the House and Senate, transcripts of hearings before Congressional committees and the like. In fact, before reaching the merits of the challenge, the Court remanded the case for further post-enactment factual development on the likely future economic impact of the legislation. *Turner Broad. Sys., Inc*, 512 U.S. 622, 668 (1994). To suggest that *Turner* stands for the proposition that a statute must be defended on the basis of what legislators had in their files at the time of the passage of the legislation is to grossly mischaracterize it.

Citizens Union's reliance on *White River Amusement Pub, Inc*. v. *Town of Hartford*, 481 F.3d 163 (2d Cir. 2007) fares no better. *White River* arose in the context of a municipal ordinance which, among other things, banned nudity in commercial establishments open to the public, an ordinance adopted shortly after a nude dancing parlor opened in the town of Hartford, Vermont. A series of Supreme Court decisions arising in precisely the same context have established that such ordinances are constitutional only if they are enacted for the purpose of discouraging the "secondary effects" that are said to arise from the presence of such establishments, such as increases in crime, loitering or the like. *See City of Renton* v. *Playtime Theatres, Inc*., 475 U.S. 41, 51 (1986); *City of Erie* v. *Pap's A.M*., 529 U.S. 277, 293 (2000); *City of Los Angeles* v. *Alameda Books, Inc*., 535 U.S. 425, 441 (2002). In *White River* the Second Circuit affirmed the district court's finding that Hartford's ordinance was unconstitutional because there was no evidence that the town had considered "secondary effects" at all in passing the ordinance. But this case is not a "secondary effects" case and *White River* and the Supreme Court's precedents upon which it relies have no application outside that context. *See, e.g., Free Speech Coal., Inc*. v. *Attorney General*, 825 F.3d 149, 161 (3d Cir. 2016) ("*[I]f* the secondary effects doctrine survives, *Reed* [v. *Town of Gilbert*, 135 S. Ct. 2218 (2015)] counsels against expanding its application beyond the only context to which the Supreme Court has ever applied it: regulations affecting physical purveyors of adult sexually explicit content.") (emphasis in original); *id*. at 162-63 (same).[1]

Where the governmental purpose advanced in support of a challenged law has widespread acceptance and recognition, discovery of what motivated the legislators who enacted it (or the Governor who signed it) is particularly irrelevant. Citizens Union acknowledges that where a state enacts legislation in response to a problem that is "'plainly of the same character' as a previously identified problem," no further justification is needed to defend it. CU Letter at 2 n.1 (quoting *Barnes* v. *Glen Theatre, Inc.*, 501 U.S. 560, 584 (1991) (Souter, J., concurring)). Here, while the precise contours of the large donor requirements in the Nonprofit Disclosure Provisions differ from prior statutes (indeed, if they were the same, new legislation would not have been required), the government interest in casting sunlight on those who engage in significant funding of electoral advocacy and issue advocacy has repeatedly (and recently) been

---

[1] The district court's decision in *New York Youth Club* v. *Town of Smithtown*, 867 F.Supp. 2d 328 (E.D.N.Y. 2012) is inapposite for the same reason as it too relies on all the "secondary effects" precedents that have no application here.

recognized by the Supreme Court.  In *Citizens United* v. *Federal Election Commission*, 558 U.S. 310 (2010) the court held that it was constitutional for Congress to require the disclosure of identities of individuals and corporations who provided large donations used for political advertising, since "transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Id*. at 371.  This was entirely consistent with the Supreme Court's prior rulings in *Buckley* v. *Valeo*, 424 U.S. 1 (1976) (upholding disclosure requirements of the Federal Election Campaign Act), and *McConnell* v. *Federal Election Commission*, 540 U.S. 93 (2003) (upholding disclosure requirements of the Bipartisan Campaign Reform Act), as well as the Supreme Court's most recent ruling on the subject in *Independence Institute* v. *Federal Election Commission*, 216 F. Supp. 3d 176, 185-88 (D.D.C. 2016) (rejecting an as-applied challenge to BCRA's large donor disclosure requirements in the context of issue advertising urging support for pending legislation), *aff'd*, 137 S. Ct. 1204 (2017).  Indeed, it is consistent with Citizens Union's own stated position that "[i]ncreased disclosure is integral to campaign finance reform. . . ."[2]  Notably, in none of the Supreme Court's disclosure cases did the Court require the government to justify the provisions at issue by reference to evidence considered by legislators before they were passed.

