USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/1/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

CITIZENS UNION OF THE CITY OF NEW YORK et al.,

                           Plaintiffs,

            -against-

THE ATTORNEY GENERAL OF THE STATE OF
NEW YORK,

                         Defendant.

---------------------------------------------------------------X

**OPINION AND ORDER**

**16-cv-09592 (RMB) (KHP)**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      Plaintiffs Citizens Union of the City of New York and Citizens Union Foundation, Inc. of the City of New York (collectively, "Plaintiffs") commenced this action to challenge the constitutionality of New York Executive Law Sections 172-e and 172-f (the "Disclosure Provisions").

      Currently pending before this Court is a dispute over a subpoena Plaintiffs served upon the Governor of the State of New York (the "Governor") insofar as it seeks non-public documents concerning the government's interest in enacting the Disclosure Provisions and the extent to which the Disclosure Provisions are tailored to address that interest. The Governor moved to quash this subpoena on the grounds that the non-public documents sought are not relevant and also are protected from disclosure under the legislative privilege, deliberative process privilege and/or attorney-client privilege. For the reasons that follow, the Governor's motion to quash is **GRANTED**.

## BACKGROUND

On June 8, 2016, the Governor announced anticipated ethics, lobbying, and campaign-finance reform legislation intended to "curb the power of independent expenditure campaigns unleashed by the 2010 Supreme Court case *Citizens United vs. Federal Election Commission.*" (Doc. No. 41 ¶ 38.) In a speech announcing the legislation, the Governor stated:

> [T]he power to influence and the power to be heard in elections was tilted beyond all recognition when the Supreme Court upheld *Citizens United*. This decision ignited the equivalent of a campaign nuclear arms race and created a shadow industry in New York—maligning the integrity of the electoral process and drowning out the voice of the people . . . . As Governor of New York, I am taking action to curb the powers of independent entities and ensure these committees cannot circumvent the law and cheat the system. We are also strengthening disclosure requirements so we know exactly where and from whom this dark money flows. Our message is clear: In New York, democracy is not for sale.

(Doc. No. 41 ¶ 39.)

On June 17, 2016, at the end of the Legislative Session, two bills that addressed ethics, lobbying, and campaign-finance reform—A10742 and S8160—were introduced into the New York State Assembly and New York State Senate. (Doc. No. 41 ¶ 41.) The two bills were accompanied by a "Message of Necessity" from the Governor,[1] which states, *inter alia*: "[t]he bill would . . . require disclosures of political relationships and behaviors widely recognized to be influential but which operate in the shadows. As passage of this bill would enact the strongest reforms in the country to combat the outsized influence of dark money in politics, it is

---

[1] Under the New York State Constitution, a bill may not be passed unless the final form of the bill is printed and provided to the legislators "at least three calendar legislative days" prior to its final passage, unless the Governor issues a message of necessity certifying the facts which necessitate an immediate vote on the bill. N.Y. CONST. art. III, § 14.

imperative that New York pass this bill." (Doc. No. 41 ¶ 43.) The Senate and Assembly voted upon and passed the two bills on the same day.[2] (Doc. No. 41 ¶¶ 43, 47.)

On August 24, 2016, the Governor signed the bills into law as Chapter 286. (Doc. No. 41 ¶ 5.) As described by Plaintiffs, Chapter 286 "contained many provisions aimed at much-needed ethics and campaign-finance reform," the majority of which are not at issue in this litigation. (Doc. No. 68 p. 1.) However, Chapter 286 also amended the New York Executive Law by adding the Disclosure Provisions, Sections 172-e and 172-f, which are the subject of Plaintiffs' constitutional challenges. (Doc. No. 41 ¶ 5.)

Section 172-e requires a non-profit organization ("501(c)(3) organization") that makes an in-kind donation in excess of $2,500 to a non-profit lobbying organization ("501(c)(4) organization") to disclose the identity of any donor who makes a donation in excess of $2,500 to the 501(c)(3) organization.[3] N.Y. Exec. L. §§ 172-e(2)(a), 172-e(1). Section 172-f requires a 501(c)(4) organization that spends more than $10,000 on published communications that "refer[] to and advocate[] for or against a clearly identified elected official or the position of any elected official or administrative or legislative body relating to the outcome of any vote or substance of any legislation, potential legislation, pending legislation, rule, regulation, hearing, or decision by any legislative, executive or administrative body" to disclose "the name and

---

[2] According to Plaintiffs, the bills were passed with little discussion and several senators expressed concern about having insufficient time to consider the legislation. (Doc. No. 41 ¶¶ 45-48.) For example, Senator Krueger reportedly stated "I have a summary, but I'm not sure any of us could actually tell you what exactly is in this bill. It became available I believe at 1:45 a.m. It's now 10 to 3:00 in the morning. Many of us have been up for 24 hours at least." (Doc. No. 41 ¶ 45.)

[3] Internal Revenue Code Section 501(c) governs non-profit organizations which are exempt from some federal income taxes.

address of any individual, corporation, association, or group that made a donation of [$1,000]

or more" to the 501(c)(4) organization. *Id.* at §§ 172-f(2)(a), 172-f(1)(a)-(b). The Disclosure

Provisions further mandate that the donor disclosure reports will made publicly available,

absent a determination by the New York Attorney General that disclosure may result in harm to

the source of the donation. *Id.* at §§ 172-e(3), 172-f(3).[4] Section 172-e took effect on November

22, 2016, and Section 172-f took effect on September 23, 2016. (Doc. No. 41 ¶ 5.)

On December 12, 2016, Plaintiffs filed a Complaint in the Southern District of New York

against the Governor, the Attorney General of the State of New York, and various other state

officials,[5] seeking declaratory and injunctive relief from the implementation and enforcement

of the Disclosure Provisions. (Doc. No. 1.) The Complaint alleged that the Disclosure Provisions

are facially overbroad under the First Amendment. Plaintiffs subsequently filed an Amended

Complaint, which added claims that the Disclosure Provisions are unconstitutional under the

First Amendment as applied to Plaintiffs and invalid under the New York State Constitution.

(Doc. No. 41.) In the Amended Complaint, Plaintiffs also assert that the Governor signed the

legislation "to retaliate against good government groups like Plaintiffs for criticizing his ethics

reform efforts."[6] (Doc. No. 41 ¶¶ 4, 32-34, 87, 97, 120, 131.)

---

[4] Under the Disclosure Provisions as enacted, Plaintiffs would have been required to submit their first disclosure reports by July 30, 2017, and the reports would have been made public shortly thereafter. (Doc. No. 41 ¶ 6.) However, the parties entered into a Stipulation and Order providing, *inter alia,* that Plaintiffs shall not be required to take any action related to the Disclosure Provisions, including preparing or filing the disclosure reports, until the Court renders a determination on Plaintiffs' anticipated motion for a preliminary injunction. (Doc. No. 16.)

[5] Specifically, Plaintiffs also named as Defendants the Members of the Joint Commission on Public Ethics and the Executive Director of the Joint Commission on Public Ethics. Plaintiffs dismissed their claims against these Defendants on January 4, 2017. (Doc. No. 33 ¶ 1.)

[6] The Amended Complaint does not assert a separate cause of action for retaliation, nor would such a claim be plausible, as the Disclosure Provisions apply to all 501(c)(3) and 501(c)(4) organizations in New York.

On December 30, 2016, Plaintiffs wrote to the Court advising that they sought leave to file a motion for a preliminary injunction, preceded by "targeted discovery on the existence and scope of the government's interest in obtaining donor disclosures from covered organizations, and the interest's relationship to the amount of burdened speech, both of which are vital to analyzing the facial overbreadth of the statutes." (Doc. No. 28 pp. 1, 5-6 & n.2.) Plaintiffs further explained that the necessary discovery included "basic documents like the bill jacket, message of necessity, and legislative history, and any other documents from the Governor's office concerning the rationale for the statute." (Doc. No. 28 p. 1 n.2.) On January 11, 2017, the Honorable Richard M. Berman ruled that "limited expedited discovery" would be permitted prior to Plaintiffs' application for a preliminary injunction. (Doc. No. 34 p. 7.)

On January 24, 2017, Plaintiffs served Requests for the Production of Documents (the "Requests") on the Governor seeking documents regarding the nature and extent of the government interest in the Disclosure Provisions, the scope of the Disclosure Provisions, the application of the Disclosure Provisions, and the Governor's Message of Necessity, among other documents and information. (Doc. No. 38-1.) Plaintiffs also served the New York State Senate (the "Senate") and the New York State Assembly (the "Assembly") with subpoenas seeking similar types of information on the same day. (*See* Doc. No. 63-1.) The Governor, Senate, and Assembly agreed to produce copies of publicly available documents in their possession regarding the Disclosure Provisions, but objected to Plaintiffs' demands for the production of non-public documents. Specifically, the Governor objected to the Requests on relevance grounds and insofar as they sought production of privileged documents and communications.

The Governor subsequently requested a conference to address his anticipated motion for a protective order quashing the Requests. (Doc. No. 38.) On March 3, 2017, this Court held a pre-motion conference and granted the Governor leave to proceed with filing a motion for a protective order. (Doc. Nos. 44-45, 50.)

Following the March 3, 2017 conference, the Senate and Assembly (collectively, the "Intervenors") sought leave to intervene in this action for the limited purposes of participating in the briefing for the Governor's motion for a protective order, explaining that their privileges would also be implicated by any ruling regarding the Governor's claims of privilege. (Doc. Nos. 46, 49, 53-54.) Judge Berman granted the Intervenors' applications on March 10, 2017. (Doc. No. 55.)

On March 17, 2017, the Governor filed the instant motion for a protective order quashing Plaintiffs' Requests. (Doc. Nos. 64-65.) The Intervenors filed memoranda of law in support of the issuance of a protective order on the same day. (Doc. Nos. 61-63.) The Governor and Intervenors all argue in their briefs that the discovery Plaintiffs seek is not relevant and, further, is protected from disclosure under the legislative and deliberative process privileges, as well as attorney-client privilege in some instances. Plaintiffs oppose the Governor's motion. (*See* Doc. No. 68.)

On April 25, 2017, this Court held oral argument on the pending motion for a protective order. During the conference, the Court ordered Plaintiffs to serve revised and narrowed discovery requests on the Governor by May 5, 2017. The Court also directed the parties to provide supplemental briefing regarding two issues raised during oral argument: the relevance

6

of the discovery sought and the potential waiver of privilege.[7] The Court further ordered the

Governor to serve a redacted privilege log upon Plaintiffs and to provide an unredacted version

of the privilege log to the Court for *in camera* review. (Doc. Nos. 77, 79.)

On May 5, 2017, Plaintiffs filed their supplemental brief and also served their Amended

First Set of Requests for Production of Documents (the "Amended Requests") upon the

Governor. (Doc. No. 81.) The Amended Requests seek:

- Documents and communications containing factual information or factual conclusions concerning the government's interest in enacting the Disclosure Provisions, including factual information or factual conclusions concerning any purported harm or problem (or lack thereof) resulting from the activities regulated by the Disclosure Provisions.

- Documents and communications containing factual information or factual conclusions concerning the relationship, if any, between the Disclosure Provisions and "dark money," as that term is used by the Governor in his message of approval, dated August 24, 2016, including the existence, prevalence, or impact of such "dark money."

- Documents and communications containing factual information or factual conclusions concerning the relationship, if any, between the Disclosure Provisions and "shadow lobbying," as that term was used by the Governor's spokesman's public statements directed at "Good Government Groups," including the existence, prevalence, or impact of such "shadow lobbying" by 501(c)(3)s or 501(c)(4)s.

- Documents and communications containing factual information or factual conclusions concerning whether and what ways the scope of activity regulated by the Provisions, and the manner of regulation, was tailored to address the identified problems or harms, and not to otherwise burden First Amendment rights, including how the activities regulated compare to activities that were already subject to regulation prior to enactment of the Disclosure Provisions.

---

[7] With respect to waiver, Plaintiffs argued that to the extent any document was transmitted from the Governor's Office to a Member of the Legislature, legislative staff, or legislative counsel, the Governor had waived any claim of privilege as to that document. (*See* Doc. No. 81.) This argument is moot, however, because the Governor's Privilege Log does not reflect any such documents or communications.

- Documents and communications containing factual information or factual conclusions concerning whether and in what ways the Disclosure Provisions are like or unlike other disclosure provisions in other states or jurisdictions.

(Doc. No. 81-1 pp. 5-7.)

Plaintiffs assert that the Amended Requests, taken together, seek the production of factual information or materials in the possession of the Governor or his staff that "supports or undermines the existence of any real harm or problem resulting from the activities regulated by the [] Disclosure Provisions; that supports or undermines a conclusion that the Provisions will alleviate those harms or problems; and that supports or undermines a conclusion that the scope of activity regulated by the Provisions, and the manner of regulation, was tailored to address the identified problems or harms, and not to otherwise burden First Amendment rights." (Doc. No. 81-1 p. 4.) They have repeatedly clarified, however, that the Amended Requests do not seek "the subjective intent of the Governor or any of his aides." (Doc. No. 81-1 pp. 4-5.)

On May 30, 2017, the Governor filed his supplemental brief and submitted his Privilege Log to the Court for *in camera* review. (Doc. No. 89.) For each of the 214 documents over which the Governor has asserted a claim of privilege, the Privilege Log lists the date, the document type, the author, the recipients, the type of privilege asserted, and a description of the document. The documents included on the Governor's Privilege Log can be broadly categorized as:

- Communications between and among counsel for the Governor regarding the drafting of the Disclosure Provisions (Privilege Log Entry Nos. 1; 25; 38).

- Communications between and among counsel regarding research by, or requested by, counsel for use in drafting the Disclosure Provisions (Privilege Log Entry Nos. 3-24; 26-27; 47-48; 138).

- Drafts of summary memoranda prepared by counsel regarding potential ethics reform bills, including summaries of the purpose and provisions of the legislation (Privilege Log Entry Nos. 28-30; 57; 59; 61-62; 67).

- Communications regarding counsel's legal assessment or analysis of the Disclosure Provisions, including regarding the potential scope of the disclosure requirements (Privilege Log Entry Nos. 2; 31; 135-137; 214).

- Communications regarding, requesting, or reflecting counsel's edits to draft public statements regarding campaign finance reform and the ethics reform legislation (Privilege Log Entry Nos. 32-37; 39-46; 49-56; 58; 60; 63-66; 68-134; 139-175; 179-180; 206-209).

