UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**CITIZENS UNION OF THE CITY OF NEW YORK, et al.,**

*Plaintiffs*,

v.

**THE ATTORNEY GENERAL OF THE STATE OF NEW YORK,**

*Defendant*.

No. 16 Civ. 9592 (RMB) (KHP)

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166

*Attorneys for Plaintiffs Citizens Union of the City of New York and Citizens Union Foundation, Inc. of the City of New York*

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036

*Attorneys for Plaintiffs American Civil Liberties Union Foundation, New York Civil Liberties Union Foundation, and New York Civil Liberties Union*

GIBBONS P.C.
One Gateway Center
Newark, NY 07102

*Attorneys for Plaintiffs Lawyers Alliance for New York and Nonprofit Coordinating Committee of New York*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ...................................................................................................4

    I.      Regulation of 501(c)(3) and 501(c)(4) Organizations ...........................................4

    II.     The Legislature Passes Sections 172-e and 172-f the Same Day They Were Introduced and Without Any Public Comment ......................................................6

    III.    The Challenged Provisions ...................................................................................8

          A.      Section 172-e ..........................................................................................8

          B.      Section 172-f ...........................................................................................9

    IV.    Plaintiff Nonprofit Groups ................................................................................10

          A.      The Citizens Union Plaintiffs.................................................................10

          B.      The ACLU Plaintiffs...............................................................................11

          C.      The Lawyers Alliance Plaintiffs .............................................................11

    V.      Procedural History .............................................................................................12

ARGUMENT .....................................................................................................................12

    I.      Standard for Summary Judgment and a Permanent Injunction ...........................12

    II.     Standard of Review Under the First Amendment.................................................13

    III.    Section 172-e Violates the First Amendment .......................................................14

          A.      Section 172-e Substantially Chills Speech and Burdens Donors' Rights to Free Association and Privacy .............................................................15

          B.      Section 172-e Cannot be Justified by the State's Interest in Regulating Speech Related to Elections.....................................................................18

          C.      Section 172-e Cannot be Justified by the State's Interest in Combating Fraud in the Nonprofit Sector or Promoting Transparency in Lobbying Activity ................................................................................................20

**TABLE OF CONTENTS** *(continued)*

Page

IV.    Sections 172-f Violates the First Amendment .........................................................22

      A.    Section 172-f Burdens the Rights of Free Speech, Free Association, and Privacy...........................................................................................22

      B.    There is No Substantial Relationship Between Section 172-f and the State's Interest in Regulating Election-Related Speech...........................24

      C.    There is No Substantial Relationship Between Section 172-f and the State's Post-Hoc Prevention of Fraud Rationale ......................................28

V.    Sections 172-e and 172-f are Unconstitutional As Applied to the ACLU Plaintiffs and the Citizens Union Plaintiffs .........................................................29

CONCLUSION......................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abood v. Detroit Bd. of Educ.*,
431 U.S. 209 (1977) ........................................................................................................16, 23

*ACLU of Nev. v. Heller*,
378 F.3d 979 (9th Cir. 2004) ..............................................................................................19

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
889 F. Supp. 2d 606 (S.D.N.Y. 2012)..................................................................................12

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ............................................................................................................14

*Averill v. City of Seattle*,
325 F. Supp. 2d 1173 (W.D. Wash. 2004)...........................................................................30

*Baggett v. Bullitt*,
377 U.S. 360 (1964).............................................................................................................17

*Brown v. Socialist Workers '74 Comm. (Ohio)*,
459 U.S. 87 (1982)...............................................................................................................29

*Buckley v. Am. Constitutional Law Found., Inc.*,
525 U.S. 182 (1999).............................................................................................................13

*Buckley v. Valeo*,
424 U.S. 1 (1976)............................................................................................15, 22, 25, 29

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*,
954 F. Supp. 2d 127 (E.D.N.Y. 2013), *aff'd* 705 Fed. Appx. 10 (2d Cir. 2017) ....................30

*Citizens United v. FEC*,
558 U.S. 310 (2010)......................................................................................2, 13, 25, 29

*Citizens United v. Schneiderman*,
882 F.3d 374 (2d Cir. 2018)..........................................................2, 3, 4, 13, 15, 20

*Davis v. FEC*,
554 U.S. 724 (2008).............................................................................................................15

*Doe v. Reed*,
561 U.S. 186 (2010).............................................................................................................30

*Does 1-10 v. Univ. of Wash.*,
2017 U.S. Dist. LEXIS 197244 (W.D. Wash. Nov. 30, 2017)...............................................30

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012).............................................................................................................17

iii

# TABLE OF AUTHORITIES *(continued)*

Page(s)

*Federal Election Comm'n v. Wisconsin Right To Life, Inc.*,
    551 U.S. 449 (2007).....................................................................................14

*Forsyth Cty., Ga. v. Nationalist Movement*,
    505 U.S. 123 (1992).....................................................................................14

*Indep. Inst. v. FEC*,
    137 S. Ct. 1204 (2017), (D.D.C. 2016)......................................................25

*Indep. Inst. v. Williams*,
    812 F.3d 787 (10th Cir. 2016) ....................................................................25

*Iowa Right To Life Comm., Inc. v. Tooker*,
    717 F.3d 576 (8th Cir. 2013) ......................................................................28

*Local 1814, Int'l Longshoremen's Ass'n AFL-CIO v. Waterfront Com. of N.Y.
    Harbor*,
    667 F.2d 267 (2d Cir. 1981)........................................................................29

*McConnell v. FEC*,
    540 U.S. 93 (2003).......................................................................................25

*McCutcheon v. FEC*,
    134 S. Ct. 1434 (2014)................................................................13, 22, 26

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)............................................................2, 4, 15, 26, 30

*Minn. Citizens Concerned for Life, Inc. v. Kelley*,
    427 F.3d 1106 (8th Cir. 2005) ....................................................................21

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
    692 F.3d 864 (8th Cir. 2012) ................................................................24, 28

*N.Y. Civ. Liberties Union v. Acito*,
    459 F. Supp. 75 (S.D.N.Y. 1978)...............................................................30

*NAACP v. Alabama*,
    357 U.S. 449 (1958)...............................................................................15, 22

*Nat'l Ass'n of Mfrs. v. Taylor*,
    582 F.3d 1 (D.C. Cir. 2009)........................................................................21

*Nat'l Org. for Marriage, Inc. v. McKee*,
    649 F.3d 34 (1st Cir. 2011).........................................................................22

*Nixon v. Shrink Mo. Gov't PAC*,
    528 U.S. 377 (1999).....................................................................................18

*In re Primus*,
    436 U.S. 412 (1978).....................................................................................16

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006)....................................................................................................15

*Simsbury-Avon Preservation Soc'y, LLC v. Metacon Gun Club, Inc.*,
  575 F.3d 199 (2d Cir. 2009).....................................................................................12

*Stern v. Regency Towers, LLC*,
  886 F. Supp. 2d 317 (S.D.N.Y. 2012)......................................................................12

*Talley v. California*,
  362 U.S. 60 (1960)....................................................................................................15

*Thomas More Law Ctr. v. Harris*,
  2016 U.S. Dist. LEXIS 158851 (C.D. Cal. Nov. 16, 2016)......................................30

*United States v. Harriss*,
  347 U.S. 612 (1954)..................................................................................................27

*United States v. Stevens*,
  559 U.S. 460 (2010)..................................................................................................14

*Van Hollen v. FEC*,
  811 F.3d 486 (D.C. Cir. 2016)..................................................................................19

*Vt. Right to Life Comm., Inc. v. Sorrell*,
  758 F.3d 118 (2014)............................................................................................22, 26

*Vill. of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980)..................................................................................................16

*Watchtower Bible and Tract Soc'y v. Vill. of Stratton*,
  536 U.S. 150 (2002)..................................................................................2, 15, 20, 22

*White River Amusement Pub, Inc. v. Town of Hartford*,
  481 F.3d 163 (2d Cir. 2007)......................................................................................18

*Williams-Yulee v. Fla. Bar*,
  135 S. Ct. 1656 (2015)..............................................................................................27

*Windsor v. United States*,
  699 F.3d 169 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013) ................................20, 28

*Wisconsin Right to Life, Inc. v. Barland*,
  751 F.3d 804 (7th Cir. 2014) ........................................................................3, 19, 25, 27

## TABLE OF AUTHORITIES *(continued)*

Page(s)

### Constitutional Provisions

Const. N.Y. art. III, § 14 ...................................................................................7