The problems the Nonprofit Disclosure Provisions address – including the secrecy behind large donor funding of speech of 501(c)(4) groups and the potential for affiliated 501(c)(3) groups to funnel money and services to 501(c)(4) groups – have been widely recognized by politicians and the press, well-before the Nonprofit Disclosure provisions were enacted.  *See, e.g*., Letter from Senator Sheldon Whitehouse et al., Comments on Guidance for Tax-Exempt Social Welfare Organizations on Candidate-Related Political Activities (Feb. 27, 2014)[3] ("[F]ollowing *Citizens United*, that regime of 'effective disclosure' has completely broken down with regard to non-profit groups, in large part because of ambiguous and permissive Treasury rules regarding political spending by these groups.  Many of these groups formed as 501(c)(4)s because the current rules allow them to avoid disclosure."); Bill de Blasio and the Coalition for Accountability in Political Spending (CAPS), Report: From Social Welfare to Political Warfare (Mar. 2013)[4] (noting that in the two years following *Citizens United*, spending by 501(c)(4) corporations on campaign-related speech and issue advertising increased 1,579% over 2008 levels); Chris Bragg, "Who funds New York's watchdogs at Capitol?," *Times Union* (Jan. 16, 2016)[5] (reporting spending "spik[e]" in 501(c)(3)s affiliated with 501(c)(4) corporations, and

---

[2] Citizens Union of the City of New York, *Hidden from View: The Undisclosed Campaign Activity of Political Clubs in New York State*, at 5 (May 2013), CITIZENS UNION, *available at* http://www.citizensunion.org/campaign_finance_reform_state.

[3] *Available at* https://www.whitehouse.senate.gov/imo/media/doc/2014-02-27%20501c4%20Rules%20 Comments%20Signed%20FINAL.pdf.

[4] *Available at* http://politicalspending.org/501c4-Report.pdf.

[5] *Available at* http://www.timesunion.com/tuplus-local/article/Who-funds-New-York-s-watchdogs-at-Capitol-6764182.php.

Cahill Gordon & Reindel LLP

- 5 -

noting that a 501(c)(3), unlike a 501(c)(4), "won't have to disclose the donors funding its lobbying" under the 2011 lobby disclosure legislation).

Press reports and public statements such as these, all of which are equally available to Citizens Union, are routinely put before courts determining the constitutionality of legislation. In *Allstate*, the court noted that this is the type of information "traditionally" utilized to evaluate the constitutionality of a statute under the First Amendment: "the legislative history, other publicly available material, and . . . factual material . . . related to its enforcement of the statute." *Allstate*, 1998 WL 477961, at *5 (citing *Mississippi University of Women* v. *Hogan*, 458 U.S. 718, 730 (1982)). Citizens Union is correct in asserting that the state must demonstrate that the Nonprofit Disclosure Provisions will alleviate real harms. CU Letter at 2. But that will not be difficult in the context of a case challenging large donor disclosure requirements: the dangers of dark money are well-documented, well-established, and frequently asserted by Citizens Union itself, at least as to entities other than itself. The government is not required, however, to prove the harms from pre-enactment evidence that happens to still exist in the files of the Governor, Senate or Assembly. The fact of *whether* the Governor or Members of the Senate or Assembly reviewed any particular report – precisely the sort of information most obviously protected by the legislative privilege – does not change their content or applicability here.

Consistent with the approach outlined in *Allstate*, here the Governor has already produced the public legislative materials in his possession, including the message of approval and the comprehensive bill jacket. The State Senate and Assembly have, as well, made substantial productions of documents.[6] The first reporting requirements under the Nonprofit Disclosure Provisions have yet to take effect; as such no documents exist relating to the enforcement of the statute, a duty not within the Governor's responsibilities in any event. And in response to the request from Citizens Union, the Governor has also provided correspondence with outside groups, although the opinions of groups expressed after the New York State Legislature had voted to pass the Nonprofit Disclosure Provisions can hardly have any bearing on either their constitutionality or the government interest advanced by them.