- Communications regarding the drafts of the sponsor's memo, approval message, and/or executive order for the ethics reform legislation, as well as communications requesting or reflecting the work of counsel regarding these documents (Privilege Log Entry Nos. 176-178; 181-205; 210-213).

(Doc. No. 89 Ex. B.)

The Governor also submitted a list of the documents that he, as well as the Senate and Assembly, have produced to Plaintiffs in discovery thus far. (Doc. No. 89 Ex. C.) This list includes a number of documents regarding the legislation at issue, including the Bill Jacket, emails between the Governor's Counsel's Office and various third-parties such as "Good-Government Groups," the June 17, 2016 Senate Standing Committee on Rules Voting and Attendance Record, DVDs of the Senate's discussion and vote on the legislation, the Assembly Floor Debate Transcript, and Assembly agendas, among other documents. (Doc. No. 89 Ex. C.)

During the pendency of the instant motion for a protective order, the Governor filed a motion to dismiss the Amended Complaint based upon, *inter alia*, executive immunity from suit

under the Eleventh Amendment. (Doc. No. 82.) On June 23, 2017, Judge Berman granted the Governor's motion to dismiss, holding that the Court lacked subject matter jurisdiction to consider Plaintiffs' claims asserted against the Governor in his official capacity. (Doc. No. 95.)

Following Judge Berman's Opinion and Order dismissing the Governor as a party to this litigation, Plaintiffs served the Governor with a third-party subpoena pursuant to Federal Rule of Civil Procedure 45. (Doc. No. 96-1.) The subpoena propounds identical Requests for the Production of Documents as Plaintiffs' Amended Requests. (*See* Doc. No. 96.)

The parties subsequently requested that this Court convert the Governor's motion for a protective order, and all briefing associated with that motion, into a motion to quash Plaintiffs' subpoena seeking the production of documents. (Doc. Nos. 96, 98, 100.) This Court granted that application during a conference held on June 29, 2017. (Doc. No. 100.)

<u>**DISCUSSION**</u>

**I.     STANDARD FOR DISCOVERY**

**A.     *Federal Rules Of Civil Procedure 45 And 26***

Rule 45 governs the issuance of third-party subpoenas and supplies the framework for motions to quash. Under Rule 45(d)(3), the court must modify or quash a subpoena that, *inter alia*, "requires disclosure of privileged or other protected matter, if no exception or waiver applies" or "subjects a person to undue burden." FED. R. CIV. P. 45(d)(3)(A)(iii)-(iv). In assessing whether the subpoena imposes an undue burden, courts weigh "the burden to the subpoenaed party against the value of the information to the serving party" by considering factors such as "relevance, the need of the party for the documents, the breadth of the document request, the

time period covered by it, the particularity with which the documents are described and the burden imposed." *Bridgeport Music Inc. v. UMG Recordings, Inc.,* No. 05-cv-6430 (VM) (JCF), 2007 WL 4410405, at *2 (S.D.N.Y. Dec. 17, 2007) (quoting *Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005)). "Motions to compel and motions to quash a subpoena are both 'entrusted to the sound discretion of the district court.'" *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (quoting *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000)).

The discovery parameters set forth in Rule 26 also apply to subpoenas served upon non-parties. Under Rule 26(b), "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1). In general, the relevance standard that applies when seeking discovery from a party also applies to non-parties. *Malibu Media, LLC v. Doe*, No. 15-cv-3147 (AJN), 2016 WL 5478433, at *2 (S.D.N.Y. Sept. 29, 2016) ("subpoenas issued under Rule 45 are subject to the relevance requirement of Rule 26(b)(1)") (internal quotations omitted).

The party seeking discovery bears the initial burden of proving the discovery is relevant, and then the party withholding discovery on the grounds of burden, expense, privilege, or work product bears the burden of proving the discovery is in fact privileged or work product, unduly burdensome and/or expensive. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284

F.R.D. 132, 135 (S.D.N.Y. 2012) ("Once relevance has been shown, it is up to the responding party to justify curtailing discovery.") (citation omitted); *Allison v. Clos-ette Too, L.L.C.*, No. 14-cv-1618 (LAK) (JCF), 2015 WL 136102, at *8 (S.D.N.Y. Jan. 9, 2015).

**B.    *Application Of Rules 45 And 26***

Plaintiffs, as the parties seeking discovery from the Governor, bear the initial burden of proving that the information and documents sought are relevant and proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b); *Fireman's Fund Ins. Co.*, 284 F.R.D. at 135.

In their Amended Complaint, Plaintiffs allege that the Disclosure Provisions are overly broad on their face and as-applied to Plaintiffs and other similar types of "good-government groups."[8] First Amendment challenges to legislation like the Disclosure Provisions are analyzed under heightened scrutiny. For purposes of this discovery motion only, the parties agree that the Disclosure Provisions will be subject to "exacting scrutiny," which assesses whether there is a "substantial relationship" between the Disclosure Provisions and a "sufficiently important" governmental interest.[9] (Doc. No. 81 p. 1; *see also* Doc. No. 38 p. 3.) *See also Citizens United v.*

---

[8] "A 'facial challenge' to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (citation omitted). In contrast, an as-applied challenge "requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Id.* (citations omitted). During oral argument, Plaintiffs appeared to suggest that less discovery is needed regarding their facial First Amendment claim than their as-applied claim. (*See* Doc. No. 79 at 70:18-71:13.) However, this distinction is not fleshed out in Plaintiffs' briefs.

[9] Plaintiffs argue that strict scrutiny should govern Judge Berman's review of the Disclosure Provisions on the merits, but, for purposes of this discovery motion, Plaintiffs concede that the Disclosure Provisions will not pass constitutional muster absent evidence of a "a substantial relationship between the disclosure requirement and a sufficiently important government interest." (Doc. No. 81 p. 1; *see also* Doc. No. 42 pp. 1-2 n.1.) Therefore, this Court need not—and does not—decide whether strict scrutiny or exacting scrutiny will ultimately apply to the merits for purposes of adjudicating this discovery motion.

*Fed. Election Comm'n*, 558 U.S. 310, 366-67 (2010) (quoting *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976)); *Indep. Inst. v. Fed. Election Comm'n*, 216 F. Supp. 3d 176, 190 (D.D.C. 2016), *aff'd*, 137 S.Ct. 1204 (2017). Under this standard, Plaintiffs argue that documents reflecting the "factual information" considered by the Governor and Members of the Senate and Assembly concerning the governmental interest in the Disclosure Provisions and the Disclosure Provisions' relationship to those interests are relevant to the merits of their claim and, as such, are subject to discovery in this litigation. (*See, e.g.,* Doc. No. 81 pp. 1-3.) They state that factual information may be contained in statistics, reports, studies, investigative findings, and other communications.

1. *Production Of Documents In The Public Record*

As a starting point, it is important to recognize what discovery has been produced thus far. The Governor has produced all public legislative documents in his possession, including the Governor's Message of Approval, his Message of Necessary, and the Bill Jacket. The Bill Jacket is comprised of several documents, including the text of the bill, vote count, Message of Necessity and requests for same from the Legislature, and letters from "Good Government Groups" concerning the proposed legislation. The Governor also produced email communications between the Governor's Counsel's Office and third-party entities, such as Citizens Union, the Brennan Center, Lawyers Alliance for New York, and other groups, with related attachments. Likewise, the Senate and Assembly have produced documents in their possession regarding the legislative history, including the voting records, relevant transcripts, and the Assembly Sponsors' Memorandum, among other documents and communications.

In the Governor's and Intervenors' view, the legislative history and other materials in the public record are the only evidence relevant to Plaintiffs' facial and as-applied challenges to the Disclosure Provisions, and they have already produced this information. They correctly point out that, in other First Amendment cases, numerous courts have recognized that the bill text, legislative record and other public materials are the primary source for discerning the governmental interest in the legislation (regardless of the standard of review applied). *See, e.g., Buckley*, 424 U.S. at 66-67, 72 (relying on the legislative history to conclude that the governmental interests sought to be vindicated by the disclosure requirements were sufficiently important to withstand exacting scrutiny); *New York v. Ferber*, 458 U.S. 747, 757-59 (1982) (relying on the legislative history and other public sources as supplying the governments' basis for enacting the challenged law and holding "[w]e shall not second-guess this legislative judgment"); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) (for a First Amendment case, "[t]he relevant governmental interest is determined by objective indicators as taken from the face of the statute, the effect of the statute, comparison to prior law, facts surrounding enactment of the statute, the stated purpose, and the record of proceedings."); *Allstate Ins. Co. v. Serio*, No. 97-cv-620 (SS) (THK), 1998 WL 477961, at *5 (S.D.N.Y. Aug. 13, 1998) ("[a]s is traditionally done, inquiry into the constitutionality of [the challenged provision] can be conducted on the basis of the statutory scheme, the legislative history, [and] other publicly available material . . . ."); *All. of Auto. Mfrs., Inc. v. Jones*, No. 4:08-cv-555 (MCR) (CAS), 2013 WL 4838764, at *4-5 (N.D. Fla. Sept. 11, 2013) ("Legislative history is the primary source for determining legislative intent"); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 13-13

(D.C. Cir. 2009) (courts may look to the legislative history to discern the government's interest, but should only do so when the statutory text itself is ambiguous).

2. *Plaintiffs' Requests For Non-Public Documents*

Plaintiffs vigorously dispute that discovery is limited to materials in the public record and argue that they are entitled to know what "factual material" was before the Governor and legislative bodies for several reasons. First, Plaintiffs contend that the documents in the Governor's Privilege Log should be produced because the public legislative records do not contain sufficient information to withstand heightened scrutiny. This argument misses the mark. While a sparse legislative record, if proven, may be relevant to Judge Berman's determination on the merits, it does not justify turning discovery into a fishing expedition into non-public information that may or may not have been considered important by individual legislators and the Governor in connection with passage of the Disclosure Provisions; nor does it warrant the disclosure of privileged materials. *See Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602, 608 (S.D.N.Y. 1989) ("it has long been the rule in this Circuit that 'the parties should not be permitted to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.'") (citing *In re Surety Ass'n of Am.*, 388 F.2d 412, 414 (2d Cir. 1967)). Rather, the Federal Rules of Civil Procedure dictate that the appropriate inquiry remains whether the discovery sought—here, the documents listed on the Governor's Privilege Log—is relevant, proportional, and otherwise not barred by an applicable privilege or as a result of undue burden or expense.

Plaintiffs next argue that documents on the Privilege Log should be produced because the government must present concrete, pre-enactment evidence establishing the existence of a sufficiently important governmental interest and that the Disclosure Provisions are tailored to address that interest. (*See, e.g.,* Doc. No. 81 pp. 1-2.) Plaintiffs assert that they need to know what facts the Governor and legislators considered before enacting the Disclosure Provisions in order to make their argument that the State lacked a sufficient evidentiary basis to justify enacting the Provisions and that the State's alleged concerns also are not addressed by the Provisions. (Doc. No. 100 at 13:5-19.) While the Supreme Court has required the presentation of "concrete evidence," such as statistics, to withstand a constitutional challenge in some cases where the government's asserted justification for a law is premised on empirical data, *see Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 664-67 (1994), the Court has explained that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). The Court has held that empirical evidence is not required, however, when the asserted government interest is "neither novel nor implausible." *Id.* at 391. In *Nixon*, a case involving a challenge to campaign contribution limitations imposed by the State of Missouri, the Court rejected the argument that empirical evidence was required and, instead, held that an affidavit from a state senator and various public newspaper articles were sufficient to substantiate the state's interest in

preventing corruption,[10] an interest that had already been recognized as important by the

Court in *Buckley*. *Id.* at 391-94.

In the same vein as *Nixon*, the Governor and Intervenors argue that the factual

discovery Plaintiffs seek is irrelevant because "[t]he government interest here in disclosure has

been repeatedly recognized by courts, commentators, and Citizens Union itself" and has been

found to be sufficiently important to justify requiring the disclosure of donors. (Doc. No. 70 p. 5;

*see also, e.g.,* Doc. No. 65 p. 11.) They emphasize that in other donor disclosure cases, the

Supreme Court has never required the government to support its interest in the disclosure

requirements by pointing to facts considered by individual legislators before enactment of the

statutes at issue, but instead has looked to its prior precedent, and to a lesser extent, the

legislative history, to determine whether the challenged disclosure requirement can withstand

constitutional scrutiny. (Doc. No. 70 p. 5) (citing, *i.e., Citizens United*, 558 U.S. at 367). Plaintiffs

acknowledge that "the Supreme Court has heard donor disclosure First Amendment cases again

and again over . . . the last ten years" (Doc. No. 79 at 68:20-22), yet, significantly, they do not

cite to a single case involving a First Amendment challenge to a disclosure requirement where

the government was required to identify specific, non-public facts that were considered by

individual lawmakers or executives as part of the constitutionality analysis. On the contrary, a

review of the precedent involving First Amendment challenges to other donor disclosure

---

[10] In assessing whether the government had presented sufficient evidence to support its asserted interest in the challenged statute in *Nixon*, the Court noted that Missouri does not preserve legislative history. *Id.* at 393. Thus, while the government in *Nixon* needed to submit evidence from outside of the legislative record to defend the constitutionality of the statute, it does not follow that such evidence must be presented in every case. Also, unlike Missouri in the *Nixon* case, New York has preserved the legislative history and produced it to Plaintiffs here.

requirements supports the Governor's and Intervenors' position that the documents on the Privilege Log are not relevant to Plaintiffs' claims.

For example, in *Buckley*, the Supreme Court addressed constitutional challenges to various provisions of the Federal Election Campaign Act of 1971 ("FECA"), including to provisions that required political committees and candidates to disclose the identities of donors whose contributions exceeded a certain amount. 424 U.S. at 60-64. The Court held that the government's interests in the disclosure requirements—providing the electorate with information about where political campaign money comes from, deterring corruption and the appearance of corruption, and gathering data to detect violations of campaign contribution limitations—were sufficiently important to outweigh any potential infringement on First Amendment rights. *Id.* at 64-72. The Court cited to the legislative history of the FECA as the evidence of the government's interests and purpose underlying the law. *Id.* at 66-68 (citing H.R. Rep. No. 92-564, p. 4 (1971) and S. Rep. No. 93-689, p. 2 (1974)). The Court concluded that, while donor disclosure requirements may impose some burden on individuals' First Amendment rights, such requirements "certainly in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist." *Id.* at 68.