### Statutes

26 U.S.C. § 501(c)(3) ......................................................................................18

26 U.S.C. § 501(c)(4) ......................................................................................29

26 U.S.C. § 6104(d)(3)(A) .................................................................................5

N.Y. Elec. L. § 14-107(1)(a) ...........................................................................23

N.Y. Elec. L. § 14-107(1)(a)-(b) .......................................................................6

N.Y. Elec. L. § 14-114 .......................................................................................6

N.Y. Elec. L. § 14-116 .......................................................................................6

N.Y. Exec. L. § (2)(a)-(b) ................................................................................23

N.Y. Exec. L. § 14-107(a) ...............................................................................27

N.Y. Exec. L. 172(1) ..........................................................................................5

N.Y. Exec. L. § 172-b .........................................................................................5

N.Y. Exec. L. § 172-e .........................................................................................8

N.Y. Exec. L. § 172-e(1)(b) .............................................................................17

N.Y. Exec. L. § 172-e(1)(b)-(c) .........................................................................8

N.Y. Exec. L. § 172-e(1)(c) .............................................................................17

N.Y. Exec. L. § 172-e(1)(d) ..........................................................................9, 18

N.Y. Exec. L. § 172-e(2)(a) ...............................................................................8

N.Y. Exec. L. § 172-e(3) ...............................................................................8, 30

N.Y. Exec. L. § 172-f ..............................................................................8, 22, 28

N.Y. Exec. L. § 172-f(1)(b) ...........................................................10, 13, 24, 25, 26

N.Y. Exec. L. § 172-f(1)(c) .............................................................................23

N.Y. Exec. L. § 172-f(2) .................................................................................23

N.Y. Exec. L. § 172-f(2)(a) .............................................................................10

N.Y. Exec. L. § 172-f(2)(a)(iv) .......................................................................23

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

N.Y. Exec. L. § 172-f(3) ...........................................................................................10, 30

N.Y. Exec. L. § 172-f(c) ................................................................................................10

N.Y. Exec. L. § 177 .........................................................................................................9

N.Y. Exec. L. § 177(2) ..................................................................................................10

N.Y. Legis. Law § 1-c(b) .................................................................................................5

N.Y. Legis. Law § 1-h .....................................................................................................5

N.Y. Legis. Law § 1-h(c)(4) ..........................................................................................21

N.Y. Legis. Law § 1-h(c)(4)(ii) ......................................................................................21

N.Y. Legis. Law § 1-j .......................................................................................................5

N.Y. Legis. Law § 1-j(c)(4) ...........................................................................................21

N.Y. Legis. Law § 1-j(c)(4)(ii) .......................................................................................21

**Rules**

Fed. R. Civ. P. 56(a) ......................................................................................................12

**Regulations**

26 C.F.R. § 1.501(c)(3)-1(b)(3)(ii)-(iii) ...........................................................................4

26 C.F.R. § 1.501(c)(3)-1(b)(v)(3) .................................................................................18

26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) ...................................................................................5

26 C.F.R. § 301.6104(b)-1(b)(1) .....................................................................................5

72 Fed. Reg. 72899 (Dec. 26, 2007) .............................................................................19

13 N.Y.C.R.R. § 91.5(c)(3)(i)(a) ................................................................................5, 29

13 N.Y.C.R.R. § 96.2 .......................................................................................................5

**Other Authorities**

Internal Revenue Service, *Political Campaign and Lobbying Activities of IRC 501(c)(4), (c)(5), and (c)(6) Organizations*, https://www.irs.gov/pub/irs-tege/eotopicl03.pdf ..........................................................................................................5

Plaintiffs Citizens Union of the City of New York and Citizens Union Foundation, Inc. of the City of New York (together the "Citizens Union Plaintiffs"); the American Civil Liberties Union Foundation, the New York Civil Liberties Union Foundation, and the New York Civil Liberties Union (together the "ACLU Plaintiffs"); and Lawyers Alliance for New York and Nonprofit Coordinating Committee of New York (together the "Lawyers Alliance Plaintiffs") respectfully submit this Memorandum of Law in support of their joint motion for summary judgment.  For the reasons that follow, this Court should declare New York Executive Law sections 172-e ("Section 172-e") and 172-f ("Section 172-f") unconstitutional and enter a permanent injunction restraining Defendant Attorney General of the State of New York from enforcing or implementing them.

## PRELIMINARY STATEMENT

Plaintiffs bring this action to vindicate their rights, and the rights of their members and donors, under the First Amendment to the United States Constitution.  Sections 172-e and 172-f are dangerous and unprecedented provisions that will require public disclosure of the identities of donors to nonprofit organizations on state-run websites, even when those donors and their donations support speech and expressive activities on matters of public concern unrelated to elections or lobbying.  In the guise of campaign finance reform, New York's Governor and Legislature slipped these provisions into a broader bill without debate or prior disclosure to the public, and voted on them shortly after their introduction.  The challenged provisions subject nonprofit groups, no matter how nonpartisan or apolitical, to onerous, invasive reporting and disclosure requirements that cannot survive constitutional scrutiny.

Section 172-e requires the public disclosure by a 501(c)(3) of all of its donors and donations over $2,500 if the 501(c)(3) makes contributions valued at $2,500 or more—including in-kind donations—to any 501(c)(4) that is required to make a filing under New York lobbying

laws, even if those donations are entirely unrelated to lobbying activity, never make their way to the 501(c)(4), or are earmarked by the donor or 501(c)(3) for a purpose other than lobbying. Section 172-f requires the public disclosure by a 501(c)(4) of all donors and donations over $1,000 when the organization spends more than $10,000 annually on "covered communications," which include communications on virtually any matter of public concern.

As this Court recognized at the outset of the litigation, "[n]o other jurisdiction has disclosure requirements similar to Sections 172-e and 172-f." Dkt. 34 at 6. And for good reason: The Supreme Court has repeatedly struck down overbroad compelled disclosure laws because they burden First Amendment-protected rights to speak and to associate anonymously on matters of public concern. *See, e.g.*, *Watchtower Bible and Tract Soc'y v. Vill. of Stratton*, 536 U.S. 150, 165-66 (2002) (invalidating village ordinance requiring door-to-door canvassers to publicly identify themselves); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342-43 (1995) (invalidating law barring anonymous pamphlets in election campaigns). As the State concedes, such laws may stand only if there is, at a minimum, a "substantial relation between the disclosure requirement and a sufficiently important government interest," such as narrowly tailored campaign finance regulations that combat *quid pro quo* corruption. *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010). And where, as here, a disclosure law is triggered by "the topic[s] discussed," or "cannot be justified without reference to the content of the regulated speech," strict scrutiny applies, requiring a narrowly tailored "compelling" state interest. *Citizens United v. Schneiderman*, 882 F.3d 374, 381 (2d Cir. 2018). Sections 172-e and 172-f are unconstitutional because they substantially burden First Amendment rights but are not "substantial[ly] relat[ed]" to a "sufficiently important government interest," let alone narrowly tailored to a "compelling" state interest.

2

By requiring the public disclosure of a covered entity's donors on state-run websites, Sections 172-e and 172-f burden Plaintiffs' associational rights and the privacy interests of their donors; chill protected speech and charitable contributions on matters of public concern (including deterring donors from contributing, knowing that their support for unpopular causes or controversial positions will be broadcast to the public); infringe the right to express opinions and support causes without fear of threats or harassment; burden organizations' protected right to solicit charitable donations; and impose significant administrative burdens on nonprofits.

Neither the Governor nor the Legislature articulated any basis whatsoever for inserting these specific provisions in a broader campaign finance reform bill, and the State has not articulated an interest sufficient to justify these extraordinary burdens on protected speech and activities.  Instead, it vaguely references a general interest in promoting transparency in elections.  But this interest, valid as it may be as applied to other laws, is simply inapposite here.  The challenged provisions say nothing about elections, campaigns, or candidates—indeed, they even apply to funds that a donor *prohibits* from being used for election- or lobbying-related activity.  In *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 842 (7th Cir. 2014), the Seventh Circuit struck down a comparable reporting and disclosure law as unconstitutional because it applied to all manner of organizations that engaged in issue advocacy "without distinguishing between groups that are organized with express election advocacy as their major purpose and those that are not."  This Court should do the same here.  The challenged provisions are not campaign finance regulations at all, but unprecedented intrusions into the membership of the kind of nonprofit organizations that have long made this nation great.