Having already produced the universe of documents that typically apply in a constitutional challenge, the protections afforded by the legislative privilege should not be overcome based on Citizen Union's intrusive and ever-changing requests, which it has narrowed in some respects and has expanded in others.[7] In its Letter, Citizens Union has provided

---

[6] A complete listing of the documents produced to Citizens Union by the Governor, the New York State Senate and the New York State Assembly is attached hereto as Exhibit C.

[7] Notwithstanding the Court's instruction to Citizens Union to "narrow" its document requests, Apr. 26th Order, in its May 5th Requests Citizens Union took the opportunity to include a new request for a category of documents not reflected in its original document requests (nor in the CU Letter). Specifically, Request 6 seeks "Documents and communications containing factual information or factual conclusions concerning whether and in what ways the Nonprofit Disclosure Provisions are like or unlike other disclosure provisions in other states or jurisdictions." The Governor has objected to this new Request on several grounds, including that it is outside the scope of discovery authorized by Judge

CAHILL GORDON & REINDEL LLP

- 6 -

examples of the documents it is still seeking: "reports, statistics, and studies" and "communications containing factual observations or factual conclusions,[8] references to news reports, and investigative findings." CU Letter at 3. Such documents are not relevant nor required to identify the government interest underlying the Nonprofit Disclosure Provisions for several reasons. As Judge Katz explained in *Allstate,* non-final proposals and opinion-related documents are "neither essential nor highly probative" to demonstrating a government interest in legislation. 1998 WL 477961, at *5. As to Citizen Union's request for "news reports," Citizen Union has not cited any case where a government entity was required to provide "references to news reports" to justify its interest in a statute. Such reports are not only equally available to Citizens Union but would require much more extensive searches to locate in the Governor's files, as they would not necessarily be linked to the Nonprofit Disclosure Provisions.[9] And Citizen Union's request for "investigative findings" (which do not exist) further underscores the distinction between a challenge to a disclosure-related law as is the case here as opposed to cases in which some government action was taken in direct response to an investigation or study. If the government knew the extent to which 501(c)(3) corporations donated in-kind goods and services to 501(c)(4) corporations or the identities of those funding political speech through the vehicles of non-profits, the Nonprofit Disclosure provisions would not have been needed.[10]

Finally, Citizen Union's characterization of its requests as seeking "facts" is misleading and does not alter whether the underlying documents are or are not relevant to a constitutional inquiry. As discussed in more detail below, the legislative and executive privileges protect

---

Berman, does not relate to the Government interest in the Nonprofit Disclosure Provisions, and calls for legal analysis.

[8] As an initial matter, what Citizens Union vaguely describes as a "factual conclusion," up-ends the meaning of the word "factual" in the context here. The two cases Citizens Union cites in its document requests, *E.B.* v. *N.Y. City Bd. of Educ.*, 233 F.R.D. 289, 292 (E.D.N.Y. 2005), and *Adams* v. *United States*, 686 F. Supp. 417, 419 (S.D.N.Y. 1988), both discuss conclusions in the context of investigative reports commissioned by government agencies. Here, the conclusions drawn by the Governor's counsel are pre-deliberative legal analysis, and the Governor has objected to the new requests on this basis.

[9] Further, to review every news article received by any member of the Governor's office (let alone the Members of the Senate and Assembly) within a year and a half period to determine whether the news article contained facts that also relate to the government interests here would be unduly burdensome. To that end, the Governor has not agreed to provide documents that "reference" or constitute news reports or public articles, as such requests are hardly proportional.

[10] The Governor's prior two privilege logs have made clear that he has identified drafts of public statements and speeches as potentially responsive to Citizen Union's document requests. As Citizens Union has not discussed those log entries or raised similar documents as examples of what it is seeking, the Governor presumes that Citizens Union acknowledges it is not seeking such documents. This makes sense. Where the final published statements are available (and cited in Citizen Union's complaint), the drafts of the speeches, which do not reflect the final policy of the Governor, add no value to understanding the government interest, and are not relevant. In an abundance of caution, however, the Governor has again included drafts of speeches and statements on the privilege log submitted herewith.