Twenty-five years after *Buckley*, the Supreme Court again considered the constitutionality of donor disclosure requirements, this time ones enacted as part of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which amended FECA and other portions of the United States Code. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 114 (2003). The

plaintiffs in *McConnell* alleged that the disclosure requirements, which required the identification of individuals or groups who contributed threshold amounts towards "electioneering communications," were facially overbroad. *Id.* at 194-95. In upholding the disclosure requirements as constitutional, the Court summarily explained that "[w]e agree with the District Court that the important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements—providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions—apply in full to BCRA." *Id.* at 196, 201-02.

Most recently, in *Citizens United*, the plaintiffs alleged that BCRA's donor disclosure requirement was unconstitutional on an as-applied basis. 558 U.S. at 367-68. The Court rejected plaintiffs' claims, holding that the government's "informational interest"—that is, its interest in ensuring that the electorate is aware about the source of political speech—was sufficient to justify the disclosure requirement, citing to *McConnell* as the basis for this conclusion. 558 U.S. at 368-71.

Since *Citizens United*, circuit and district courts across the country have looked to the the *Buckley-McConnell-Citizens United* trilogy as the basis for holding that there is a "'recognized governmental interest' in 'providing the electorate with information about the sources of election-related spending'" in connection with assessing the constitutionality of compelled disclosure requirements. *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 137-39 (2d Cir. 2014); *see also, e.g., Indep. Inst.*, 216 F. Supp. 3d at 185-86 (citing to *Citizens United*, *McConnell*, and other case law as recognizing the significance of the asserted governmental

interest), *aff'd*, 137 S.Ct. 1204 ; *Nat'l Ass'n of Mfrs.*, 582 F.3d at 14-16 (relying on precedent as

the basis for finding that the "vital national interest" of transparency in government justified

the disclosure requirements and explicitly rejecting plaintiff's argument that the government

was required to put forth "studies, statistics, or empirical evidence" supporting the need for

mandatory disclosure statements). While this Court is mindful that the standards for discovery

are broader than the rules governing the admissibility of evidence on the merits, *see In re*

*Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 69 (2d Cir. 2003), the fact that courts have

routinely adjudicated the constitutionality of donor disclosure requirements without the type

of expansive evidence that Plaintiffs request in this case supports the conclusion that such

discovery is not relevant.

Plaintiffs next contend that they need to know what factual material was before the

Governor in order "to test the pre-enactment evidentiary basis" underlying the Disclosure

Provisions. (Doc. No. 81 p. 3.) This very same argument regarding the need for discovery to

"test" the sufficiency of the government's asserted interest was recently made—and

conclusively rejected—in *Citizens United v. Schneiderman*. 203 F. Supp. 3d 397, 406-07 (S.D.N.Y.

2016) (appeal pending). *Citizens United v. Schneiderman* involved facial and as-applied First

Amendment challenges to the New York Attorney General's policy of requiring charities to

disclose their donors in order to be permitted to solicit funds within the state. *Id.* at 400-01,

406-07. While *Citizens United v. Schneiderman* concerned a motion to dismiss, rather than a

discovery motion, in that case, the Honorable Sidney H. Stein dismissed the case over plaintiffs'

objections that discovery was needed before their claims could be adjudicated on the merits.

*Id.* at 406-07. Judge Stein further observed that "plaintiffs do not cite—nor has the Court found—any case authority supporting the proposition that merely pleading the existence of a disclosure requirement such as the attorney general's entitles the plaintiff[s] and subjects the state to discovery . . . ." *Id.* at 407.

Much like the precedential deficiency recognized in *Citizens United v. Schneiderman*, Plaintiffs in this case do not identify, and this Court does not know of, any cases where a court authorized expansive discovery into the files of a governor or individual lawmakers in connection with a constitutional challenge to a donor disclosure requirement. Nevertheless, Plaintiffs assert that, in other types of First Amendment challenges, courts have "required discovery on the purported government interest and the sufficiency of the challenged regulation's tailoring to that interest" citing *to Turner Broadcasting*, 512 U.S. at 664-65 and *Free Speech Coalition, Inc. v. Attorney General of U.S.*, 677 F.3d 519, 537 (3d Cir. 2012). (Doc. No. 42 p. 2.)

*Turner Broadcasting* involved a First Amendment challenge to telecommunications regulations requiring cable television systems to devote a portion of their broadcast channels to the transmission of local broadcast stations. 512 U.S. at 626. *Free Speech Coalition* involved a challenge to a criminal statute and accompanying regulations that imposed recordkeeping, labeling and inspection requirements on producers of sexually explicit content. 677 F.3d at 524-25. The stated government interests with respect to the regulations and law in *Turner Broadcasting* and *Free Speech Coalition* bear no similarity to the well-recognized government interests implicated in this case. This distinction alone renders them distinguishable. *Nixon*, 528

U.S. at 391 ("[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised").

In *Turner Broadcasting*, Congress' proffered justifications for the "must carry" regulations were the promotion of fair competition, preservation of free broadcast television, and promotion of the dissemination of information. 518 U.S. at 662. The government relied on economic statistics and other empirical evidence to support these justifications. *Id.* at 662-68; *see also Nat'l Ass'n of Mfrs.*, 582 F.3d at 15-16. The economic analyses and empirically-derived justifications for the regulations in *Turner Broadcasting* are fundamentally different from the justifications for the Disclosure Requirements here. *See Nat'l Ass'n of Mfrs.*, 582 F.3d at 15-16. As D.C. Circuit Chief Judge Merrick B. Garland explained in *National Association of Manufacturers,* a case involving a First Amendment challenge to a donor disclosure requirement, "[t]he informational interest that Congress and the public have in knowing who is lobbying is hardly novel" and "a claim that good government requires greater transparency" is a common-sense value judgement that has been "repeatedly endorsed by the Supreme Court as sufficient to justify disclosure statutes." *Id.* at 6-9, 15-16. Thus, the court in *National Association of Manufacturers* found that the government did not need to present evidence beyond the publicly stated purpose of a donor disclosure law in order for the court to find that the disclosure requirement did not violate the First Amendment. *Id.* at 15-16.

In *Free Speech Coalition*, the government's justification for the criminal law and regulations was to deter the production and distribution of child pornography. 677 F.2d at 525-

22

28, 535. The Third Circuit remanded for further fact-finding regarding the application of the challenged provisions, but not for additional discovery into the government's interest in enacting the regulations or into the relationship between the interest and the regulations—the type of discovery that Plaintiffs seek here. 677 F.3d at 537-39. The court explained that it could not "intelligently weigh the legitimate versus problematic applications of the Statutes" to decide the constitutionality of the regulations because it lacked evidence to "accurately compare the amount of [p]laintiffs' constitutionally-protected speech that does not implicate the government's interest in protecting children (*e.g.,* speech involving performers who are obviously adults) to the amount of [p]laintiffs' speech that implicates the government's interest (*e.g.,* speech involving performers who are not obviously adults)." *Id.* In contrast here, Plaintiffs make it clear that they are not seeking discovery into the effects of the Disclosure Provisions, but rather want the pre-enactment material considered by the different legislative actors. Further, Plaintiffs can provide information about the nature and volume of donations implicated by the Disclosure Provisions without discovery from the Governor or Intervenors. Nothing in *Free Speech Coalition* can be read as supporting Plaintiffs' assertion that the discovery they seek is appropriate here. (Doc. No. 68 p. 14) (citing *Free Speech Coal.*).

To the extent that Plaintiffs rely on discriminatory redistricting or other Equal Protection cases to support their discovery requests, such cases are also unhelpful. In redistricting cases, "proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 101-02 (S.D.N.Y. 2003) (holding that

even if evidence of discriminatory animus was not an element of plaintiffs' claim under the Voting Rights Act, "it certainly is something that can be considered in deciding whether the New York Legislature's 2002 redistricting plans pass judicial muster"), *adopted by*, 293 F. Supp. 2d 302 (S.D.N.Y. 2003). Judicial inquiry into legislative intent is therefore "specifically contemplated as part of the resolution of the core issue that such cases present," *Bethune-Hill v. Va. St. Bd. of Elections*, 114 F. Supp. 3d 323, 337 (E.D. Va. 2015), and "requires 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Puente Ariz. v. Arpaio*, 314 F.R.D. 664, 668 (D. Ariz. 2016) (quoting *Arlington Heights*, 429 U.S. at 266). As a result, "e[]vidence that the legislature has undertaken 'a series of official actions . . . for invidious purposes'" or "'[c]ontemporary statements by members of the decisionmaking body, minutes of its meetings, or reports'" may be relevant in cases where the government is accused of engaging in discriminatory conduct. *Id.* (quoting *Arlington Heights*, 429 U.S. at 267-68). Thus, in redistricting and Equal Protection cases, courts have been willing to permit some discovery into the legislative process when the discovery might "shed light on" whether the legislature acted with a constitutionally impermissible purpose in adopting the challenged provision. *Id.; see also Bethune-Hill*, 114 F. Supp. 3d at 337 (explaining that redistricting cases present "extraordinary circumstances" to justify judicial intrusion into the legislative process because "the natural corrective mechanisms built into our republican system of government offer little check upon the very real threat of 'legislative self-entrenchment'") (citation omitted).

In contrast, a First Amendment challenge to a statute does not require inquiry into biased motives or potential self-dealing. Indeed, in *United States v. O'Brien*, the Supreme Court

stated that inquiries into legislative purpose have no place in deciding the merits of a First Amendment challenge. 391 U.S. 367, 383 (1968) (cautioning that "[i]nquiries into congressional motives or purposes are a hazardous matter" in a First Amendment challenge to a law prohibiting the destruction of a draft card). The Court also stated that "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive" or purpose. *Id.* Courts applying *O'Brien* have recognized that "[a]llowing discovery of legislative motives . . . would not only create a major departure from the precedent rejecting the use of legislative motives, but is also inconsistent with basic analysis under the First Amendment which has not turned on the motives of the legislators, but on the effect of the regulation." *Foley*, 747 F.2d at 1297-98; *see also Trunk v. City of San Diego*, No. 06-cv-1597 (BTM) (WMC), 2007 WL 1110715, at *4-6 (S.D. Cal. Apr. 2, 2007) (holding that discovery into Congressman's reasons for supporting a law was not relevant to plaintiff's First Amendment Establishment Clause challenge).

Plaintiffs repeatedly assert that they do not seek discovery into legislative motivations, but rather that they only want to know what "factual material" was considered by the Governor and individual legislators prior to the enactment of the Disclosure Provisions. (*See* Doc. No. 68 p. 13.) As stated above, Plaintiffs argue that the documents listed on the Governor's Privilege Log, as well as similar documents sought from the Senate and Assembly, are relevant because they will reveal whether the government had a sufficient factual basis to justify enacting the Disclosure Provisions. (Doc. No. 100 at 13:10-19.) But this argument fails to appreciate that there is a distinction between what factual information may have been before

the Governor's Office "concerning" the government's interests in the Disclosure Provisions and what facts ultimately prompted the New York State government acting as a whole to enact the Disclosure Provisions. A fact does not become the foundation for the government's purpose for a law simply because it is considered by a single decisionmaker or even several decisionmakers. Nor is every single legislator required to consider a specific fact in order for that fact to be the primary impetus behind a bill. Likewise, the facts that cause a governor to endorse a law may differ from the facts relied on by individual legislators when voting for a law. Enacting legislation requires collective action on the part of the Senate, Assembly, and Governor, all of whom receive information from a range of different sources, both formal and informal. Each individual within this collective may place different weight on different facts and have varying interests that nevertheless align to result in the passage of a law. *See Brown v. Gilmore*, No. 00-cv-1044, 2000 U.S. Dist. LEXIS 21623, at *20 (E.D. Va. Oct. 26, 2000) ("[t]here is an important difference between the motive and purposes of individual legislators and institutional legislative purpose"), *aff'd*, 258 F.3d 265 (4th Cir. 2001); *see also Jewish War Veterans of the U.S. of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 60 (D.D.C. 2007); *S.C. Edu. Ass'n v. Campbell*, 883 F.2d 1251, 1261-62 (4th Cir. 1989) (determining the "collective motivation of legislatures" based upon the statements of a few individuals "is a perilous enterprise indeed"). Even in cases where legislative motive is relevant to the merits of a claim, courts have observed that "it is the motivation of the entire legislature, not the motivation of a handful of voluble members[] that is relevant." *S.C. Edu. Ass'n*, 883 F.2d at 1262 (citing *Aldridge v. Williams*, 44 U.S. 9, 24 (1845)); *see also Murphy v. Empire of Am., FSA*, 746 F.2d 931, 935 (2d Cir. 1984) (holding that isolated

remarks in legislative debate are entitled to little or no weight, particularly when they are unclear or conflict with other comments); *In re Kelly*, 841 F.2d 908, 912 n.3 (9th Cir. 1988) ("Stray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted on the bill. The opposite inference is far more likely."). Instead, "the best indication of legislative intent is the law itself." *Utah Republican Party v. Hebert*, No. 2:14-cv-876 (DN) (DBP), 2015 WL 1851387, at *2-3 (D. Utah Apr. 22, 2015) (holding that discovery into the purpose behind a state statute was not relevant but, even if it were, the best sources of evidence existed in the public record). These same considerations are applicable to Plaintiffs' efforts to parse out the factual considerations of the Governor and each individual legislator and extrapolate those facts as either supporting or undermining the government's collective interest in the Disclosure Provisions. In short, Plaintiffs fail to explain why the Governor's consideration of a particular fact, or failure to consider a particular fact, is at all probative of whether the New York State government as a whole has a sufficiently important interest to justify the Disclosure Provisions.

The distinction between an individual lawmaker's factual knowledge and the factual underpinnings of the collective governmental interest is particularly significant here because the documents reflected in the Privilege Log are exclusively to, from, and/or between members of the Governor's staff and his Counsel's Office. There is not a single entry on the Log where the Governor himself was a party to the communication. As a result, there is no way for Plaintiffs to ascertain whether the Governor considered, or was even was aware of, the factual material reflected in any particular document listed on the Privilege Log. While the Governor's counsel

and staff certainly play an important advisory role, the Governor is the ultimate decisionmaker in determining whether to sign a piece of legislation presented to him. Plaintiffs do not explain how they can credibly divine what factual information actually influenced the Governor's decisionmaking process simply by looking to the communications and work product of his staff. Nor do they address why it is reasonable to assume that facts identified by one of the Governor's aides could conceivably support or undermine the interests of the collective New York State government in enacting the Disclosure Provisions or the published statements setting forth the government's interest in the law. It is difficult for this Court to ideate a use of the documents listed on the Privilege Log that would not require impermissible speculation or the consideration of hearsay.