The Second Circuit's recent decision in *Citizens United v. Schneiderman* is instructive.  There, the court rejected a challenge to a very different statute requiring only non-public

reporting to the Attorney General, but went out of its way to clarify that, if the government "were to publicize donor lists"—as the provisions challenged here mandate—such public disclosure would "raise the [First Amendment] stakes."  882 F.3d at 384.  As the Second Circuit explained, "when information about one's donation to a group is available to the public, it is more plausible that people who are opposed to the mission of that group might make a donor suffer for having given to it."  *Id.*  And this, in turn, naturally leads to a chilling of support—and infringement on protected speech—in precisely the manner asserted here.  *See McIntyre*, 514 U.S. at 341-42.

The challenged provisions are also unconstitutional as applied to the Citizens Union and ACLU Plaintiffs.  Both at times take controversial positions, and have submitted evidence establishing a "reasonable probability" that their donors will face "threats, harassment or reprisals if their names [are] disclosed."  *Citizens United v. Schneiderman*, 882 F.3d at 370.

For these reasons, the challenged provisions violate the First Amendment, and are not, as the State has conceded, capable of a narrowing construction.  *See* Dkt. 66 at 12:21-13:2.  Plaintiffs are therefore entitled to summary judgment and a permanent injunction barring their implementation and enforcement.

## STATEMENT OF FACTS

### I.      Regulation of 501(c)(3) and 501(c)(4) Organizations.

Plaintiffs are nonprofit organizations exempt from taxation under Sections 501(c)(3) and 501(c)(4) of the Internal Revenue Code.  ¶¶ 14, 15, 39, 51, 52, 75, 84.[1]  An organization exempt from taxation under Section 501(c)(3) is prohibited from "[d]irectly or indirectly" participating in a political campaign or supporting a candidate for office, or from devoting more than an "insubstantial" amount of resources to influencing legislation, including through lobbying.  26

---

[1]  References to "¶__" are to Plaintiffs' Rule 56.1 Statement, submitted herewith.

C.F.R. § 1.501(c)(3)-1(b)(3)(ii)-(iii).  An organization exempt from taxation under Section

501(c)(4) may engage in political activities, provided those activities do not constitute the

organization's primary purpose, *id.* § 1.501(c)(4)-1(a)(2)(ii), and may engage in lobbying

activities related to the 501(c)(4)'s social welfare purpose, *see* Internal Revenue Serv., *Political*

*Campaign and Lobbying Activities of IRC 501(c)(4), (c)(5), and (c)(6) Organizations*,

https://www.irs.gov/pub/irs-tege/eotopicl03.pdf; *see also* ¶¶ 1-9.  Both federal and state law

already require 501(c)(3)s and 501(c)(4)s to make detailed disclosures concerning their donors

and activities.  Specifically, the IRS requires every tax-exempt organization to file a Form 990

on an annual basis, including a non-public Schedule B identifying its major donors that must be

kept confidential.  26 U.S.C. § 6104(d)(3)(A); 26 C.F.R. § 301.6104(b)-1(b)(1); ¶¶ 93-96.

New York also already imposes registration and reporting requirements relevant to this

action.  First, "prior to any solicitation" in New York, 501(c)(3)s and 501(c)(4)s must submit

certain information—including the organization's name and address; its branches, fundraisers,

and officers; and its certificate of incorporation and bylaws—by way of registration with the

Attorney General's Charities Bureau.  N.Y. Exec. L. § 172(1); ¶ 97.  Second, 501(c)(3)s and

501(c)(4)s registered with the Charities Bureau and operating in New York must annually file a

financial disclosure that includes the federal Form 990 and Schedule B, the latter of which is

maintained confidentially in keeping with federal law.  N.Y. Exec. L. § 172-b; 13 N.Y.C.R.R.

§§ 91.5(c)(3)(i)(a), 96.2; ¶¶ 99-101.  Finally, under New York's Lobbying Act, a 501(c)(4) that

(i) retains or employs a lobbyist, (ii) expends at least $15,000 annually on lobbying, and (iii)

devotes at least 3% of its total expenditures to lobbying in New York must file biannual source

of funding reports with the Joint Commission on Public Ethics ("JCOPE") detailing the topic of

the lobbying and naming contributors of $2,500 or more.  N.Y. Legis. Law §§ 1-c(b), 1-h, 1-j.

New York also regulates election-related spending by limiting the amount that corporations and individuals may contribute to candidates, parties, and political committees, *see* N.Y. Elec. Law §§ 14-114, 14-116, and by requiring entities that make "independent expenditures" (not influenced by or coordinated with a candidate or political party) to register with the board of elections and identify, *inter alia*, any person who contributed $1,000 or more toward the expenditure, § 14-107(1)(a)-(b); ¶¶ 105-07.

## II.     The Legislature Passes Sections 172-e and 172-f the Same Day They Were Introduced and Without Any Public Comment.

Sections 172-e and -f of the Executive Law were enacted as part of a larger ethics reform bill introduced and passed in the pre-dawn hours of June 17, 2016, the last day of the spring 2016 legislative session.  ¶ 108.  In announcing the bill, Governor Cuomo stated that its purpose was to "curb the power of independent expenditure campaigns unleashed by the 2010 Supreme Court case *Citizens United vs. Federal Election Commission*," which, the Governor said, "ignited the equivalent of a campaign nuclear arms race and created a shadow industry in New York— maligning the integrity of the electoral process and drowning out the voice of the people."  ¶ 110. According to the Governor, the proposed legislation would "strengthen[] disclosure requirements so we know exactly where and from whom this dark money flows," "limit the '*quid pro quo*' danger posed by colossal corporate donations," and "ensure that independent expenditure groups remain autonomous from the entities they support."  ¶ 111; *see also* ¶¶ 112-14.

The bill that was introduced in both houses of the Legislature (Senate Bill S. 8160 and Assembly Bill A. 10742) contained certain provisions that purported to address the Governor's stated concerns about independent campaign expenditures.  But it also contained additional, new provisions—including the two provisions at issue here—that had not been previously disclosed to members of the Legislature or to the public at large.  ¶¶ 117-18.  These new provisions went

well beyond the stated goal of regulating campaign expenditures.  Like the Governor's pre-enactment statements, the Assembly's written statement in support of the bill was devoid of any mention of the language that was eventually enacted as Sections 172-e and -f, instead highlighting the same electoral and political corruption concerns upon which the Governor had focused.  ¶ 126.  There is no record of any statement in support from the Senate.  The bill received less than 15 minutes of discussion in each house.  ¶¶ 115-16.  Several lawmakers stated on the record that they had not read the bill and did not know what they were voting on.  ¶¶ 120-23; *see also* ¶¶ 124-25.  Nevertheless, the bill was passed that same evening, shortly after it was introduced.  ¶¶ 115-16.

Despite certifying to the Legislature that the bill was so urgent that it required an immediate vote, the Governor did not sign it for 69 days.  ¶ 127.[2]  While the bill was on the Governor's desk, numerous organizations—including several of the plaintiffs here—made submissions identifying constitutional problems with Sections 172-e and -f, including the challenged provisions' overbroad, speech-chilling regulation of non-election related activities, and the disconnect between the stated goals of the bill and the challenged provisions.  ¶¶ 128-36.  Some groups urged the Governor to veto the legislation or work with the Legislature to reform it before signing the bill, but those requests were ignored and the Governor signed the bill into law on August 24, 2016.  *See id.*; ¶¶ 137-38.  The Governor's approval message, like the Assembly's statement in support, emphasized the bill's focus on campaign finance reform and political

---

[2]  To circumvent the New York Constitution's requirement that bills be submitted at least three days before passage, the Governor included a "message of necessity," which by law must "certif[y] . . . the facts which in [the governor's] opinion necessitate an immediate vote thereon."  N.Y. Const. art. III, § 14.  ¶ 119.  The message of necessity submitted here, however, did not certify any such facts.  Dkt. 41 (Citizens Union Amended Complaint), Count V.  The *Citizens Union* Plaintiffs hereby reserve their rights with respect to their § 14 claim.

corruption.  ¶ 138.[3]  Neither statement included anything justifying the new provisions targeting nonprofit groups.

## III.    The Challenged Provisions.

The 2016 law has eleven provisions, including parts that regulate independent expenditure committees (Part A), political party committees (Part B), political candidates and campaign funds (Part C), registered lobbyists (Part D), and political consultants (Part H).  This litigation involves just two provisions:  all Plaintiffs challenge Part F, which is codified at N.Y. Exec. L. § 172-e and imposes new disclosure requirements on 501(c)(3)s; and the Citizens Union Plaintiffs and ACLU Plaintiffs challenge Part G, which is codified at N.Y. Exec. L. § 172-f and imposes new disclosure requirements on 501(c)(4)s.