Cahill Gordon & Reindel LLP

- 7 -

factual material gathered and assembled by the Governor's office; the research and analysis undertaken by his staff are protected processes. And documents related to the passage of legislation fall within the core of the legislative privilege. For that reason, it is not surprising that the vast majority of documents Citizens Union seeks – related to researching, drafting and negotiating legislation and internal office analyses – are privileged.

## II.     Citizens Union's "Waiver" Theory Is Moot and Is Not Defensible in Any Event

Citizens Union argues that the Governor has waived the attorney-client privilege as to the documents summarized in Section II of the Governor's original privilege log. CU Letter at 3. Those documents – communications with the Senate and Assembly exchanging and wordsmithing bill drafts – do not contain factual material and are thus not responsive to Citizen Union's narrowed requests. Therefore they are no longer at issue and Citizens Union's "waiver" theory is now moot. Citizens Union does not contend that the Governor shared documents with anyone else outside the legislative and executive privileges, and concedes that its waiver theory obtains only "*if* [the Governor] voluntarily made those materials available to individuals ***outside that process***." CU Letter at 5 (emphasis added). The Governor did not do so.[11]

Because the issue is now moot, this Court need not consider it. But even if the issue remained ripe for determination, Citizens Union is incorrect that the Governor can "waive" the legislative and executive privileges by sharing documents with others assisting in legislative activities. The Supreme Court has instructed that the Speech or Debate protections, from which the legislative privilege is derived, may be waived only in the narrowest of circumstances. In *United States* v. *Helstoski*, 442 U.S. 477 (1979), the Court stated that waiver of the "evidentiary barriers erected by the Speech or Debate Clause . . . can be found only after explicit and unequivocal renunciation of the protection," *id*. at 491, 494. Indeed, the *Helstoski* court stated that "[t]he ordinary rules for determining the appropriate standard of waiver do not apply" when analyzing legislative privilege, because "'[t]he immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process,'" *id*. at 491-493 (quoting *United*

---

[11] The only documents involving individuals outside the Governor's office are a handful of e-mails with counsel for the New York State Department of Taxation and Finance and the New York Department of State related to research in connection with drafting the Nonprofit Disclosure Provisions, reflected in rows 9, 10, 12-14 and 21-24 of the privilege log. Both departments are executive agencies that are overseen by the Governor and whose heads report directly to the Governor, and thus fall within the executive and legislative privileges. As the court noted in *Allstate*, "[t]he law is clear that both inter-agency and intra-agency deliberative communications are entitled to deliberative privilege protection." *See Allstate*, 1998 WL 477961, at *3 ("legislative proposals which Governor sought from state departments and agencies fell within deliberative process privilege and were protected from disclosure") (citing *Capital Information Group* v. *State of Alaska, Office of the Governor*, 923 P.2d 29, 37 (Alaska 1996)); *see also SEC* v. *Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 237 (S.D.N.Y. 2015) (the legislative privilege covers "a legislator's gathering of information from federal agencies").

- 8 -

*States* v. *Brewster*, 408 U.S. 501, 507 (1972)). The same reasoning extends to state officials and legislators as well. *See 2BD Assocs. Ltd. P'ship* v. *Cty. Comm'rs*, 896 F. Supp. 528, 535 (D. Md. 1995) ("[T]he policy rationale underlying the Speech or Debate Clause is 'equally applicable to federal, state, and regional legislators.'") (quoting *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency*, 440 U.S. 391, 404-06 (1979)).

  Nor is Citizens Union correct that a waiver of the attorney client privilege would waive the executive or legislative privileges. CU Letter at 4. It is not the case, and Citizens Union does not argue otherwise, that applicability of the executive or legislative privileges depends on the attorney-client privilege, and indeed the three privileges have different purposes and scopes, as outlined in the Governor's moving brief. *See, e.g., In re Lindsey*, 158 F.3d 1263, 1266, 1283 (D.D.C. 1998) (finding that attorney-client privilege did not apply, but the executive privilege was still potentially applicable). Citizens Union argues merely that "in many cases the facts constituting a waiver of one privilege will also constitute a waiver of the others," CU Letter at 4, but has not pointed to any such "facts" here.