Moreover, review of the categories of documents listed in the Privilege Log further supports the conclusion that such documents have no probative value in this case. A majority of the documents listed on the Governor's Privilege Log are drafts of various documents, including drafts of Disclosure Provisions themselves, public statements, summaries, and analyses, among other examples of preliminary work product. "Drafts, by their very nature, rarely satisfy the test of relevance." *Grossman v. Schwarz*, 125 F.R.D. 376, 385 (S.D.N.Y. 1989). As the court in *Grossman* explained, "administrative decisions . . . are often subjected to repeated revisions, including changes in language and style, correction of typographical errors, editing by superiors of subordinates' work, incorporation of new legal research or a more detailed review of the facts, or simply a more focused view of the issues with each reading." *Id*. It further stated that "[t]he relevance of such revisions to defendants' state of mind is pure speculation. Absent

extrinsic evidence tending to show the relevance of a particular draft, production of these documents is likely to lead only to wasteful fishing expeditions concerning the identification and deciphering of handwriting and the reasons for immaterial revisions." *Id*.

Similarly, approximately three-quarters of the documents listed on the Privilege Log pertain to communications about draft public statements to be issued by the Governor about the new campaign-finance and ethics reform law. Plaintiffs fail to explain why these documents—and the factual statements contained therein—are relevant to their claims and defenses. Deliberations amongst the Governor's staff and counsel about how the Governor should announce or message the new ethics reform law have no bearing on whether the Disclosure Provisions impermissibly infringe upon Plaintiffs' First Amendment rights. *See Greater Birmingham Ministries v. Merrill,* No. 2:15-cv-2193 (LSC), 2017 WL 2903197, at *3-4 (N.D. Ala. July 7, 2017) (holding that, in an Equal Protection and Voters' Right Act case, communications reflecting how the Governor's staff opted to announce the challenged Photo ID Law were not relevant to plaintiffs' claims).

In sum, this Court finds that Plaintiffs have failed to meet their burden of demonstrating the relevance of the documents listed in the Governor's Privilege Log.

### 3. *Undue Burden*

Having concluded that the discovery at issue has no relevance to the claims and defenses in this litigation, the Court will only briefly address the issue of whether the Amended Requests impose an undue burden on the Governor under Rule 45. Plaintiffs argue that since the Governor already identified and reviewed documents before being dismissed as a party, it

would not be burdensome for the Governor to produce the documents that he collected. (Doc.

No. 100 at 5:8-6:1.) In opposition, the Governor asserts that had he not been named as a party,

he would have objected to the subpoena for the production of documents as burdensome at

the outset. (Doc. No. 100 at 14:16-22.) Thus, the Governor argues, Plaintiffs should not receive

the "benefit" of the less-stringent standard for party discovery simply because they improperly

named him as a party to this suit. This Court agrees with the Governor that focusing the "undue

burden" inquiry on only what would need to be done to produce the documents listed in the

Privilege Log, without considering the burden associated with the collection of those

documents, would unfairly benefit Plaintiffs and would negate the distinction between party

and non-party discovery. This Court accordingly finds that locating, collecting, logging, and

producing the documents sought by Plaintiffs amounts to an undue burden on the Governor

and is disproportional to the needs of this case considering that the discovery is of no real

probative value to Plaintiffs' claims. Moreover, insofar as Plaintiffs seek to probe the files of

each of the 150 Members of the Assembly and 63 Members of the Senate, this Court notes that

compliance with such a request would likely require significant time and resources and would

be disruptive to the workings of the State Legislature and is similarly disproportional to the

needs of this case.

## II. LEGAL STANDARDS GOVERNING THE CLAIMED PRIVILEGES

The documents listed in the Governor's Privilege Log are not only irrelevant, but many of the documents are also protected by one or more privileges. For this reason as well, the Court grants the Governor's motion to quash with respect to the certain categories of documents as more fully discussed below.

The Governor asserts claims of legislative privilege, deliberative process privilege, and/or attorney-client privilege over the documents listed in his Privilege Log. The parties dispute the scope and applicability of the legislative privilege against compelled disclosure in the context of discovery. The Governor and Intervenors assert that the legislative privilege operates as an absolute bar against the discovery sought by Plaintiffs. Plaintiffs contend that the legislative privilege is qualified such that, if the privilege applies, the Court must apply a balancing test to determine whether disclosure of the privileged document is nevertheless proper in this case. The Governor and the Intervenors reply that even if the privilege is qualified, the balance of interests weighs in favor of quashing Plaintiffs' subpoenas.

The parties agree that the deliberative process privilege is qualified but disagree about its applicability to the documents on the Governor's Privilege Log and whether the balance of relevant factors weighs for or against disclosure. Likewise, there is no dispute as to the standard and scope of the attorney-client privilege; the parties simply dispute its applicability to the documents at issue.

The Court begins by addressing the legal standards for the legislative and deliberative process privileges below and then, in Subsection C, applies the privileges to the documents on

the Governor's Privilege Log and, in Subsection D, addresses whether disclosure of the privileged documents is nevertheless warranted in this case in light of the balance of interests. In Subsection E, the Court addresses attorney-client privilege.

### A.  *Legislative Privilege*

#### 1.  *Legislative Privilege As Applied To Federal Lawmakers*

The concept of legislative privilege, and the parallel doctrine of legislative immunity, "developed in sixteenth- and seventeenth-century England as a means of curbing monarchical overreach, through judicial proceedings, in Parliamentary affairs." *Favors v. Cuomo*, 285 F.R.D. 187, 207 (E.D.N.Y. 2012) ("*Favors I*") (citing *United States v. Johnson*, 383 U.S. 169, 177-80 (1966); *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951)). By the time this nation was founded, legislative autonomy was "deemed so essential for representatives of the people that it was written into the Articles of Confederation and later into the Constitution" as the Speech or Debate Clause, and also was protected under several state constitutions. *Tenney*, 341 U.S. at 372-73.

The Speech or Debate Clause of the federal Constitution provides that "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place." U.S. CONST. art. I, § 6, cl. 1. The Clause has been construed as providing Members of Congress with two distinct, but related, absolute protections: (1) immunity from suit for their legislative acts and (2) protection from being compelled to testify in court and produce information about acts that fall within the "legitimate legislative sphere." *See, e.g., Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975); *Supreme Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S.

719, 731-33 (1980); *Gravel v. United States*, 408 U.S. 606, 613-16 (1972); *United States. v. Brewster*, 408 U.S. 501, 525 (1972); *see also Sec. & Exch. Comm'n v. Comm. on Ways & Means of the U.S. House of Representatives*, 161 F. Supp. 3d 199, 242 (S.D.N.Y. 2015) (the "[t]estimonial privilege is thus at the heart of the Speech or Debate Clause protections.").

The protections afforded by the Speech or Debate Clause are broad. *Eastland*, 421 U.S. at 501-02. Even if a legislative act, "if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes," legislative immunity shields a Member of Congress from suit. *Doe v. McMillan*, 412 U.S 306, 312-12 (1973) (citing *Gravel*, 408 U.S. at 624-25). The protections afforded under the Clause serve the important purposes of ensuring that "the legislative function the Constitution allocates to Congress may be performed independently" and preventing executive and judicial interference with legislative responsibilities. *Eastland*, 421 U.S. at 502-03; *see also Gravel*, 408 U.S. at 616. It also fulfills the "additional function of reinforcing the separation of powers so deliberately established by the Founders." *Eastland*, 421 U.S. at 502 (citing *Johnson*, 383 U.S. at 178). Finally, the protections guard against compelled testimony and discovery, which have the "potential to create [] a distraction and force[] Members to divert time, energy, and attention from their legislative tasks" to defend the litigation. *Ways & Means*, 161 F. Supp. 3d at 233, 235 (quoting *Eastland*, 421 U.S. at 503) (internal quotations omitted). The protections generally apply to legislative acts in both civil cases and criminal prosecutions. *Id.* at 233-34.

A presumption underlying the Speech or Debate Clause protections is that public statements and debate preceding action on a bill constitute the official record of considerations

aired and discussed among legislators, and that the outcome of the vote and public statement of purpose for a bill represent the collective, negotiated decision of all lawmakers as it pertains to a law and the official purpose of the law. To the extent an individual lawmaker's constituents disagree with his or her vote and statements (or silence) on the Floor, they have the power to replace that lawmaker in the next election. Potential removal from office in the next election cycle, rather than legal liability, is the consequence for legislative acts. Likewise, the public record of the legislative process, official statements of purpose for a law, and actual language of laws passed generally serve as the evidence considered by the courts in evaluating legal challenges to laws.

Critically, not every activity of a lawmaker is protected under the Speech or Debate Clause protections. Legislative acts that are protected under the privilege include any activity that is "'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'" *Eastland,* 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625 and citing *McMillan*, 412 U.S. at 313); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1988) (actions are legislative in nature when they are "integral steps in the legislative process"). For example, legislative acts may include, but are not limited to: "delivering an opinion, uttering a speech, or haranguing in debate'; proposing legislation; voting on legislation; making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and 'introducing material at committee hearings."

*Ways & Means*, 161 F. Supp. 3d at 236 (citing *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10-11 (D.C. Cir. 2006)) (internal quotations omitted).

The legislative privilege also protects Congressional fact- and information-gathering activities about the subject of potential legislation, as well as documents regarding or reflecting the fruits of this research. *See id.* at 236-37, 245; *see also United States v. Biaggi*, 853 F.2d 89, 102-03 (2d Cir. 1988) (holding that legislative fact-finding activity is protected under the Speech or Debate Clause); *McSurely v. McClellan*, 553 F.2d 1277, 1286 (D.C. Cir. 1976) (*en banc*) ("information gathering, whether by issuance of subpoenas or field work by a Senator or his staff, is essential to informed deliberation over proposed legislation" and hence is protected legislative activity), *cert. dismissed*, 438 U.S. 189 (1978). The gathering of facts and other information—whether by formal means, such as a subpoena, or informal means, such as field work—is protected because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland*, 421 U.S. at 504 (citation omitted); *see also Ways & Means*, 161 F. Supp. 3d at 236-37. To the extent there is a question as to whether particular research activities are privileged, the court must determine "whether 'the information is acquired in connection with or in aid of an activity that qualifies as 'legislative' in nature,' not what the source of the information is." *Ways & Means*, 161 F. Supp. 3d at 237 (quoting *Jewish War Veterans*, 506 F. Supp. 2d at 57). Thus, it is not just the motives of lawmakers that are protected by the privilege, but factual information as well (so long as it was collected and summarized in connection with a legislative activity).

On the other hand, activities concerning the administration of a federal law, speeches delivered outside of Congress and preparation for the same, newsletters and press releases to constituents and drafts thereof all fall outside of the protection of the privilege. *Brewster,* 408 U.S. at 512; *Hutchinson v. Proxmire*, 443 U.S. 111, 130-33 (1979). Similarly, the privilege does not attach to documents or communications that are "merely administrative or personal in nature." *Ways & Means*, 161 F. Supp. 3d at 246 (citing *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985) ("Private conversations—even between officials of governments—do not necessarily involve official business."); *Fields*, 459 F.3d at 11 (personnel decisions lacking a nexus to legislative acts are beyond the scope of the Clause's protections)).

2.  *Legislative Privilege As Applied To State Legislators*

The Speech or Debate Clause, by its own terms, is limited to Members of Congress. However, many state constitutions, including New York's, contain a Speech or Debate Clause that mirrors the one in the U.S. Constitution. *See* N.Y. Const. art. III, § 11. Consequently, many states, including New York, recognize a privilege that provides immunity from suit and protection from being compelled to testify and produce information about legislative acts.[11] *See People v. Ohrenstein*, 77 N.Y.2d 38, 53-54 (1990) (recognizing that the New York State Constitution "provide[s] at least as much protection as the immunity granted by the [Speech or Debate Clause]"). Based on principles of comity, the Supreme Court has held that state legislators, like Members of Congress, are entitled to absolute "immunity from liability for their

---

[11] Because Plaintiffs' primary claims arise under federal law, federal common law, and not the New York constitutional privilege, is applicable to the Governor's and Intervenors' claims of privilege. Fed. R. Evid. 501; *see also, e.g., Rodriguez*, 280 F. Supp. 2d at 93-95.

legislative acts" as a matter of federal common law. *Supreme Ct. of Va.,* 446 U.S. at 732-33

(citing *Tenney*, 341 U.S. at 379*); Bogan*, 523 U.S. at 48-49; *see also Rodriguez*, 280 F. Supp. 2d at

94-95 (explaining that "[t]he doctrine of absolute immunity for state legislators is an outgrowth

of the Speech or Debate Clause of the United States Constitution."). Governors likewise are

protected from suit in connection with their lawmaking duties. *In re Hubbard*, 803 F.3d 1298,

1308 (11th Cir. 2015) (collecting cases); *see also Warden v. Pataki*, 35 F. Supp. 2d 354, 358

(S.D.N.Y. 1999) ("The well-settled doctrine of absolute legislative immunity . . . bars actions

against legislators or governors—and, *a fortiori*, legislatures—on the basis of their roles in

enacting or signing legislation"), *aff'd sub nom,* 201 F.3d 430 (2d Cir. 1999).

In *Arlington Heights*, the U.S. Supreme Court implicitly recognized in dicta that the

common law legislative privilege for state lawmakers also extends to protection from

compelled testimony in civil cases. 429 U.S. at 267-68. That case involved claims by a nonprofit

real estate developer and several individuals that a municipal zoning law and denial by town

officials of a rezoning request to permit the construction of a low-cost housing project were

racially discriminatory in violation of the Fourteenth Amendment to the U.S. Constitution, the

federal Fair Housing Act, and several other federal laws. *Id.* at 254. When discussing the type of

evidence needed by plaintiffs to prove discrimination, the Court stated that legislative and

administrative history might be highly relevant, especially where the record reflects statements

by members of the decisionmaking body, as would be the specific sequence of events leading

up to the challenged decision, minutes of meetings and official reports, and substantive

departures from established procedures. *Id.* at 266-68. In discussing this evidence, the Court

also recognized that in "some extraordinary instances the [town officials] might be called to the stand at trial to testify concerning the purpose of the official [zoning] action, although even then such testimony frequently will be barred by privilege," citing to *Tenney*, 341 U.S. 367 and *United States v. Nixon*, 418 U.S. 683, 705. *Id.* at 268 & n.18 (noting it has long been recognized that "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government" and that "[p]lacing a decisionmaker on the stand is therefore 'usually to be avoided'") (citations omitted).