### A.    Section 172-e.

Section 172-e imposes new donor disclosure obligations on certain 501(c)(3)s. Specifically, it requires every 501(c)(3) that provides a donation worth at least $2,500 in a six-month period to any 501(c)(4) that is required to submit a "source of funding" report under New York's Lobbying Act to publicly disclose certain donors via a "funding disclosure report."  N.Y. Exec. L. § 172-e(2)(a).  A "donation" is "anything of value," including an "in-kind donation," which is defined broadly to include "donations of staff, staff time, personnel, offices, office supplies, financial support of any kind or any other resources."  § 172-e(1)(b)-(c).  The "funding disclosure report" filed by the 501(c)(3) must include the identity of any donor of $2,500 or

---

[3]  Specifically, the Governor message stated that the bill "provides much-needed reform to New York's campaign finance system" and "enacts sweeping ethics reform" by, *inter alia*, "requiring certain political consultants who provide services to sitting elected officials to register with the state," and "implement[ing] various measures to shed light on the dark money that runs rampant through our political process."  ¶ 138.  The Assembly similarly stated that the bill would "provide a much-needed reform to New York's campaign finance system," including through increased disclosure of "political relationships and funding behaviors."  ¶ 126.

more, and must be made publicly available on JCOPE's website within 30 days of filing.

§§ 172-e(2)(a), (3). Disclosure of donors is mandated even if neither the 501(c)(3)'s donation nor the contributions of its donors are earmarked for lobbying purposes—indeed, even if they are earmarked for *non-lobbying* purposes. Moreover, reporting requirements can be triggered by contributions to 501(c)(4)s that are not themselves lobbyists but that merely hire lobbyists. § 172-e(1)(d) (defining a "recipient entity" of the 501(c)(3) contribution as a 501(c)(4) that is required to file a source-of-funding report as a "client" of lobbyists under New York Legislative Law § 1-j). A 501(c)(3) that fails to comply with Section 172-e's disclosure requirements faces a fine of up to $1,000 per violation and $100 for every day that the violation continues, and may have its registration—and thus its authority to solicit charitable contributions in New York State—revoked or suspended. N.Y. Exec. L. § 177.

Publication of donor identities on JCOPE's website is automatic, unless the 501(c)(3) petitions the Attorney General for an exemption, which "may" be granted upon a finding that disclosure "may cause harm, threats, harassment, or reprisals to the source of the donation or to individuals or property affiliated with the source of the donation." § 172-e(3). The Attorney General has not published any regulations to implement this exemption provision.[4]

## B.     Section 172-f.

Section 172-f applies to 501(c)(4)s and requires that the subject organization publicly disclose certain donors and other information if the 501(c)(4) spends more than $10,000 in a

---

[4]  At a hearing on January 4, 2017, counsel for the Attorney General represented that, notwithstanding the stay of enforcement, "necessary regulations" were in the process of being promulgated and would be "enacted in a timely manner." ¶ 156. At the Court's direction, the ACLU Plaintiffs and Citizens Union Plaintiffs held a meet-and-confer on February 6, 2017 to discuss the rulemaking process. *Id.* To date, however, no proposed regulations have been posted for public notice and comment and Plaintiffs are not aware of any steps the Attorney General has taken to promulgate such regulations. *Id.*

calendar year on "covered communications," defined as any communication conveyed to 500 or more members of the public that "refers to and advocates for or against a clearly identified elected official or the position of any elected official or administrative or legislative body relating to the outcome of any vote or substance of any legislation, potential legislation, pending legislation, rule, regulation, hearing, or decision by any legislative, executive or administrative body." N.Y. Exec. L. § 172-f(1)(b). Section 172-f thus expressly seeks to regulate speech on issues of public concern unrelated to election campaigns or lobbying. "Expenditures" on covered communications that apply toward the $10,000 reporting threshold include any funds spent, liability incurred, or "any other transfer of funds, assets, services or any other thing of value." § 172-f(c).

If a 501(c)(4) meets this $10,000 threshold, it must file a biannual report with the Attorney General that includes a description of each covered communication, the dollar amount paid for each covered communication, and the name and address of any individual or entity that made a donation of $1,000 or more to the 501(c)(4), whether or not that donation had anything to do with the covered communications. § 172-f(2)(a). Entities that fail to file a required report are subject to civil penalties or a revocation of their registration. § 177(2). As with Section 172-e, the Attorney General must promptly publish the disclosure unless she determines that disclosure "may cause harm, threats, harassment, or reprisals." § 172-f(3). No regulations to implement this section have been promulgated or proposed. *See* ¶ 156; *see also* ¶ 157.

## IV.    Plaintiff Nonprofit Groups.

### A.    The Citizens Union Plaintiffs.

Citizens Union Foundation, Inc. of the City of New York, a 501(c)(3), and Citizens Union of the City of New York, a 501(c)(4), are nonprofit corporations that work jointly to promote increased civic participation and political accountability in New York City and State

government.  ¶¶ 14-19.  As described in Arg. Part V, *infra*, donors to the Citizens Union Plaintiffs have expressed concern about the threat of harassment and retaliation from elected officials if their identities are made public, consistent with prior concerning events.  ¶¶ 20-38.

### B.     The ACLU Plaintiffs.

The American Civil Liberties Union Foundation ("ACLU Foundation"), the New York Civil Liberties Union Foundation ("NYCLU Foundation"), both 501(c)(3)s, and the New York Civil Liberties Union ("NYCLU"), a 501(c)(4), are non-partisan nonprofit corporations that engage in public advocacy, education and litigation in defending and preserving individual rights and constitutional liberties.  ¶¶ 39-74.  The ACLU Plaintiffs are largely supported by donor contributions.  ¶¶ 46-48, 56.  As described in Arg. Part V, *infra*, there is a long history of individuals associated with the ACLU Plaintiffs being subject to threats, retaliation, and harassment.  ¶¶ 164-203.

### C.     The Lawyers Alliance Plaintiffs.

Lawyers Alliance for New York ("Lawyers Alliance") and Nonprofit Coordinating Committee of New York ("NPCC") are 501(c)(3)s that provide legal and technical assistance, management support, and capacity-building services to, and advocate on behalf of, New York's nonprofit sector.  ¶¶ 75-91.  Lawyers Alliance provides legal assistance and other services to 501(c)(4) clients, some of which are or were registered as lobbyists with JCOPE; these services could be construed as an "in-kind donation" under the broad definition given that term by Section 172-e(1)(b).  ¶¶ 78-81.  NPCC is a membership organization for the nonprofit sector; its 501(c)(3) members interact with and provide support—often having nothing to do with lobbying—to 501(c)(4)s whose lobbying activity has triggered or may in the future trigger the public disclosure requirements of Section 172-e.  ¶¶ 84-91.

## V.     Procedural History.

The first of these consolidated actions was commenced by the Citizens Union Plaintiffs on December 12, 2016.  The ACLU Plaintiffs filed their complaint on December 21, 2016, the Lawyers Alliance Plaintiffs filed suit on March 6, 2017, and the Citizens Union Plaintiffs later filed an amended complaint.  ¶¶ 153-154.  By stipulation, the Attorney General agreed to stay the enforcement of Sections 172-e and -f pending resolution of any preliminary injunction motion, and later agreed to maintain the stay pending resolution of summary judgment motions.  ¶ 155.[5]

Following a preliminary conference, Citizens Union requested documents from the Governor and Legislature related to the alleged government interests advanced by the challenged provisions.  ¶ 159.  The Governor and Legislature produced a small number of public legislative documents and communications with third parties highlighting the law's deficiencies.  The Governor successfully blocked discovery of internal communications.  ¶ 160.

## ARGUMENT

## I.     Standard for Summary Judgment and a Permanent Injunction.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[6]  A "party requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a

---

[5]  Members of JCOPE were originally named as defendants, but the parties agreed to dismiss those defendants and JCOPE agreed that it would be bound by any final order as though it had remained a party.  ¶ 158.  The Governor, originally a defendant in Citizen Union's complaints, moved to dismiss on Eleventh Amendment grounds.  ¶ 162.  This Court granted the motion on June 23, 2017.  *Id.*

[6]  If the moving party meets its initial burden of showing that there is no genuine dispute as to a material fact, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial."  *Simsbury-Avon Preservation Soc'y, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).  The non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation."  *Stern v. Regency Towers, LLC*, 886 F. Supp. 2d 317, 322 (S.D.N.Y. 2012).

constitutional violation) and (2) actual success on the merits." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 889 F. Supp. 2d 606, 611 (S.D.N.Y. 2012).