  Finally, Citizens Union argues that because the Governor has made "factual assertions concerning pre-enactment evidence purportedly in his possession," that equity compels production of the otherwise privileged documents. CU Letter at 5. Citizens Union does not identify the "factual assertions," the Governor purportedly made. If Citizens Union is arguing that the very act of moving for a protective order and providing detail in the form of briefing, argument and a privilege log is sufficient to waive the underlying privileges, there is simply no support for so bizarre a position.

### III. The Legislative Privilege Protects Factual Material

  Citizens Union has also injected into its waiver section a renewed argument that the legislative and executive privileges do not protect factual information (an argument which, in any event, has no relation to questions of waiver). CU Letter at 4.

  The most recent Southern District of New York case to address this issue, *Ways & Means*, makes clear that "legislative information gathering, whether formal or informal, is protected under the Speech or Debate Clause." *Ways & Means*, 161 F. Supp. 3d at 242 (citing *United States* v. *Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988); *McSurely* v. *McClellan*, 553 F.2d 1277, 1286-87 (D.C. Cir. 1976)). In *Biaggi*, the Second Circuit held that "legislative factfinding activity" fell within the privilege. 853 F.2d at 103. *See also N. Carolina State Conference* v. *McCrory*, Nos. 1:13CV658, 1:13CV660, 1:13CV861, 2015 WL 12683665, at *6 (M.D.N.C. Feb. 4, 2015) (legislative privilege covers "the objective facts State legislators relied upon"); *Bethune-Hill* v. *Virginia State Bd. of Elections*, 114 F. Supp. 3d 323, 338 (E.D. Va. 2015) (because the privilege "'protects a *process*,' . . . the activity of legislative fact-finding is encompassed within the privilege" as well) (emphasis in original) (internal citation omitted).

  The decisions cited by Citizens Union do not hold otherwise. In *Hopkins* v. *U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 85-86 (2d Cir. 1991), the court required further review to see

CAHILL GORDON & REINDEL LLP

- 9 -

whether factual observations made by HUD inspectors in reports, which HUD had conceded were not privileged, were inexplicably intertwined with analysis so as to fall within the deliberative process privilege.  *Azon* v. *Long Island R.R.*, No. 00 CIV 6031(HB), 2001 WL 1658219, at *2 (S.D.N.Y. Dec. 26, 2001), likewise noted that the deliberative process privilege might not extend to observations recorded in investigations.  And *ACORN* v. *Cty. of Nassau*, No. 05-CV-2301(JFB)(WDW), 2009 WL 2923435, at *4 (E.D.N.Y. Sept. 10, 2009) arose in the redistricting context, which courts have treated distinctly because of the relevance of the legislators' motivation in such cases.  *See id*. ("[I]f any of the withheld documents reveal that racial considerations played any role in the legislative deliberations regarding the re-zoning of the Social Services site, then the factors regarding legislative privilege would warrant production of those documents. . . .")

*       *       *       *       *

Citizens Union has not demonstrated that the documents reflected on the Governor's privilege log are relevant to a constitutional inquiry or probative of the current government interest in the Nonprofit Disclosure Provisions, let alone that the legislative privilege and others at issue here can be overcome.  The Second Circuit has cautioned that "the Speech or Debate Clause forbids not only inquiry into acts that are manifestly legislative but also inquiry into acts that are purportedly legislative, '*even to determine if they are legislative in fact*. . . .'" *Biaggi*, 853 F.2d at 103 (emphasis added) (quoting *United States* v. *Dowdy*, 479 F.2d 213, 226 (4th Cir 1973)).  The Governor respectfully submits that Citizens Union is not entitled to any further inquiry into the Governor's documents and the mental impressions of his staff.

Respectfully submitted,

/s Floyd Abrams

Floyd Abrams
Cahill Gordon & Reindel LLP
*Attorneys for Governor Andrew Cuomo*

The Honorable Katharine H. Parker
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

BY ECF