The Second Circuit likewise has recognized the shared origins of and justifications for the Speech or Debate Clause protections and common law protections afforded to state lawmakers. *See Star Distribs., Ltd*. *v. Marino*, 613 F.2d 4, 6-9 (2d Cir. 1980). Because of their common roots, the Second Circuit has stated in very strong terms that it is inappropriate to "differentiate the scope of the two without good reason." *Id.* at 8. This suggests that the privilege should extend to protect against compelled testimony and discovery in civil cases. However, the case in which the court made this statement, *Star Distributors*, did not involve application of the privilege to discovery. Rather, in *Star Distributors*, the Court addressed whether the defendant legislators were immune from a suit brought by private companies that sought to enjoin a state investigation into their pornography businesses and, specifically, whether the businesses were exploiting and employing juveniles in connection with that business. *Id.* at 5-6. A New York State Select Legislation Committee, comprised of members of the state legislature, served subpoenas *duces tecum* on plaintiffs ordering production of various corporate records at a hearing. *Id.* at 5. Plaintiffs contended that the subpoenas violated their

First Amendment rights. *Id.* at 6. The District Court denied the request for an injunction, and the Second Circuit affirmed, concluding that "state legislators, to the same extent as their federal counterparts are immune from suit under § 1983 . . . based on their activities within the traditional sphere of legislative activity." *Id.* at 6, 9. In its affirmance, the Second Circuit stated that, "under our system of federalism, the role of the state legislature is entitled to as much judicial respect as that of Congress." *Id.* at 9. It also stated that the need to be free from interference by the courts is equally important to Congress and state legislatures. *Id.* Thus, it held, "[w]e show no more than a 'proper respect for state functions'" "in holding that state legislators must be accorded a privilege similar to that of federal legislators." *Id.* (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)). The court explained that "[t]o create a system in which the Bill of Rights monitors more closely the conduct of state officials than it does that of federal officials is to stand the constitutional design on its head." *Id.* (quoting *Butz v. Economou*, 438 U.S. 478, 504, (1978)).

Notwithstanding the dicta in *Arlington Heights* and *Star Distributors*' suggestion that federal courts should recognize an evidentiary privilege for state legislators similar in scope to the one enjoyed by federal legislators, the Supreme Court has found that the legislative privilege does not preclude the introduction of evidence related to legislative acts against a state lawmaker in the context of a federal criminal prosecution. *United States v. Gillock,* 445 U.S. 360, 361-62, 373 (1980). In *Gillock,* the Supreme Court addressed the two interrelated rationales underlying recognition of an evidentiary privilege for federal legislators: (1) "the need to avoid intrusion by the Executive or Judiciary into the affairs of a coequal branch," and

(2) "the desire to protect legislative independence." *Id.* at 369. The Court found that the first rationale did not support the grant of an evidentiary privilege because the separation of powers doctrine—the need for effective checks and balances between and among coequal branches of government—is not a concern with respect to state legislators. *Id.* at 370.

The Court took more time analyzing whether the second rationale supported the grant of an evidentiary privilege. It first looked to its prior decision in *Tenney,* which involved a claim that a state legislative committee hearing had been conducted to prevent the plaintiff from exercising his First Amendment rights. *Id.* at 371-72. *Tenney*, it explained, demonstrated the Court's "sensitivity to interference with the functioning of state legislators." *Id*. at 372. But it distinguished *Tenney* by expressly noting that that sensitivity was expressed in the context of a civil action brought by a private plaintiff to vindicate private rights. *Id.* The Court then noted that in other decisions, it "presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." *Id.* (citing *O'Shea v. Littleton,* 414 U.S. 488, 503 (1974); *Imbler v. Pachtman,* 424 U.S. 409, 429 (1976); *Scheuer v. Rhodes,* 416 U.S. 232 (1974)). Thus, the Court explained that "in protecting the independence of state legislators, *Tenney* and subsequent cases on official immunity have drawn the line at civil actions." *Id.* at 373. In reaching its conclusion, the Court stated that "principles of comity command careful consideration," but when balanced against the "legitimate interest of the Federal Government in enforcing its criminal statutes," comity must yield. *Id.*

It is important to note the unique factual circumstances involved in *Gillock*. There, a lawmaker was accused of taking bribes in violation of federal law. *Id.* at 362. Evidence

concerning his personal legislative acts was directly relevant and intertwined with his alleged unlawful conduct. In no way does the holding in *Gillock* suggest that the legislative privilege does not extend to compelled testimony and discovery in a civil case. To the contrary, the Court carefully distinguished criminal and civil cases for purposes of determining whether the common law privilege should yield in the context of that particular criminal prosecution. *See id.* at 373.

Hence, district courts within the Second Circuit have interpreted the Supreme Court case law discussed above to provide state lawmakers with protection against discovery into their legislative acts in civil cases, explaining that such protection is needed to "shield legislators from civil proceedings which disrupt and question their performance of legislative duties to enable them to devote their best efforts and full attention to the public good." *See, e.g., Searingtown Corp. v. Inc. Vill. of N. Hills*, 575 F. Supp. 1295, 1299 (E.D.N.Y. 1981) (precluding discovery into motivation of local legislators for rezoning decision that plaintiffs claimed violated their constitutional rights) (internal quotations and citations omitted). The privilege is "a personal one," meaning that it can only be asserted, or alternatively, waived, by each individual lawmaker. *See Favors v. Cuomo*, No. 11-cv-5632 (DLI) (RR) (GEL), 2015 WL 7075960, at *8-9 (E.D.N.Y. Feb. 8, 2015) ("*Favors III*"). When a state official invokes the legislative privilege, courts routinely look to the framework of the Speech or Debate Clause for guidance on whether a particular document or communication is protected by the common law privilege. *See, e.g., Favors v. Cuomo*, No. 11-cv-5632 (DLI) (RR) (GEL), 2013 WL 11319831, at *5 (E.D.N.Y. Feb. 8, 2013) ("*Favors II*").

At the same time, courts in this Circuit have found that protection under the common law legislative privilege in civil cases is not absolute. *See, e.g., Favors I*, 285 F.R.D. at 209 (collecting cases). They have acknowledged that, in some extraordinary instances, some discovery may be warranted. *Rodriguez*, 280 F. Supp. 2d at 95-96 (citing *Arlington Heights*, 429 U.S. at 268); *see also Orange v. Cnty. of Suffolk*, 855 F. Supp. 620, 623-24 (E.D.N.Y. 1994). To determine when such discovery is warranted, the district courts within this Circuit apply five balancing factors, as originally set out in *Rodriguez*. 280 F. Supp. 2d at 100-01; *see also Favors III*, 2015 WL 7075960, at *10; *E. End Ventures, LLC v. Inc. Vill. of Sag Harbor*, No. 09-cv-3967 (LDW) (AKT), 2011 WL 6337708, at *3 (E.D.N.Y. Dec. 19, 2011); *ACORN v. Cnty. of Nassau*, No. 05-cv-2301 (JFB) (WDW), 2008 WL 708551, at *4 (E.D.N.Y. Mar. 14, 2008). These factors include: "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Rodriguez*, 280 F. Supp. 2d at 100-01.

Notwithstanding the case law in this Circuit, the Governor and Intervenors urge this Court to hold that communications and documents concerning legitimate legislative acts are entitled to absolute protection from disclosure based upon the cases holding that state officials are entitled to a legislative immunity that is "on a parity" with the protections afforded to federal legislators under the Speech or Debate Clause. *See Star Distribs., Ltd.*, 613 F.2d at 7-9; *St. Emps. Bargaining Agency Coal. v. Rowland*, 494 F.3d 71, 83 (2d Cir. 2007). They argue that

legislative immunity and legislative evidentiary privilege are parallel concepts that should protect state officials from the compelled discovery to the same extent Members of Congress are protected from discovery under the Speech or Debate Clause. Alternatively, they argue that the exceptions to the privilege in civil suits should be limited to cases where the motivations of lawmakers are directly at issue and that in all other types of cases a balancing test is inappropriate. (*See, e.g.,* Doc. No. 65 pp. 4-7; Doc. No. 70 pp. 3-4.)

Plaintiffs argue that the Governor's and Intervenors' position impermissibly conflates legislative immunity with the less-robust evidentiary privilege against discovery. (Doc. No. 68 pp. 6-8.) They contend that the privilege against discovery is qualified and always subject to a balancing test. *See Rodriguez*, 280 F. Supp. 2d at 100-01.

Having carefully reviewed the relevant authority, this Court rejects the Governor and Intervenors' invitation to find that the legislative privilege against compelled testimony and discovery for state officials is absolute. Case law makes clear the privilege is not absolute. *See, e.g., Gillock*, 445 U.S. at 373-74; *Arlington Heights,* 429 U.S. at 268; *Rodriguez,* 280 F. Supp. 2d at 95-96. Additionally, this Court declines to cabin its ability to use a balancing test when resolving legislative privilege issues that arise in civil case discovery. As this Court interprets relevant case law, when there is a challenge to a claim of legislative privilege by state lawmakers, the court may consider whether the private parties' interest in exploring the motivations and fact-finding efforts of individual legislators (1) rises to a level of public need for full development of relevant facts that is sufficient to overcome the competing public interests in ensuring that legislators devote their full efforts and attention to legislative duties; (2)

outweighs the threat of chilling legislative deliberations; and (3) warrants federal intrusion into the independence of state lawmakers. *Rodriguez,* 280 F. Supp. 2d at 95-96, 100-101*; Searingtown Corp*., 575 F. Supp. at 1299; *Favors I,* 285 F.R.D. at 207-09; *see also Ways & Means*, 161 F. Supp. 3d at 232-33, 242 (collecting cases); *Star Distribs., Ltd.*, 613 F.2d at 7-9; *Tenney*, 341 U.S. at 373-78. None of the cases from the Supreme Court, the Second Circuit, or cases from within this Circuit cited by the Governor or the Intervenors suggest that the inherent power of the Court to consider and balance these interests should be limited to specific categories of cases.

The *Rodriguez* balancing factors provide appropriate guideposts for managing discovery in civil cases and will not lead to broad discovery into legislators' files in civil cases as the Governor and the Intervenors fear. Rather, and as discussed below, the *Rodriguez* factors will weigh against disclosure and in favor of upholding the privilege in all but the extraordinary case. *See Arlington Heights*, 429 U.S. at 268*; see also Rodriguez,* 280 F. Supp. 2d at 95-96. The cases cited by Plaintiffs illustrate this point. All carefully circumscribed the discovery permitted and did not grant broad discovery into individual lawmaker's motives. *See Rodriguez*, 280 F. Supp. 2d at 100-03 (allowing discovery concerning operations of LATOR, an advisory group that included non-legislative "outsiders" because such documents were not covered by the legislative privilege, but denying plaintiffs' motion to compel information about legislative deliberations outside of LATFOR or after the proposed redistricting plan reached the floor of the legislature); *Favors III*, 2015 WL 7075960, at *12-16 (finding that plaintiffs' need for certain specific categories of documents, such as documents reflecting reasons why certain Senate

districts contained population deviations, outweighed any potential chilling effect, but denying plaintiffs' requests for, *inter alia*, all documents relating the redistricting plan because permitting such discovery would "effectively render the legislative privilege a nullity"); *Manzi v. DiCarlo*, 982 F. Supp. 125, 129-31 (E.D.N.Y. 1997) (in a case with only two documents at issue, concluding that budget allocations were not legislative acts and, moreover, that plaintiff's need for discovery outweighed the state's need for confidentiality given that the two documents at issue concerned past allocations to a former senator and there was no reason to believe that disclosure would disrupt the legislative process); *Searingtown Corp.*, 575 F. Supp. at 1299 (holding that plaintiffs' interest in discovery did not justify intrusion into legislative privilege and denying discovery).

Further, all but one of the cases from within the Second Circuit addressing legislative privilege fall into the category of extraordinary cases where invidious discrimination and alleged self-dealing were at issue.[12] *See Rodriguez*, 280 F. Supp. 2d at 92-93 (alleging that redistricting plan was racially discriminatory and diluted voting power of minorities); *Favors I*, 285 F.R.D. at 194-95 (same); *ACORN v. Cnty. of Nassau*, No. 05-cv-2301 (JFB) (WDW), 2007 WL 2815810, at *1 (E.D.N.Y. Sept. 25, 2007), *aff'd*, 2009 WL 2923435, at *1 (E.D.N.Y. Sept. 10, 2009) (involving challenges to a zoning decision under the Fair Housing Act where plaintiffs alleged the decision

---

[12] *Searingtown Corp.* is the only case within this Circuit to address the legislative privilege in a different context. In *Searingtown*, plaintiffs alleged that a series of legislative enactments deprived them of their constitutional rights by diminishing their property value without just compensation and without due process. 575 F. Supp. at 1295-96. The court in *Searingtown* denied plaintiffs' motion to compel discovery into the reason behind the challenged legislative acts, concluding that plaintiffs' interest in the discovery did not rise to "a level of public need for the full development of relevant facts sufficient to warrant threatening the interest in protecting the legislative process mandated by the Supreme Court in *Tenney* and *Lake Country Estates*." *Id.* at 1296, 1299.

was motivated by discriminatory animus); *E. End Ventures, LLC,* 2011 WL 6337708, at *4 (alleging that the defendant Village violated the Equal Protection Clause by "act[ing] arbitrarily and in bad faith in applying an amended zoning code and moratorium to Plaintiffs' project, but not to a similar project"); *Manzi*, 982 F. Supp. at 127 (alleging that a former state senator unlawfully terminated plaintiff's employment); *Orange*, 855 F. Supp. at 621 (claiming that members of the county legislature conspired to wrongfully discharge or otherwise adversely affect plaintiffs' employment on the basis of their political affiliation); *Almonte v. City of Long Beach*, No. 04-cv-4192 (JS) (JO), 2005 WL 1796118, at *3-5 (E.D.N.Y. July 27, 2005) (plaintiffs alleged that the defendant City terminated their employment with the City as a result of their political affiliation); *Joseph's House & Shelter, Inc. v. City of Troy, N.Y.*, 641 F. Supp. 2d 154, 157 (N.D.N.Y. 2009) (alleging discrimination related to a building project in violation of the federal Fair Housing Act and Americans with Disabilities Act).