## II.     Standard of Review Under the First Amendment.

Because the challenged provisions are compelled disclosure laws, which by their nature burden the First Amendment-protected rights to speak and associate anonymously on matters of public concern, the State concedes that they may stand only if they survive "exacting scrutiny." Dkt. 131 (Feb. 23, 2018 AG Ltr.), at 2 ("AG Ltr.").  There must be a "substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Citizens United v. FEC*, 558 U.S. at 366-67 (quotation omitted).  Exacting scrutiny "require[s] a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456-57 (2014) (plurality op.).  Disclosure requirements that "no more than tenuously relate[] to the substantial interests disclosure serves . . . fail exacting scrutiny." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 204 (1999).  And where, as here, a disclosure law is triggered by "the topic[s] discussed," or "cannot be justified without reference to the content of the regulated speech," strict scrutiny applies and requires that the law be narrowly tailored to a "compelling" state interest.  *Schneiderman*, 882 F.3d at 381.

The application of Section 172-f turns expressly on the topic discussed or message expressed by a 501(c)(4)—specifically, public statements for or against the "position" of various government actors regarding the "substance" of any "potential legislation" or other government action.  N.Y. Exec. L. § 172-f(1)(b).  Section 172-e similarly targets expressions of support from 501(c)(3)s to certain 501(c)(4)s, depending on the nature of the 501(c)(4)s' activities and speech. A statute that does not survive exacting scrutiny by definition fails strict scrutiny.  Because the

13

challenged provisions fail under both standards—and given the State's concession that exacting

scrutiny applies—Plaintiffs focus their argument below on the exacting scrutiny standard.

In the First Amendment context, there are two quite different ways in which a statute or

ordinance may be invalidated "on its face"—either because it suppresses protected speech in

"every application" or because it "sweeps too broadly, penalizing a substantial amount of speech

that is constitutionally protected." *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123,

129-30 (1992); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002) (statute is

facially invalid if "a substantial amount of protected speech is prohibited or chilled"). A statute

that burdens protected speech is thus unconstitutionally overbroad so long as "a substantial

number of its applications are unconstitutional, judged in relation to the statute's plainly

legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). A successful

overbreadth challenge invalidates all enforcement of the law out of concern that the threat of

prosecution may deter or chill constitutionally protected speech, because "[m]any persons, rather

than undertake the considerable burden (and sometimes risk) of vindicating their rights through

case-by-case litigation, will choose simply to abstain from protected speech— harming not only

themselves but society as a whole." *Federal Election Comm'n v. Wis. Right To Life, Inc.*, 551

U.S. 449, 494 (2007) (Scalia, J., concurring in part and concurring in the judgment).

## III.    Section 172-e Violates the First Amendment.

Section 172-e requires any 501(c)(3) that provides "financial support . . . or any other

resources" totaling $2,500 or more to a 501(c)(4) that is required to submit a "source of funding"

report under New York's lobbying regulations to publicly disclose certain donor identities,

regardless of the donation's purpose or use. In doing so, Section 172-e infringes upon core First

Amendment rights. The State cannot and does not satisfy its burden of demonstrating that the

law is substantially related to an important governmental interest. To the contrary, by eschewing

any connection between donations to 501(c)(3)s (including "in-kind donations," a term which is broadly defined to encompass support of any kind) and electioneering by the 501(c)(4)s that they support, Section 172-e chills expressive conduct far beyond what the First Amendment permits.

### A. Section 172-e Substantially Chills Speech and Burdens Donors' Rights to Free Association and Privacy.

It is well-established that compelled disclosure of the identities of a 501(c)(3)'s donors burdens the First Amendment speech, association, and privacy rights of both donors and the nonprofit recipient of donations.  The Supreme Court has repeatedly recognized that "'compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment.'"  *Davis v. FEC*, 554 U.S. 724, 744 (2008) (quoting *Buckley v. Valeo*, 424 U.S. 1, 64 (1976)).  By "compel[ling] disclosure of affiliation with groups engaged in advocacy," Section 172-e has "the practical effect of discouraging the exercise of constitutionally protected political rights."  *NAACP v. Alabama*, 357 U.S. 449, 461 (1958).  Because "the right to speak is often exercised most effectively by combining one's voice with the voices of others," *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 68 (2006), the First Amendment can be infringed not only by direct interference with a group's membership decisions or an individual's decision to associate, but also by laws that make the decision to associate "less attractive" and thereby "affect[] the group's ability to express its message."  *Id.* at 69.

Section 172-e also infringes upon donors' First Amendment freedom to speak or associate anonymously.  *See Watchtower Bible*, 536 U.S. at 166; *McIntyre*, 514 U.S. at 342-43; *Talley v. California*, 362 U.S. 60, 64-65 (1960) (invalidating ordinance requiring disclosure of names and addresses of handbill distributors).  By requiring public disclosure, Section 172-e chills the protected speech of donors who prefer to remain anonymous, whether "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire

15

to preserve as much of one's privacy as possible." *McIntyre*, 514 U.S. at 341-42; *see also*

*Schneiderman*, 882 F.3d at 384 (public disclosure "raise[s] the stakes" for donors).  The burden

on free expression is exacerbated here since, at the time of donating, a contributor may not know

if the reporting thresholds for a given six-month period have been met, creating uncertainty

about whether she will remain anonymous.  Nor is there any way for a donor to contribute above

a certain amount without publication, even if the donor *prohibits* her donation from being used as

part of a contribution to a 501(c)(4).

Section 172-e also burdens 501(c)(3)s' own constitutionally protected right to associate

with donors who support their charitable missions.  "[C]haritable appeals for funds . . . involve a

variety of speech interests—communication of information, the dissemination and propagation

of views and ideas, and the advocacy of causes—that are within the protection of the First

Amendment."  *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980); *see*

*also Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 233-34 (1977) ("[C]ontributing to an

organization for the purpose of spreading a political message is protected by the First

Amendment.").  For 501(c)(3)s that provide *pro bono* legal services to 501(c)(4)s, the statute

burdens the provision of legal advice, another form of First Amendment-protected activity.  *See*

*In re Primus*, 436 U.S. 412, 431 (1978) (organizations provide legal services "as a vehicle for

effective political expression and association, as well as a means of communicating useful

information to the public").  In sum, Section 172-e forces 501(c)(3)s to make a choice

antithetical to the First Amendment: either support worthy 501(c)(4)s that align with their

mission, or desist from constitutionally protected activity to preserve donor privacy and ensure

continued financial support.

Finally, Section 172-e imposes substantial administrative burdens on 501(c)(3)s.  Under

the law, each 501(c)(3) must track its contributions to 501(c)(4)s in a new way, keep track of

which 501(c)(4) donees are registered as lobbyists in a given six-month period, and file a new

and complex report with the state on a biannual basis.  Yet, at the time a 501(c)(3) provides

support to a 501(c)(4), it may not know whether the 501(c)(4) has reached the lobbying

thresholds that trigger the reporting obligations, let alone whether the 501(c)(4) will later reach

those thresholds.  The burden on 501(c)(3)s is exacerbated by 172-e's vague definition of a

triggering "donation" to include "anything of value," including "in-kind donations" that can

include "donations of staff, staff time, personnel, offices, office supplies, financial support of any

kind or any other resources."  N.Y. Exec. L. §§ 172-e(1)(b), (c).  These vague formulations force

501(c)(3)s "to steer far wider of the unlawful zone than if the boundaries of the forbidden areas

were clearly marked."  *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see also FCC v. Fox

Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

This is an especially knotty problem for 501(c)(3)s that routinely provide non-monetary

support to 501(c)(4)s, including services that are difficult to value.  For example, the ACLU

Foundation allows the NYCLU to use a portion of its offices at less than fair market value and

Lawyers Alliance provides free or low-cost legal assistance to 501(c)(4)s.  ¶¶ 70, 76.  In order to

comply with Section 172-e, though, each 501(c)(3) must determine whether it has provided

"anything of value" to a 501(c)(4) under the law's expansive definition; decide whether the

501(c)(4) is required to report to JCOPE; track the 501(c)(4)'s status in case it later exceeds the

reporting threshold; and potentially prepare a new report complying with Section 172-e or seek

an exemption every six months.  In sum, Section 172-e imposes significant burdens on both

donors and 501(c)(3)s, chilling the exercise of First Amendment rights.