Many of the cases from outside of this Circuit cited by Plaintiffs also involve similar extraordinary claims of discrimination or self-dealing. *See U.S. E.E.O.C. v. Wash. Suburban Sanitary Comm'n*, 666 F. Supp. 2d 526, 528 (D. Md. 2009) (considering whether legislative privilege barred the EEOC's investigation into age discrimination claims of 15 former employees); *Nashville Student Org. Comm. v. Hargett*, 123 F. Supp. 3d 967, 968 (M.D. Tenn. 2015*)* (challenging Tennessee's voter identification law on the grounds that it discriminates against voters on the basis of age or student status); *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 619-21 (5th Cir. 2017) (involving claims of retaliatory eviction); *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, No. A-15-cv-134 (RP), 2016

WL 5922315, at *1 (W.D. Tex. Oct. 11, 2016) (challenging the constitutionality of Texas's liquor regulations on the basis that the laws discriminated against out-of-state companies); *N.C. St. Conference of the NAACP v. McCrory*, No. 13-cv-658 (TDS), 2015 WL 12683665, at *1 (M.D.N.C. Feb. 4, 2015) (claims of race and age discrimination asserted against North Carolina's Voter Information Verification Act).

Having concluded that the legislative privilege is qualified, the Court will address the application of the *Rodriguez* factors in Subsection D, *infra*.

**B.** *Deliberative Process Privilege*

The Governor and Intervenors also claim that the Amended Requests seek the production of documents that are protected from disclosure under the deliberative process privilege. The deliberative process privilege, which is also referred to as the executive privilege, "'protects the decisionmaking processes of the executive branch in order to safeguard the quality and integrity of governmental decisions.'" *Marisol A. v. Giuliani*, No. 95-cv-10533 (RJW), 1998 WL 132810, at *6 (S.D.N.Y. Mar. 23, 1998) (quoting *Hopkins v. H.U.D.*, 929 F.2d 81, 84 (2d Cir. 1991)). The privilege applies to both the executive and the executive's staff members. *See Hopkins*, 929 F.3d at 85 (work product, opinions, and recommendations of staff are part of the deliberative process). It is motivated by "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news" and the desire to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Fed. Hous. Fin. Agency v. HSBC N. Am. Holdings Inc.*, No. 11-cv-6189 (DLC), 2014 WL 1909446, at *1 (S.D.N.Y.

47

May 13, 2014) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001)); *see also Marisol A.*, 1998 WL 132810, at *6 (the deliberative process privilege is premised upon the notion that "effective decisionmaking requires a free flow of information amongst government officials and that this free flow would be constrained if these communications had the potential to be revealed to outsiders.") (citations omitted).

In addition to protecting the mental decisionmaking process, the privilege also protects documents and communications that are used to assist the executive in reaching a policy decision when such documents are both (1) predecisional and (2) deliberative. *Marisol A.*, 1998 WL 132810, at *6. A document is "predecisional" when it is prepared to aid the decisionmaker in arriving at a decision. *Hopkins*, 929 F.2d at 84; *Marisol A.*, 1998 WL 132810, at *6. In assessing whether a document is predecisional, courts also consider whether the government can: "(i) pinpoint the specific agency decision to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates." *Nat'l Congress for Puerto Rican Rights ex rel Perez v. City of New York*, 194 F.R.D. 88, 92 (S.D.N.Y. 2000) (quotations and citation omitted). A document is "deliberative" when it relates to the process by which policies are formulated. *Hopkins*, 929 F.2d at 84.

Courts have recognized that the deliberate process privilege protects communications and "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Hopkins*, 929

F.2d at 84-85 (citation omitted). "[P]roposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" also are protected from disclosure. *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999). "Courts have been particularly protective of draft documents because they are inherently deliberative in nature." *LNC Invs., Inc. v. Republic of Nicaragua*, No. 96-cv-6360 (JFK) (RLE), 1997 WL 729106, at *1 (S.D.N.Y. Nov. 21, 1997) (citing *Lead Indus. Ass'n v. Occupational Safety & Health Admin.*, 610 F.2d 70, 86 (2d Cir. 1979)).

On the other hand, the deliberative process privilege "does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (citation omitted). And, unlike the legislative privilege, the deliberative process privilege generally does not apply to "purely factual" material that can be segregated from policy deliberations. *Id.* (citing *Hopkins*, 929 F.2d at 85; *Env't Prot. Agency v. Mink*, 410 U.S. 73, 87-88 (1973) ("memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery"); *Local 3, Int'l Bhd. of Elec. Workers v. Nat'l Labor Relations Bd.*, 845 F.2d 1177, 1180 (2d Cir. 1988) ("Purely factual material not reflecting the agency's deliberative process is not protected.")). The privilege also does not apply to documents that represent "an opinion or interpretation that embodies the agency's effective law and policy, in other words, its 'working law.'" *N.Y. Times v. U.S. Dep't of Justice*, 101 F. Supp. 3d 310, 318 (S.D.N.Y. 2015) (citation omitted).

The deliberative process privilege, like the legislative privilege, is qualified. *See*

*Rodriguez*, 280 F. Supp. 2d at 99-101. As a result, it "may be overridden in circumstances where

'reason and experience' suggest that the claim of privilege should not be honored." *Id.*; *see also*

*Allstate Ins. Co.*, 1998 WL 477961, at *2. Courts in this Circuit use the same balancing factors to

weigh whether the deliberative process privilege should yield to the need for discovery as they

do when weighing whether the legislative privilege should yield to the need for discovery. *See*

*id*. This Court will address whether the interests of this case weigh in favor of upholding the

Governor's claims of deliberative process privilege in Section D, *infra.*

**C.** ***Application Of The Privileges To The Six Categories of Documents Listed In The Privilege Log***

The Governor's Privilege Log lists 214 documents and communications concerning the

proposed Disclosure Provisions or ethics reform legislation. These documents fall into six broad

categories: (1) communications concerning drafting of the Disclosure Provisions; (2) documents

reflecting or regarding research used for drafting the Disclosure Provisions; (3) drafts of

summary memoranda regarding potential ethics reform legislation; (4) communications

regarding or reflecting legal assessment of the proposed Disclosure Provisions; (5)

communications regarding drafts of public statements; and (6) communications regarding

drafts of the sponsor's memo, approval message, and executive order for the ethics reform

legislation. Most of the documents and communication are written by the Governor's staff or

lawyers and conveyed between and among his staff and lawyers, though two of the

communications are from counsel for other Executive agencies to counsel for the Governor.

The Governor is not personally a party to any of the communications listed on the Privilege Log.

The Governor contends that all of the documents listed on the Privilege Log are protected by either the legislative privilege or deliberative process privilege, or both, and that these privileges should be honored under the *Rodriguez* factors. The Governor also states that some of the documents are protected from disclosure under the attorney-client privilege.

The Court will first address whether the documents listed on the Governor's Privilege Log are protected by the legislative or deliberative process privileges, and then will discuss whether disclosure of the documents covered by these privileges is nevertheless warranted under the balancing factors set forth in *Rodriguez.* Finally, in Subsection E, this Court will discuss the application of the attorney-client privilege to the documents listed in the Governor's Privilege Log.

1. *Communications Regarding Drafting Of The Disclosure Provisions (Privilege Log Entry Nos. 1; 25; 38)*

The Governor's Privilege Log lists three communications between and among counsel for the Governor regarding the drafting of (and predating enactment of) the Disclosure Provisions. The Governor argues that the legislative privilege and deliberative process privilege protect these three communications.

There can be little dispute that internal communications and deliberations about the drafting of proposed legislation are "integral steps in the legislative process." *Bogan*, 523 U.S. at 55; *see also Gravel*, 408 U.S. at 625 (privilege applies to conduct that is "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation"); *Favors II*, 2013 WL 11319831, at *9 (concluding that documents reflecting changes

51

to proposed statutory language are covered under the legislative privilege); *Jewish War Veterans*, 506 F. Supp. 2d at 53 (negotiations over drafts of legislation are acts that are "indisputably legislative in nature"). Accordingly, these communications fall squarely within the legislative privilege.

Discussions about drafting the Disclosure Provisions also strike at the heart of the deliberative process privilege. The three communications are indisputably predecisional, as they all occurred before the enactment of the Disclosure Provisions. The process of revising and commenting on draft legislation is inherently deliberative, as the authors are exchanging thoughts and ideas about potential legislation as part of the decisionmaking process. *Hopkins*, 929 F.2d at 84-85. Disclosure of these communications would reflect the manner in which a final policy determination—that is, the text of the Disclosure Provisions as passed and enacted—was reached. *Id*; *see also Nat'l Council of La Raza v. Dep't of Justice,* 411 F.3d 350, 356 (2d Cir. 2005) (material is "deliberative" when it is "actually related to the process by which policies are formed"). Moreover, this Court is mindful that these communications seem likely to reflect the preliminary thoughts and opinions of the Governor's counsel, as all of the communications occurred months before the Disclosure Provisions were enacted.

Thus, the Court finds that both the legislative and deliberative process privileges apply to communications regarding the drafting of the Disclosure Provisions.

2. *Documents Reflecting Or Regarding Research Used For Drafting The Disclosure Provisions (Privilege Log Entry Nos. 3-24; 26-27; 47-48; 138)*

The Governor next asserts that documents regarding, or reflecting, research conducted for use in drafting the Disclosure Provisions are all protected under the legislative and

deliberative process privileges. The documents falling into this category are largely email communications, with associated attachments, sent between and among counsel for the Governor's Office before the Disclosure Provisions were enacted. These communications discuss research that was conducted for the drafting of the Disclosure Provisions, including research regarding non-profit corporations generally, the "existing requirements for nonprofit corporations," and non-profit corporations' compliance with applicable laws.

Plaintiffs strenuously object to the Governor's claims of privilege over documents reflecting, or communications concerning, research conducted about nonprofits, existing requirements for nonprofits, and nonprofits' compliance with those requirements. In Plaintiffs' view, this type of factual research "is quintessential non-privileged material that should be disclosed." (Doc. No. 90, p. 2.) This Court disagrees.

As the Supreme Court unequivocally recognized in *Eastland*, "a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." 421 U.S. at 504. For this reason, numerous courts have recognized that fact-finding, information-gathering, and other types of research concerning the subjects of potential legislation are entitled to protection under the legislative privilege. *See Ways & Means,* 161 F. Supp. 3d at 236-37, 246 (legislative privilege protects documents reflecting information gathered for future legislative activity); *Gov't of Virgin Islands*, 775 F.2d at 521-22 ("fact-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation"); *Favors III,* 2015 WL 7075960, at *8 (privilege extended to emails forwarding news

stories and other information to legislators or their aides to be considered as part of the legislative deliberations); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) ("Obtaining information pertinent to potential legislation . . . is one of the 'things generally done in a session of the House,' . . . concerning matters within the 'legitimate legislative sphere'") (internal citations omitted).[13] Thus, Plaintiffs' argument that the legislative privilege does not apply to documents reflecting or containing facts is contrary to the weight of authority.

To the extent that Plaintiffs argue that the legislative privilege does not apply to communications with individuals outside of the Governor's Office (*i.e.,* Privilege Log Entry Nos. 9 and 10), this position is without merit here. The Governor's Privilege Log only reflects two emails concerning research for use in drafting the Disclosure Provisions from "outside" of the Governor's Office, and these communications were from the Deputy Commissioner & Counsel for the New York State Department of Taxation & Finance and the General Counsel for the New

---

[13] Plaintiffs rely on *ACORN* to argue that factual material is not protected under the legislative privilege. (Doc. No. 90 p. 1) (citing 2009 WL 2923435, at *4). This Court does not read *ACORN* as broadly as Plaintiffs. *ACORN* recognized that "fact-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation." 2009 WL 2923435, at *6 (citing *Gov't of Virgin Islands*, 775 F.2d at 521). Although the court in *ACORN* observed that the legislative privilege does not "prohibit inquiries into documents and information available to the legislators at the time the decision was made," the "documents and information" referred to in that case was a report prepared by outside consultants for the Garden City Board of Trustees and other documents regarding the same. *Id.* at *4, 6. The court found that this consultant report was akin to non-privileged "conversations between legislators and knowledgeable outsiders," and concluded that the report represented the starting point for the legislative deliberations. *Id.* It held, however, that all communications thereafter that reflected legislative intent and deliberations were privileged, even those with the outside consultant. *Id.* at *6. Further, the court recognized that there are circumstances when fact-finding and analysis preceding the first draft of a bill can be privileged. *Id.* at *4 n.3. In this case, the type of factual material that Plaintiffs seek is not like the preliminary report of an outside consultant found not to be privileged in *ACORN*, but rather is the research and analysis conducted by the Governor's staff and counsel concerning the anticipated Disclosure Provisions. This type of information-gathering in aid of legislation is indisputably a legislative act and, as such, the work-product of the Governor's Office reflecting such research is privileged. *Ways & Means,* 161 F. Supp. 3d at 236-37, 246.

York Department of State, respectively. Both of these Departments are situated within the Executive Branch of the State government, of which the Governor heads. *See* https://www.budget.ny.gov/citizen/structure/structure.html. Intra-branch communications about contemplated legislation differ from the type of lobbyist-legislator communications that courts have found not to be privileged by virtue of the fact they are internal, not external, communications. *See Rodriguez*, 280 F. Supp. 2d at 101 (observing that the structure of the LATFOR advisor group was akin to a conversation between legislators and knowledgeable outsiders, such as lobbyists, about legislation—"a session for which one could not seriously claim privilege"); *see also ACORN*, 2009 WL 2923435, at *6; *Ways & Means*, 161 F. Supp. 2d at 246 (recognizing that the privilege applies to intra-Congressional communications). Moreover, these communications (Privilege Log Entry Nos. 9 and 10) from other Executive agencies were conveying information requested by the Governor's counsel for use in drafting the Disclosure Provisions. This type of informal information gathering in aid of legislating is protected under the legislative privilege irrespective of the source of information. *Ways & Means*, 161 F. Supp. 3d at 236-37; *see also Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) ("Meeting with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation . . . assist legislators in the discharge of their legislative duty" and are a "routine and legitimate part of the modern-day legislative process.").