17

**B.     Section 172-e Cannot be Justified by the State's Interest in Regulating Speech Related to Elections.**

As described above, there was no debate or discussion in the Legislature prior to the enactment of Section 172-e, and the Governor signed it into law even after being notified of its serious constitutional infirmities.  To the extent the Governor or the Legislature have attempted to justify Section 172-e at all, it has been with vague references to "dark money" and "speech about elections."  ¶ 138 (Governor's Message of Approval describing the law as "implement[ing] various measures to shed light on the dark money that runs rampant through our political process"); Dkt. 71 (Protective Order Reply Mem.), at 5 (discussing "the importance of disclosure in the election context").  Both the Attorney General's office and the Governor have stated over the course of this litigation that support for the statute is found in the public record, but no available studies, analyses, or factual findings support the contention that Section 172-e serves an interest related to elections.  This complete lack of evidence is fatal to the law's constitutionality, especially since the Attorney General acknowledges that no prior law has ever attempted to regulate election-related speech by requiring disclosures from apolitical or issue-oriented entities like 501(c)(3)s.  *See White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 171 (2d Cir. 2007) (government "must show that in enacting the legislation, it relied on some evidence 'reasonably believed to be relevant' to the problem [addressed]"); *see also Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (1999) ("[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny" is greater when the justification is "novel[]").

The absence of supporting evidence is unsurprising, since there is no connection between the donations that Section 172-e regulates and election-related speech.  Affected 501(c)(3)s are *already* prohibited by law from engaging in election-related activity:  they may not contribute to a candidate for office, a political party, or a political action committee, or undertake any other

activity that directly or indirectly supports a candidate, political party, or political action

committee. 26 U.S.C. § 501(c)(3); 26 C.F.R. § 1.501(c)(3)-1(b)(v)(3). Further, Section 172-e

covers donations to registered lobbyists, even if they do not engage in any election- or campaign-

related speech. N.Y. Exec. L. § 172-e(1)(d). And it requires public disclosure of the names of

501(c)(3) donors even if their donations were specifically earmarked for a purpose entirely

unrelated to elections. Given this "substantial mismatch" between donations to 501(c)(3)s and

the state's asserted interest in regulating election-related speech, Section 172-e cannot withstand

heightened—or any—scrutiny. *Barland*, 751 F.3d at 841; *ACLU of Nev. v. Heller*, 378 F.3d 979,

996 (9th Cir. 2004) (striking down disclosure regulation that would have prevented anonymous

speech that was temporally "far removed from the thrust and parry of election campaigns" and

was "made with neither the intent nor the effect of influencing any election").

 Faced with a similarly broad statute that required public disclosure of donors whose

contributions were not connected to the interests served by disclosure, the Federal Election

Commission issued narrower regulations limiting disclosure to earmarked contributions because

"donations from persons who support the corporation's mission . . . do not necessarily support

the corporation's electioneering communications." 72 Fed. Reg. 72899, 72911 (Dec. 26, 2007).

The D.C. Circuit upheld the regulation, recognizing the "intuitive logic behind this rationale":

> Imagine the following not unlikely scenario. A Republican donates $5,000 to the
> American Cancer Society (ACS), eager to fund the ongoing search for a
> cure. Meanwhile, Republicans in Congress, aware of a growth in private donations to
> ACS, push for fewer federal grants to scientists studying cancer in order to reduce
> the deficit. In response to their push, the ACS runs targeted advertisements
> against those Republicans, leading to the defeat of several candidates in the
> upcoming election. Wouldn't a rule requiring disclosure of ACS's Republican
> donor, who did *not* support issue ads against her own party, convey some
> misinformation to the public about who *supported* the advertisements?

*Van Hollen v. FEC*, 811 F.3d 486, 497 (D.C. Cir. 2016). That logic applies with even more force

here: there is no reason to believe that disclosing all donors of $2,500 or more to nonprofits—

regardless of any engagement by the donor or organization in election-related speech—will further transparency about election-related speech.  To the contrary, Section 172-e will result in a flood of donor lists that misleadingly imply that those donors support election-related activity— even if neither the donor nor the recipient 501(c)(4) ever in fact supported any such activity.

### C.   Section 172-e Cannot be Justified by the State's Interest in Combating Fraud in the Nonprofit Sector or Promoting Transparency in Lobbying Activity.

During the litigation, the State has suggested two additional interests that, it contends, justify Section 172-e—neither of which were identified in the run-up to enactment: uncovering violations of federal or New York laws governing nonprofits and, more obliquely, increasing transparency in lobbying activity.  AG Ltr. at 3, 4.  When applying exacting scrutiny, such *post hoc* rationalizations cannot, as a matter of law, satisfy the State's burden.  "Substantially related means that the explanation must be exceedingly persuasive.  The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013); *cf. Watchtower Bible*, 536 U.S. at 169-70 (Breyer, J., concurring) ("In the intermediate scrutiny context, the Court ordinarily does not supply reasons the legislative body has not given. . . . [That] mean[s] that we expect a government to give its real reasons for passing an ordinance.").  Because nothing in the legislative history suggests that Section 172-e was enacted to further an interest in fraud prevention or increasing lobbying transparency, these *post hoc* rationales should not be credited.

But even were these *post hoc* justifications appropriately considered, the State has not shown that Section 172-e is "closely drawn" to further either purported interest.  First, Section 172-e cannot be justified by the Attorney General's interest in detecting fraud among nonprofits: that interest is already served by existing laws, including one recently upheld by the Second Circuit requiring *confidential* disclosure of donor information, *Schneiderman*, 882 F.3d at 382-

84, and no basis is articulated to warrant the far greater First Amendment burden of "outing" donors on a public website. *See id.* at 384 (public disclosure "raise[s] the stakes"). There is, then, no fit between the challenged public disclosure regime and a fraud-prevention rationale, let alone one close enough to satisfy heightened scrutiny.

Nor can Section 172-e be justified by the State's interest in greater transparency in lobbying activities. As discussed above, New York already has a robust lobbying disclosure regime that requires 501(c)(4)s that expend $15,000 and 3% of total expenditures on lobbying during a calendar year to disclose the subjects of their lobbying efforts as well as contributions over $2,500. *See* N.Y. Legis. Law §§ 1-h(c)(4), 1-j(c)(4). Notably, only contributions "that [are] used to fund the lobbying activities" must be reported. §§ 1-h(c)(4)(ii), 1-j(c)(4)(ii). The federal Lobbying Disclosure Act likewise requires a link between the contribution and the lobbying activity, and was upheld only because it required disclosure regarding any organization that "contributes the monetary threshold and actively participates in the planning, supervision, or control of the registrant's lobbying activities" and thus "effectively advance[d]" the government's interest in shedding light on the sources of funding for lobbying. *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 16 (D.C. Cir. 2009). Similarly, a Minnesota lobbying disclosure law was held constitutional because it required disclosure by lobbyists of sources of funding that were "used for lobbying," a requirement interpreted by regulations to require disclosure of donors "who 'earmarked' donations . . . for lobbying." *Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1111 (8th Cir. 2005).

Section 172-e is not so narrowly tailored, and instead goes far beyond both federal and state lobbying laws by mandating public disclosure even in the absence of any connection between a contribution and lobbying. There is no governmental interest in requiring, as Section

172-e does, the public disclosure of contributions to a 501(c)(3) that are not passed on to a 501(c)(4) for lobbying, including those of contributions from donors who *prohibit* such use. Thus, numerous courts weighing facial challenges to disclosure requirements have required that they be tailored to reach only those contributions as to which disclosure would serve the stated governmental interests.  *See, e.g.*, *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 137 (2014) (holding that the "disclosure regime is substantially related to the recognized governmental interest" because it requires disclosure only of "transactions that have the purpose of supporting or opposing a candidate"); *Nat'l Org. for Marriage, Inc. v. McKee*, 649 F.3d 34, 58 (1st Cir. 2011) (holding that disclosure law was "well tailored to Maine's informational interest" because it required disclosure only of contributors whose donation was made to support a candidate or campaign).  Section 172-e, by contrast, requires that 501(c)(3)s publicly disclose their donors regardless of the purpose, or use, of the contribution.  In sum, Section 172-e infringes on core First Amendment rights, and the State cannot show that it is substantially related to an important government interest.  Because "[i]n the First Amendment context, fit matters," *McCutcheon*, 134 S. Ct. at 1456, Section 172-e is unconstitutional.

## IV.     Section 172-f Violates the First Amendment.

Section 172-f requires a 501(c)(4) to publicly disclose all donations over $1,000 if the organization's "expenditures for covered communications" total more than $10,000 in a calendar year.  N.Y. Exec. L. § 172-f.  That requirement imposes substantial burdens on protected speech and is not tailored to serve any government interest; it is unconstitutional.