As to the Governor's claims of deliberative process privilege, however, the question of whether these documents are protected from disclosure is a closer call. Courts have routinely

held that the deliberative process privilege does not extend to "'purely factual' information regarding, for example, investigative matters or factual observations." *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11-cv-6746 (RKE), 2015 WL 3404111, at *3 (S.D.N.Y. May 27, 2015) (citing *Grand Cent. P'ship*, *Inc*., 166 F.3d at 482). Therefore, while any opinions or recommendations about a policy-related decision set forth in a document may be protected, factual findings and conclusions are not privileged and may need to be produced. *Id.*; *see also Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 272 (S.D.N.Y. 2012) ("*Fox News II*") ("Factual material that is severable 'without compromising the private remainder of the documents' consequently must be released") (citation omitted).

At the same time, the "privilege serves to protect the deliberative process itself, not merely documents containing deliberative material." *MacNamara v. City of New York,* 249 F.R.D. 70, 81 (S.D.N.Y. 2008). For this reason, courts have recognized that it may be impractical to sever the factual portions of a document when "the context in which the facts were written and the fact that they were carefully chosen, worded, and included discloses opinions and thought processes" about the policy decision. *Stinson v. City of New York*, 304 F.R.D. 432, 437 (S.D.N.Y. 2015). Here, this Court cannot discern from the Governor's Privilege Log whether disclosure of the research-related documents would reveal otherwise privileged deliberations or if there are severable factual portions of the documents that could be disclosed. Nevertheless, there is no need for *in camera* review because these communications are clearly protected under the legislative privilege (under which fact-gathering is protected) and also are not relevant in any event for the reasons set forth above.

3.  *Drafts Of Summary Memoranda Regarding Potential Ethics Reform Legislation (Privilege Log Entry Nos. 28-30; 57; 59; 61-62; 67)*

The Governor next asserts claims of legislative and deliberative process privilege over several drafts of "summary memoranda regarding potential ethics reform legislation" that were prepared by the Governor's counsel before the enactment of the Disclosure Provisions. This Court finds that these draft summaries are protected under both privileges.

As set forth above, the legislative privilege applies not only to legislative acts themselves, but also to materials and information prepared in connection with carrying out legislative functions. *Favors III,* 2015 WL 7075960, at *8; *Jewish War Veterans*, 506 F. Supp. 2d at 54 (legislative privilege "applies fully" to "preparations for legislative activities"). Summaries of potential legislation created by a staff member can help a busy public official like the Governor stay informed as to what is being considered by the Legislature, as well as facilitate discussion regarding the bill once it is in final form, among other productive uses. Memoranda and summaries thus fall within the type of documents that may be created as part of the consideration, drafting, and enactment of new legislation. As such, they are protected under the legislative privilege.

Counsel's summaries are also protected under the deliberative process privilege. First, the drafts are predecisional because they pre-date the enactment of the Disclosure Provisions. Moreover, like the legislative process privilege, the deliberative process privilege protects all steps within the decisionmaking process as a whole to ensure that the "government can have an unrestrained analysis to render vital decisions." *New York v. Oneida Indian Nation of N.Y.*, No. 95-cv-554 (LEK) (RFT), 2001 WL 1708804, at *6 (N.D.N.Y. Nov. 9, 2001); *see also Marisol A.*,

1998 WL 132810, at *6. Disclosure of draft summaries of potential ethics reform legislation would reveal the process by which government formulated its decision as to the final version of the law that the Governor ultimately signed. *Hopkins*, 929 F.2d at 84-85; *see also MacNamara*, 249 F.R.D. at 81 ("a preliminary outline of a policy prepared by lower-ranking government officials for presentation to a superior with final policymaking authority" is an example of a deliberative document that may be covered by the privilege); *Nat'l Sec. Counselors v. Cent. Intelligence Agency*, 206 F. Supp. 3d 241, 272 (D.D.C. 2016) (observing that a document is deliberative when it is intended to "facilitate or assist development of the agency's final position on the relevant issue."). The fact that these documents are merely drafts of the summary memoranda, rather than a final memoranda, further supports the conclusion that they are entitled to protection from disclosure. *LNC Invs., Inc.,* 1997 WL 729106, at *1.

4. *Communications Regarding Legal Assessment Of The Proposed Disclosure Provisions (Privilege Log Entry Nos. 2; 31; 135-137; 214)*

The Governor's Privilege Log next lists a handful of communications from counsel for the Governor's Office to other counsel, with other members of the Governor's staff copied on some of the emails, regarding counsel's legal assessment of the proposed Disclosure Provisions, including analysis or discussion regarding the scope of the Provisions. These communications all occurred prior to the enactment of the Disclosure Provisions, except for Privilege Log Entry No. 214, which describes communications exchanged approximately a week after the Governor signed the Disclosure Provisions. The Governor asserts that the legislative and deliberative process privileges apply to Privilege Log Entry Nos. 2, 31, and 135-137, but he only advances a claim of deliberative process privilege as to Privilege Log Entry No. 214.

For largely the same reasons set forth in the prior subsection, this Court finds that documents reflecting legal assessment and analysis of the proposed Disclosure Provisions are protected by the legislative privilege and deliberative process privilege, except for Privilege Log Entry No. 214, which is discussed separately below. Evaluating, discussing, and debating proposed legislation are undeniably legitimate legislative acts that fall within the scope of the legislative privilege. *See, e.g., Orange*, 855 F. Supp. at 623 (privilege protects inquiry into a legislator's deliberations and thought processes regarding the challenged legislation). These communications are also protected under the deliberative process privilege because they are predecisional and reflect advisory opinions and analyses that are indicative of the decisionmaking process of the Governor. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 439, 441-42 (S.D.N.Y. 2009).

Privilege Log Entry No. 214 is an email chain dated September 6, 2016 between and among counsel for the Governor regarding counsel's analysis of the scope of the Disclosure Provisions conducted in connection with a potential press statement. The Governor asserts that this communication is protected by the deliberative process privilege.[14] However, because this communication occurred after the Disclosure Provisions were enacted, it cannot be predecisional and therefore is not covered by the deliberative process privilege. *See Nat'l Congress for Puerto Rican Rights ex rel Perez*, 194 F.R.D. at 92 (for deliberative process privilege to apply, the document must temporally precede the decision to which it relates). Moreover,

---

[14] The Governor also asserts that this document is protected by the attorney-client privilege. The Court addresses applicability of this privilege in Subsection E below.

this document reflects analysis of an existing law, which falls outside the scope of the

deliberative process privilege. *N.Y. Times,* 101 F. Supp. 3d at 318.

5. <u>*Communications Regarding Drafts Of Public Statements (Privilege Log Entry Nos. 32-*</u>
   <u>*37; 39-46; 49-56; 58; 60; 63-66; 68-134; 139-175; 179-180; 206-209)*</u>

The next category of documents over which the Governor asserts a claim of privilege

can be broadly characterized as communications between and among the Governor's staff and

counsel concerning drafts of public statements to be given by the Governor regarding campaign

finance and ethics reform legislation, including press releases and speeches. Most of these

documents pre-date the Disclosure Provisions, but some communications occurred on the

same day that the Governor signed the Provisions. The Governor claims that all of these

communications discuss, request, or reflect counsel's edits to these draft statements and, as

such, are protected under the deliberative process privilege. The Governor does not invoke the

legislative privilege as to these documents.[15]

In determining whether the deliberative process privilege applies to these documents,

the key inquiry is whether the drafts or communications reflect deliberations about what

"message" should be delivered to the public about an *already-decided* policy decision, or

whether the communications are of a nature that they would reveal the deliberative process

underlying a *not-yet-finalized* policy decision. *See Nat'l Day Laborer Org. Network v. U.S. Immig.*

*& Customs Enf't Agency*, 811 F. Supp. 2d 713, 741 (S.D.N.Y. 2011); *N.Y. Times,* 499 F. Supp. 2d at

515 ("the mere fact that a document is a draft . . . is not a sufficient reason to automatically

---

[15] The Governor also asserts a claim of attorney-client privilege over many of the documents in this category,
which this Court addresses in Subsection E *infra.*

exempt it from disclosure."). The former is not protected by the privilege. *See Fox News II*, 911 F. Supp. 2d at 276 ("communications concerning how to present agency policies to the press or public, although deliberative, typically do not qualify as substantive policy decisions protected by the deliberative process privilege."); *Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 741 (agency deliberations about the "messaging" to be delivered to the public about an existing policy is not protected under the privilege). But, discussions about, and revisions to, a draft public statement may be privileged if disclosure of the communications would reveal how the Legislature's or Governor's deliberations regarding the underlying ethics reform legislation progressed over time. *See Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 545-46 (S.D.N.Y. 2010) ("*Fox News I*"). For example, in *Fox News I,* the court held that a draft press release about a non-final policy decision, and emails about the press release, were privileged because they revealed alternatives that were ultimately not adopted and discussed rationales that may not accurately reflect the ultimate rationale for the policy decision. 739 F. Supp. 2d at 545. The onus is on the government to "furnish the Court with specific information establishing that the draft is both predecisional and deliberative, by explaining, for example, the 'function and significance [of the draft] in the agency's decisionmaking process.'" *Fox News II*, 911 F. Supp. 2d at 276 (quoting *N.Y. Times*, 499 F. Supp. 2d at 515); *see also Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 741 (a draft document is only protected by the privilege "if it contains discussions that reflect the policy-making process").

Applying this standard here, this Court cannot conclude whether the discussions about, and revisions to, the Governor's press releases and speeches regarding the proposed ethics

reform law are privileged. First, this Court cannot determine whether the communications and documents exchanged on August 24, 2016 do in fact temporally precede the Governor's enactment of the Disclosure Provisions, which occurred on that same day. Furthermore, it is not clear based on the description in the Privilege Log whether the drafts and communications solely pertain to the best way to publicly announce the new ethics reform law, or whether the communications would reveal last-minute deliberations about the Disclosure Provisions or ethics reform bills more generally. Nevertheless, for the reasons set forth in Section I, *supra*, this Court will not order the Governor to produce these draft statements, or communications about the same, for *in camera* review because Plaintiffs have failed to establish how they are relevant and proportional to the needs of this case. *See Grossman*, 125 F.R.D. at 385 ("Drafts, by their very nature, rarely satisfy the test of relevance.").

6. *Communications Regarding Drafts Of The Sponsor's Memo, Approval Message, And Executive Order For The Ethics Reform Legislations (Privilege Log Entry Nos. 176-178; 181-205; 210-213)*

The final category of documents listed on the Governor's Privilege Log are communications between and among the Governor's counsel and staff regarding drafts of the sponsor's memo, approval message, and/or executive order for the ethics reform legislation, as well as communications requesting or reflecting counsel's work product as to these documents. Privilege Log Entry Nos. 176-178 describe communications that occurred prior to the enactment of the Disclosure Provisions, whereas the remainder of the communications and documents in this category occurred on the date of enactment. The Governor asserts that these documents are protected under both the legislative and deliberative process privileges.

This Court agrees that these draft documents are protected by the legislative privilege. Much in the same way as preparing a legislative report is a protected act, *see Ways & Means*, 161 F. Supp. 3d at 236, drafting the sponsor's memo, approval message, and an executive order that is necessary to effectuate the new law are all components of the legislative process that relate to the enactment of the Disclosure Provisions. *See Wash. Suburban Sanitary Comm'n*, 631 F.3d at 184 (4th Cir. 2011) (explaining that legislative acts "typically involve the 'adopt[ion of] prospective, legislative-type rules.'") (internal citation omitted); *Urban Justice Ctr. v. Pataki*, 810 N.Y.S.2d 826, 835 (Sup. Ct., N.Y. Cnty. 2005) ("[w]ithout question, signing and transmitting a message of necessity are legislative acts, inasmuch as they are permissible steps in the legislative process"). As "acts that occur in the regular course" of New York's legislative process, *Brewster*, 408 U.S. at 525, communications about the sponsor's memo, approval message, and executive order, as well as drafts of these documents, are entitled to protection under the legislative privilege. *See generally Miller,* 709 F.2d at 529 (finding that the privilege applies to the insertion of material into the Congressional record).

As to the deliberative process privilege, drafts of the sponsor's memo, approval message, and executive order, and deliberations regarding the same, are deliberative because they reflect the process by which the Governor and Legislature created a final versions of the documents. *See Nat'l Council of La Raza*, 411 F.3d at 356; *see also Nat'l Sec. Archive v. Cent. Intelligence Agency*, 752 F.3d 460, 462 (D.C. Cir. 2014) (explaining that the deliberative process privilege is premised upon the notion that officials "should be judged by what they decided, not for matters they considered before making up their minds") (citation omitted). Privilege Log

Entry Nos. 176-178 are also predecisional and, thus, are also protected under the deliberative process privilege. This Court cannot determine whether Privilege Log Entry Nos. 181-205 and 210-213, the communications dated on the same day that the Disclosure Provisions were enacted, are predecisional, but this distinction is immaterial because such documents are protected under the legislative privilege.

**D.** *Application Of The* **Rodriguez** *Factors*

As set forth above, a finding that the legislative or deliberative process privilege applies to a document does not mean that disclosure is *per se* barred because both privileges are qualified. In assessing whether and to what extent the privilege bars disclosure, the court in *Rodriguez* held that courts "must balance the extent to which production of the information sought would chill the New York State Legislature's deliberations concerning such important matters . . . against any other factors favoring disclosure." 280 F. Supp. 2d at 100-01. Relevant factors for the Court to consider include:

> (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.* (quoting *In re Franklin Nat'l Bank Secs. Litig.,* 478 F. Supp. 577, 583 (E.D.N.Y. 1979)). As the court explained in *Favors II*, "[i]f consideration of the first four factors leads to the conclusion that they outweigh the risk addressed by the fifth – possible future timidity – then the demanded document ought to be disclosed," despite the claim of privilege. 2013 WL 11319831, at *11; *see also Rodriguez*, 280 F. Supp. 2d at 101.