### A.      Section 172-f Burdens the Rights of Free Speech, Free Association, and Privacy.

By compelling the disclosure of a covered entity's donors on a state-run website, Section 172-f impairs free speech exactly as Section 172-e does: it intrudes on donors' First Amendment-

protected privacy and associational interests, *Buckley*, 424 U.S. at 64, including the right to express opinions anonymously, *Watchtower Bible*, 536 U.S. at 166; "discourag[es] the exercise of constitutionally protected political rights," *NAACP*, 357 U.S. at 461-62, including the right to make contributions, *Abood*, 431 U.S. at 233-34; burdens 501(c)(4)s' own constitutionally protected right to solicit charitable donations and provide legal advice; and imposes significant administrative burdens.  The costs are particularly acute because Section 172-f requires disclosure of far more information than 501(c)(4)s must report under existing law, necessitating significant up-front costs to develop systems for preparing the disclosures that Section 172-f requires.[7]  In particular, Section 172-f requires a covered entity to prepare a separate disclosure for every expenditure on a "covered communication" it makes within a reporting period, with detail regarding, *e.g.*, the substance of the communication and the amount of money paid for it. N.Y. Exec. L. § 172-f(2).  Beyond its own communications, a covered entity must also prepare disclosures for any "covered communication" of a *third party* to whom it has contributed "for the purpose of supporting or engaging in covered communications"—whether or not the third party is under the covered entity's control.  §§ 172-f(1)(c), (2)(a)-(b).  In addition, a covered entity must provide disclosures regarding all its donors who contributed more than $1,000 within a calendar year—regardless of whether those donations related in any way to the organization's "[e]xpenditures on covered communications."  § 172-f(2)(a)(iv).

The chill accompanying Section 172-f, as well as its administrative costs, are further

---

[7]  Whereas federal law requires a 501(c)(4) to provide the IRS with information regarding donors who contribute the greater of $5,000 or 2 percent of the 501(c)(4)'s annual contributions, Section 172-f lowers that threshold, requiring the disclosure of all donations of at least $1,000.  And whereas New York law already requires the disclosure of independent expenditures on certain election-related communications—*i.e.*, communications that advocate for or against clearly identified candidates or ballot proposals prior to a public vote, N.Y. Elec. L. § 14-107(1)(a)— Section 172-f goes much further, requiring disclosure of communications containing no reference to elections or candidates, outside any pre-election period.

compounded by the extraordinarily broad and vague definition of a "covered communication." As noted, under Section 172-f, a covered entity must prepare a separate disclosure for any public statement that "refers to and advocates for or against" the "position" of any "any elected official or administrative or legislative body" relating to the "substance" of "any legislation, potential legislation, pending legislation, rule, regulation, hearing, or decision by any legislative, executive or administrative body." N.Y. Exec. L. § 172-f(1)(b). Terms such as "position" and "substance" are undefined, leaving 501(c)(4)s with little guidance as to what public statements trigger the requirement. Faced with such an uncertain standard, 501(c)(4)s will steer clear of any possible violation, preparing disclosures for nearly all public statements and incurring enormous expenses in the process. Others may reasonably decide "the exercise is simply not worth the trouble." *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 873-74 (8th Cir. 2012).

And because Section 172-f mandates the disclosure of *all* donors who contribute more than $1,000 to a covered entity in a calendar year, regardless of any limitations or conditions placed on the donation, a donor cannot ensure her own privacy: whether her donation winds up on a state-run website turns on the organization's spending on covered communications, which is beyond a donor's control. Like the 501(c)(4)s, many potential donors will be deterred from constitutionally protected activity and will decide to keep their thoughts to themselves.

### B.   There is No Substantial Relationship Between Section 172-f and the State's Interest in Regulating Election-Related Speech.

As with Section 172-e, neither the Legislature nor the Governor articulated any rationale for Section 172-f prior to its enactment. Rather, in this litigation, the State seeks to justify Section 172-f based on the public's interest in "disclosure in the election context," with passing references to "cases relating to speech about elections." Dkt. 71 at 5; *see also, e.g.*, AG Ltr. at 4. Yet the State proffers no facts—no pre-enactment study, report, or analysis of any kind—

supporting this rationale.  And as with Section 172-e, no such interest may be inferred on the

basis of similar laws in other jurisdictions; as the Court has recognized, Dkt. 34 at 6, and as the

Attorney General has acknowledged, Dkt. 26 (Dec. 30, 2016 AG Ltr.), no such laws exist.

To be sure, in a series of decisions on campaign-finance regulations, the Supreme Court

has recognized that disclosure requirements may serve the government's interest in "providing

the electorate with information as to where political campaign money comes from and how it is

spent by the candidate."  *Buckley*, 424 U.S. at 66 (quotation marks omitted).  But these

precedents provide no basis to regulate issue-oriented speech unrelated to elections.[8]  As the

Seventh Circuit has explained, "the government's authority to regulate in this area extends only

to money raised and spent for speech that is clearly *election related*; ordinary political speech

about issues, policy, and public officials must remain unencumbered."  *Barland*, 751 F.3d at 810.

By its terms, Section 172-f is not election-related: it is not directed at candidates or campaigns,

and instead covers any issue-oriented statement that publicly advocates for or against the

"position" of "any elected official or administrative or legislative body" relating to the

"substance" of any "potential legislation . . . or decision by any legislative, executive or

administrative body."  N.Y. Exec. L. § 172-f(1)(b).  Because Section 172-f is not substantially

directed at election-related communications, it is not defensible based on a general interest in

---

[8]  In particular, the Supreme Court has upheld narrowly tailored, election-related donor disclosure requirements that apply only to funding for broadcast advertisements that: (1) reference a candidate by name; (2) within 60 days of an election; (3) where the money was specifically dedicated for the purpose of that candidate-specific ad.  *See Indep. Inst. v. FEC*, 137 S. Ct. 1204 (2017), *aff'g* 216 F. Supp. 3d 176, 180 (D.D.C. 2016) (upholding disclosure requirements because the "tying of an identified candidate to an issue or message . . . gives rise to the voting public's informational interest"); *Citizens United v. FEC*, 558 U.S. 310; *McConnell v. FEC*, 540 U.S. 93 (2003); *cf. Indep. Inst. v. Williams*, 812 F.3d 787, 791-92 (10th Cir. 2016) (upholding disclosure law that was "sufficiently tailored" to "speech that mentions a candidate shortly before an election").  By contrast, Section 172-f applies to funding for vast swaths of communications on issues of public concern that do not reference any candidate by name, are not made within 60 days of an election, and do not sponsor a candidate-specific ad.

electoral transparency.

Even if the State's interest in providing voters with greater information about the sources of election-related spending could provide a basis for enacting Section 172-f, the statute is certainly not "narrowly tailored to achieve [this] objective." *McCutcheon*, 134 S. Ct. at 1457; *see McIntyre*, 514 U.S. at 348 ("The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit."). *First*, Section 172-f is overbroad in its definition of "covered communication," which extends well beyond election-related speech.  N.Y. Exec. L. § 172-f(1)(b).  A "covered communication" includes *any* public statement that advocates for or against *any* "position" of "any elected official or administrative or legislative body"—*anywhere* in the world, and at *any* time—relating to the "substance" of *any* "legislation, potential legislation, pending legislation, rule, regulation, hearing, or decision by *any* legislative, executive or administrative body."  *Id.* (emphasis added). This sweeping definition encompasses public statements in any medium on virtually any matter of public concern, even without any reference to an election or candidate.  To make matters worse, this definition lacks a temporal limitation, regulating speech whether or not an election is even remotely on the horizon.

*Second*, Section 172-f is overbroad in mandating the disclosure of donors whose donations are not connected to any "covered communication" or any election-related activity. Under Section 172-f, a covered entity must disclose all donors who contribute at least $1,000 within a reporting period, even if those donations were earmarked for purposes having nothing to do with a "covered communication."  Indeed, Section 172-f would require disclosure of a donor who expressly earmarked her donation for a purpose *other than* election-related advocacy.  *Cf. Vt. Right to Life*, 758 F.3d at 137 (disclosure requirement was substantially related to

"governmental interest in providing the electorate with information" where groups "need[ed] only disclose transactions that ha[d] a purpose of supporting or opposing a candidate").[9]

*Finally*, Section 172-f's poor fit is demonstrated by its failure to include speech regarding elections, candidates, or campaigns in its definition of a "covered communication."  While "[i]t is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech," the Supreme Court has recognized that "underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."  *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015) (internal quotation marks omitted).  The failure of Section 172-f to even mention candidates or campaigns is all the more suspect because, as discussed above, other provisions of New York law use precise language to target election-related communications.  *See* N.Y. Exec. L. § 14-107(a) (regulating any communication that "advocates for or against a clearly identified candidate or ballot proposal").