The first of the five factors—the relevance of information sought—will frequently weigh against disclosure in cases involving First Amendment challenges. As discussed above, Plaintiffs rely on cases involving allegations of discrimination, pretext, and self-dealing, which necessarily implicate the purpose and motives behind the challenged law. Such cases present the extraordinary circumstance where discovery into the legislative decisionmaking process might be relevant because intent is an element of the claim or otherwise important to establishing the claim.[16] Unlike the cases cited by Plaintiffs, in this case, what facts prompted any individual legislator to vote for the ethics reform legislation, or what facts prompted the Governor to sign the law, have no bearing on the outcome of this case. *See, e.g., O'Brien*, 391 U.S. at 383 ("it is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive") (*see also, supra*, Section I.) For this reason, as well as the reasons discussed in Section I, the first *Rodriguez* factor weighs in favor of granting the Governor's motion to quash.

The second *Rodriguez* factor—availability of other evidence—also weighs against disclosure in most First Amendment cases, including this one, for reasons that are intertwined with those cited above. That is, if the information from an individual lawmaker is not relevant, or only marginally relevant, the availability of more directly relevant information, such as the publicly available legislative record, will weigh against disclosure. In most cases, the key

---

[16] The motives and fact-finding efforts of *individual* lawmakers or a Governor will be entirely irrelevant in most cases outside of the "extraordinary circumstances" of a case involving claims of discrimination or self-dealing on the part of lawmakers. Additionally, for reasons discussed *supra*, even in these extraordinary cases, discovery, if any, into legislative motives and predecisional documents still must be narrowly tailored and only limited intrusion into legislative motives and deliberative process may be permitted.

information needed to prosecute or defend a civil case will be available from sources other than the personal files of individual legislators. However, in discrimination cases like the redistricting and voting rights cases cited by Plaintiffs, evidence needed to demonstrate invidious or discriminatory motives or self-dealing may not be available from sources other than individual legislators; indeed, the legislator may have actively attempted to hide evidence of self-dealing or unlawful motives. Therefore, in those cases, the second factor may weigh in favor of disclosure. In a First Amendment challenge to a law, a court will typically make its determination based on the language of the law, possibly the legislative history of the law, public statements of lawmakers, other public records concerning the law, the language of the constitutional provision at issue and precedent interpreting that provision. Here, the Governor and Intervenors have already produced all of the publicly available records in their possession, and Plaintiffs have access to other public materials by virtue of Plaintiffs' involvement in state politics, such as press releases, announcements, and comments to constituents. This information has routinely been sufficient for courts to adjudicate the constitutionality of disclosure laws like the one at issue in this case without assessing individual legislators' motivations or the factual information considered by each legislator in reaching a decision on how to vote. *See Buckley*, 424 U.S. 1; *McConnell*, 540 U.S. 93; *Citizens United*, 558 U.S. 310; *Indep. Inst.*, 2016 WL 6560396*, aff'd*, 137 S.Ct. 1204. In short, the information needed by Plaintiffs to prosecute their First Amendment challenge is available and has been produced to Plaintiffs already. Therefore, the second *Rodriguez* factor weighs in favor of quashing the subpoena here.

The third *Rodriguez* factor, the seriousness of the case and issues involved, goes to the nature of the claim itself. As the Governor and the Intervenors point out, every federal case is serious. Every constitutional challenge to a law enacted by a state legislature is serious. For this factor to be meaningful, there must be a rule or sliding scale for distinguishing among those cases that are, and are not, serious enough to warrant invasion into the private files of individual legislators. The case law cited by the parties, however, does not provide a clear rule for evaluating this factor. This Court holds that outcome of this factor hinges on the interest of the public—does it tip in favor of disclosure or in favor of protecting its duly elected representatives' ability to function properly in their roles without the distraction of civil litigation? In evaluating this factor, courts must be mindful that permitting discovery into a legislator's individual files threatens to undermine not only legislative independence, but also contravenes a principle purpose of the legislative privilege—"to ensure that lawmakers are allowed to focus on their public duties." *In re Hubbard*, 803 F.3d at 1310 (explaining that the legislative privilege extends to discovery requests because "even when the lawmaker is not a named party in the suit[,] complying with such requests detracts from the performance of official duties") (internal quotations and citation omitted); *see also Supreme Ct. of Va.*, 446 U.S. at 733 (private civil litigation "creates a distraction and forces [legislators] to divert their time, energy, and attention from their legislative tasks to defend the litigation.") (quoting *Eastland*, 387 U.S. at 503); *MINPECO, S.A. v. Conticommodity Servs., Inc.,* 844 F.2d 856, 859 (D.C. Cir. 1988) ("A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive.").

"[I]t is indisputable that racial [discrimination] and malapportionment claims in redistricting cases 'raise serious charges about the fairness and impartiality of some of the central institutions of our state government,' and thus counsel in favor of allowing discovery." *Favors I,* 285 F.R.D. at 219 (citing *Rodriguez*, 280 F. Supp. 2d at 102). As discussed above, redistricting and voting rights cases are "extraordinary" because they involve self-dealing that deprives, or threatens to deprive, the electorate of the power of their vote to act as a check on legislators. In such circumstances, courts have recognized that the public need for full development of relevant facts outweighs countervailing public concerns justifying the privilege. *Rodriguez*, 280 F. Supp. 2d at 95-96, 101-02; *see also Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 304 (D. Md. 1992) (redistricting "inevitably . . . directly involves the self-interest of the legislators themselves" because it "involves the establishment of the electoral structure by which the legislative body becomes duly constituted"); *Bethune-Hill*, 114 F. Supp. 3d at 337 (redistricting cases present the "extraordinary instance" contemplated by *Arlington Heights* where judicial inquiry into legislative motives may be permissible because "the natural corrective mechanisms built into our republican system of government offer little check upon the very real threat of legislative self-entrenchment") (internal quotation and citation omitted). A First Amendment challenge to a law typically will not implicate legislative self-dealing or raise issues such that the public's need for full development of the facts outweighs its interest in ensuring that lawmakers and governors are not pulled away from their official responsibilities to respond to discovery requests or to give testimony. Thus, while this case clearly involves serious First Amendment claims, the third *Rodriguez* factor does not tip in

favor of disclosure. Plaintiffs can obtain all the information needed to prosecute their claim without invading the motives, fact-finding and internal deliberations of individual lawmakers or the Governor.[17]

The fourth *Rodriguez* factor looks to the role of government in the litigation. As the court in *Favors II* explained, this factor considers the role played by the legislature and its members in the allegedly unlawful conduct. 2013 WL 11319831, at *11-12. When the role of the legislators in the unlawful conduct is "direct," the fourth factor weighs in favor of disclosure. *Id.* at *12. Contrary to Plaintiffs' suggestion, merely voting for a law or signing a bill does not render a legislator's role "direct." Indeed, voting is an everyday function of lawmakers, and signing bills into law is an ordinary function of a governor. In discriminatory redistricting cases like *Favors*, legislators are accused of intentional discrimination or self-dealing in connection with their legislative acts, meaning that their motivations and considerations "to a large degree, are the case." *Favors I*, 285 F.R.D. at 219-20. This is fundamentally different conduct than simply voting on a law that may be deemed to impinge in some way on free speech. Thus, the fourth *Rodriguez* factor does not support piercing the privileges in this case.

When these first four *Rodriguez* factors are balanced against the fifth factor—"the possibility of future timidity by government employees who will be forced to recognize that

---

[17] The Governor and Intervenors urge the Court to hold that the "seriousness" factor weighs against disclosure because the sufficiency of Plaintiffs' claims have not yet been tested on the merits. This argument misses the mark. There is no reason that Plaintiffs' claims should be viewed as less serious simply because this litigation is still in an early stage. Rather than looking to the procedural posture of the case, the proper focus for assessing the seriousness of Plaintiffs' claims is "whether the litigation and issues therein are of a *serious type*, not whether the claims will ultimately prevail." *Favors I*, 285 F.R.D. at 219 (citing *ACORN*, 2009 WL 2923435, at *4 (defining the "seriousness of the litigation" in relation to "the civil rights implicated") and *Rodriguez*, 280 F. Supp. 2d at 102) (emphasis in original).

their secrets are violable," *Rodriguez*, 280 F. Supp. 2d at 100-01— this Court concludes that the disclosure of the privileged documents is not warranted. As the Supreme Court has made clear, it is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney,* 341 U.S. at 377. And as noted above, a key rationale for the legislative and deliberative process privileges is the need to ensure that state officials will be able to engage in robust deliberation about, and analysis of, proposed legislation that is essential to our republican form of government. S*ee, e.g., Star Distribs., Ltd.,* 613 F.2d at 9 (*"*the role of the state legislature is entitled to as much judicial respect as that of Congress"); *Favors I*, 285 F.R.D. at 220; *Fed. Hous. Fin. Agency*, 2014 WL 1909446, at *1 (the deliberative process privilege "is motivated by 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news' and the desire to 'enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.'") (internal citation omitted).

Open dialogue between lawmakers and their staff would be chilled if their subjective, preliminary opinions and considerations are potentially subject to public disclosure and critique. *See Favors I*, 285 F.R.D. at 220; *Carver v. Nassau Cnty. Interim Fin. Auth.*, No. 11-cv-1614 (LDW) (GRB), 2012 WL 12266891, at *5 (E.D.N.Y. Aug. 9, 2012) ("it would be impossible to have any frank discussion of legal or policy matters in writing if all such writings were to be subjected to public scrutiny. It was argued, and with merit, that efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to 'operate in a fishbowl.'") (quoting *Mink*, 410 U.S. at 87).

This is not the "extraordinary case" where abrogation of the privileges is warranted. Indeed,

holding otherwise would expand the existing case law to such an extent that the privileges

would have virtually no meaning whatsoever. Accordingly, this Court finds that Plaintiffs'

interests in the disclosure of the documents listed in the Governor's Privilege Log are

overweighed by the public interest in ensuring that New York's state lawmakers are able to

engage in honest, robust debates needed to make thoughtful and informed decisions about

future legislation, as well as the public interest in protecting state officials from the

unnecessary distractions in effectuating their official duties that are inherent in the discovery

process.

### E.    *Attorney-Client Privilege*

The Governor also asserts a claim of attorney-client privilege over a number of

documents listed in his Privilege Log that he contends are also protected by the legislative

privilege and/or deliberative process privilege. Specifically, the Governor represents that the

attorney-client privilege applies to Privilege Log Entry Nos. 1-8, 15-16, 19-20, 25, 27-53, 57, 59,

61-62, 64-128, 131-132, 134-138, 146-147, 155-205, and 210-214.

The attorney-client privilege is one of the "oldest recognized privileges for confidential

communications." *Swindler & Berlin v. United States*, 524 U.S. 399, 403 (1998). The attorney-

client privilege "exists for the purpose of encouraging full and truthful communications

between an attorney and his client and 'recognizes that sound legal advice or advocacy serves

public ends and that such advice or advocacy depends upon the lawyer's being fully informed

by the client.'" *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987) (quoting *Upjohn Co. v. United*

*States*, 449 U.S. 383, 389 (1981)). At the same time, courts should construe assertions of privilege narrowly, sustaining the privilege "only where necessary to achieve its purpose." *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)); *see also In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000). The party seeking to invoke the privilege bears the burden of establishing its applicability. *In re Cnty. of Erie*, 473 F.3d at 418.

When the government asserts a claim of attorney-client privilege, it must establish: "(1) a communication between government counsel and their clients that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *Id.* at 419 (citations omitted). "[I]n civil litigation between a government agency and private litigants, the government's claim to the protections of the attorney-client privilege is on a par with the claim of an individual or a corporate entity." *Id.* (internal citation and quotations omitted).

The question of whether a communication is protected under attorney-client privilege often turns on whether the communication was made for the purpose of obtaining or providing legal advice, rather than policy advice. "Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct," and requires an attorney to rely upon "legal education and experience to inform judgment." *Id.* Accordingly, the key inquiry is whether the "predominant purpose" of the communication is to solicit or provide legal advice. *Id*. at 419-20 (collecting cases). When legal advice is the predominant purpose, "other 'considerations and caveats' are not severable and the entire

communication is privileged." *Fox News I*, 739 F. Supp. 2d at 560 (citing *In re Cnty. of Erie*, 473 F.3d at 420). On the other hand, if the legal advice is merely "incidental to the nonlegal advice that is the predominant purpose of the communication," then the legal portions of the document may be redacted. *In re Cnty. of Erie*, 473 F.3d at 420 n.8.

The distinction between whether the communications in fact concern legal, rather than policy, advice is one that often turns on the specifics of an individual document. *See id.* at 422-23. For this reason, courts often require *in camera* review before rendering a decision on whether the attorney-client privilege is properly invoked. *See, e.g., id; Fox News I*, 739 F. Supp. 2d at 561-62. Here, this Court is unable to determine the "primary purpose" of the communications between and among the Governor's counsel without more information than what is recited on the Privilege Log. Nevertheless, this Court will not require the Governor to produce the documents potentially protected under the attorney-client privilege for *in camera* review to the extent that such documents are already protected under the legislative privilege or deliberative process privilege.

As stated above, however, this Court is unable to determine whether the deliberative process privilege applies to Privilege Log Entry Nos. 32-37, 39-46, 49-56, 58, 60, 63-66, 68-134, 139-175, 179-180, and 206-209, which are documents regarding or reflecting the Governor's counsels' edits to draft public statements, and Entry No. 214, which is a communication regarding counsel's analysis of the scope of the Disclosure Provisions in connection with a potential press statement. With respect to the documents concerning draft public statements, Plaintiffs have failed to meet their burden of establishing how such drafts, or communications

about the same, are relevant to the claims and defenses in this litigation. (*See, supra*, Section I.)
With respect to Entry No. 214, this communication appears likely to be covered by the
attorney-client privilege, but in any event, Plaintiffs also have not explained why the post-
enactment analysis of counsel is relevant to their claims that the Disclosure Provisions as
enacted are overly broad. Thus, *in camera* review will not be required for any of the documents
over which the Governor has asserted a claim of privilege because this Court deems them to be
irrelevant.

## CONCLUSION

For the foregoing reasons, this Court **grants** the Governor's motion to quash Plaintiffs'
subpoena.

**SO ORDERED.**

Dated: September 1, 2017
New York, New York

*Katharine H. Parker*
_____
KATHARINE H. PARKER
United States Magistrate Judge