Ultimately, Section 172-f makes for a far poorer fit in terms of promoting electoral transparency than do narrower disclosure regimes that courts have found constitutionally deficient.  In *Barland*, for example, the Seventh Circuit held that a Wisconsin disclosure requirement, triggered by pre-election expenditures on advocacy for or against a candidate, violated the First Amendment by effecting a "serious chill on debate about public issues" without

---

[9]  To the extent the State points to greater transparency for lobbying activities as a separate interest, Section 172-f does not advance that interest.  Section 172-f is not tailored in any way to address funding for lobbying: it mandates disclosure of all donors who contribute at least $1,000 to a covered 501(c)(4) entity, without regard to whether the 501(c)(4) engages in lobbying or whether a donation was made for lobbying purposes.  Indeed, Section 172-f would require the disclosure of a donor who explicitly earmarked her donation for a purpose other than lobbying.  *See United States v. Harriss*, 347 U.S. 612, 620 (1954) (requiring that "lobbying" be defined narrowly as "direct communication with members of [the legislature] on pending or proposed [] legislation").  As with Section 172-e, any purported interest in greater transparency for lobbying activity fails to justify Section 172-f's burden on protected speech.

the "close tailoring required to sustain a disclosure regime under exacting scrutiny." 751 F.3d at 837, 842. Section 172-f goes much further: it applies whether or not a 501(c)(4) *ever* advocated for a particular candidate in the context of any particular election. *See* N.Y. Exec. L. § 172-f. Similarly, in *Minnesota Citizens*, the Eighth Circuit held that a Minnesota law requiring annual disclosures by a "political fund," triggered by the fund's independent expenditures on express advocacy for or against a candidate, "almost certainly" failed exacting scrutiny because its reporting requirement did not "match any sufficiently important disclosure interest" and because "Minnesota can accomplish any disclosure-related interests . . . through less problematic measures." 692 F.3d at 876. Again, Section 172-f goes further: it mandates disclosure without a connection to whether a 501(c)(4) organization has engaged in speech regarding an election or candidate. Again, as the State has acknowledged and as these decisions make clear, Section 172-f is unprecedented: it extends far beyond election-related speech and therefore lacks the tailoring that the First Amendment requires. *See also Iowa Right To Life Comm., Inc. v. Tooker*, 717 F.3d 576, 597 (8th Cir. 2013) (statute requiring ongoing disclosures unconstitutional because it was "no more than tenuously related to Iowa's informational interest") (quotations omitted).

### C.   There is No Substantial Relationship Between Section 172-f and the State's *Post-Hoc* Prevention of Fraud Rationale.

As with Section 172-e, during this litigation the State has sought to defend Section 172-f by pointing to an interest never identified during its enactment—"preventing fraud and self-dealing in charities." *See, e.g.*, AG Ltr. at 3. This made-for-litigation rationale should be rejected. *See Windsor*, 699 F.3d at 185. In any case, it bears no substantial relationship to Section 172-f. As with Section 172-e, Section 172-f mandates public disclosure of information that is largely *already* available to the State's prosecutorial authorities—all 501(c)(4) organizations must make annual reports, disclosing the names of various donors, to the Attorney

General.  *See* 13 N.Y.C.R.R. § 91.5(c)(3)(1)(a); 26 U.S.C. § 501(c)(4).  The State does not argue

that these existing disclosures are inadequate to detect illegal activity by nonprofits, or that

Section 172-f will facilitate the investigation of such activity.  Absent such a showing, the State's

purported interest provides no basis for Section 172-f's burdens on protected speech.

## V.      Sections 172-e and 172-f are Unconstitutional As Applied to the ACLU Plaintiffs and the Citizens Union Plaintiffs.

Beyond their facial invalidity, both provisions are unconstitutional as applied to ACLU

and Citizens Union Plaintiffs because their donors will face a "reasonable probability" of

"threats, harassment, or reprisals if their names [are] disclosed."  *Schneiderman*, 558 U.S. at 370.

This inquiry requires "flexibility in the proof of injury," which may include "evidence of past or

present harassment of members due to their associational ties, or of harassment directed against

the organization itself."  *Buckley*, 424 U.S. at 74; *see also Brown v. Socialist Workers '74 Comm.

(Ohio)*, 459 U.S. 87, 93 (1982).  "However, a factual record of past harassment is not the only

situation in which courts have upheld a First Amendment right of non-disclosure.  The

underlying inquiry must always be whether a compelling governmental interest justifies any

governmental action that has the practical effect of discouraging the exercise of constitutionally

protected political rights."  *Local 1814, Int'l Longshoremen's Ass'n AFL-CIO v. Waterfront

Com. of N.Y. Harbor*, 667 F.2d 267, 271-72 (2d Cir. 1981)

The ACLU and Citizens Union Plaintiffs take positions that are often controversial,

sometimes unpopular, and that, in some unfortunate circumstances, lead to threats and

harassments to the organizations and those associated with them.  ¶¶ 20-38, 164-203.

Disagreement over important issues is expected but, as detailed in Plaintiffs' declarations, their

employees and supporters have long faced much worse:  overt death threats, harassment, and

other intimidating conduct that at times requires law enforcement involvement, as well as

implied threats of retaliation by elected officials.  *Id.*  These undisputed facts show more than a reasonable probability that donors will face threats, harassment, or reprisals if their names were publicly disclosed.[10]  Faced with the prospect of being subject to abuse for donating to the organization of their choice, at least some donors will forgo further support.  ¶¶ 24-30, 203.

Nor does the possibility of a statutory exemption (for which no regulations have yet been promulgated, some twenty-one months later) ameliorate the harm.  By requiring Plaintiffs to reapply for an exemption every six months, *see* N.Y. Exec. L. §§ 172-e(3), 172-f(3), the statute creates a level of uncertainty that will chill donations, regardless of possible exemptions. Without advance assurance that their donations will remain confidential, many donors will refrain from supporting these organizations even though it is their constitutional right to do so. *Doe v. Reed*, 561 U.S. 186, 203-04 (2010) (Alito, J., concurring) (explaining that confidentiality must be assured "*at the time*" of the speech at issue to avoid "the possibility that a disclosure requirement might chill" the exercise of protected rights).  The Court should, at a minimum, find the challenged provisions unconstitutional as applied to the ACLU and Citizens Union Plaintiffs.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court grant their joint motion for summary judgment.

---

[10]  *See Does 1-10 v. Univ. of Wash.*, 2017 U.S. Dist. LEXIS 197244, at \*28 (W.D. Wash. Nov. 30, 2017) (as-applied standard met for organizations and affiliated individuals who faced threats of physical harm, vandalism, and harassment by phone and social media); *Thomas More Law Ctr. v. Harris*, 2016 U.S. Dist. LEXIS 158851, at \*11-12 (C.D. Cal. Nov. 16, 2016) (angry and obscene letters); *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 954 F. Supp. 2d 127, 140 (E.D.N.Y. 2013), *aff'd* 705 Fed. Appx. 10 (2d Cir. 2017) (evidence of past hostility to day laborers and Latino immigrants from community members); *Averill v. City of Seattle*, 325 F. Supp. 2d 1173, 1178 (W.D. Wash. 2004) (death threats and threatening prank calls); *NYCLU v. Acito*, 459 F. Supp. 75, 87-88 (S.D.N.Y. 1978) (NYCLU members were "subjected to community hostility after their association with [the organization] had become known"); *see also McIntyre*, 514 U.S. at 341-42 (threat of "official retaliation" chills speech).

Dated:    New York, New York         Respectfully submitted,
          May 24, 2018

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Randy M. Mastro*
    Randy M. Mastro
    Akiva Shapiro
    Timothy Sun
    200 Park Avenue
    New York, NY 10166
    (212) 351-4000
    rmastro@gibsondunn.com

*Attorneys for Plaintiffs Citizens Union of the City of New York and Citizens Union Foundation, Inc. of the City of New York*

PATTERSON BELKNAP WEBB & TYLER LLP

By: William F. Cavanaugh
    Stephanie Teplin
    D. Brandon Trice
    Michael D. Schwartz
    1133 Avenue of the Americas
    New York, New York 10036
    (212) 336-2000

*Attorneys for Plaintiffs American Civil Liberties Union Foundation, New York Civil Liberties Union Foundation, and New York Civil Liberties Union*

GIBBONS P.C.

By: Lawrence S. Lustberg
    J. David Pollock
    One Gateway Center
    Newark, NY 07102
    (973) 596-4500

*Attorneys for Plaintiffs Lawyers Alliance for New York and Nonprofit Coordinating Committee of New York*