UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**CITIZENS UNION OF THE CITY OF NEW YORK, et al.,**

               *Plaintiffs*,

       **v.**

**THE ATTORNEY GENERAL OF THE STATE OF NEW YORK,**

               *Defendant*.

No. 16 Civ. 9592 (RMB) (KHP)

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BARBARA D. UNDERWOOD
Attorney General
State of New York
28 Liberty Street
New York, New York 10005

Andrew Amer
  Special Litigation Counsel
James Thompson
  Assistant Attorney General
    *of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT................................................................................................1

FACTUAL BACKGROUND..................................................................................................4

   A.   The Attorney General's Oversight Of Charitable Organizations...................................4

   B.   New York's Disclosure Provisions.................................................................................4

   C.   Plaintiffs' Lawsuits........................................................................................................7

ARGUMENT............................................................................................................................9

   I.   PLAINTIFFS' FACIAL CHALLENGE FAILS BECAUSE NEW YORK'S DISCLOSURE PROVISIONS BEAR A SUBSTANTIAL RELATION TO WELL-RECOGNIZED IMPORTANT GOVERNMENTAL INTERESTS ................................9

     A.   Plaintiffs' First Amendment Challenge Is Subject To Review Under The Intermediate "Exacting Scrutiny" Standard..................................................................9

     B.   New York's Disclosure Provisions Pass Constitutional Muster Under The "Exacting Scrutiny" Standard ................................................................................11

       1.   The Same Important Governmental Interests The Supreme Court Has Repeatedly Recognized In Other Donor Disclosure Cases Apply Here.........................12

       2.   The Disclosure Provisions Are Substantially Related To The Government's Important Interests..............................................................................................18

     C.   Plaintiffs Rely On Inapposite Cases Involving On-Publication Identity Disclosure Laws Reviewed Under Strict Scrutiny ...........................................................19

     D.   Plaintiffs Overstate The Burden Imposed On Their First Amendment Rights By The Disclosure Provisions...........................................................................................25

     E.   Plaintiffs' Arguments Based On Vagueness And Burden Are Without Support .................27

   II.   PLAINTIFFS' AS-APPLIED FIRST AMENDMENT CHALLENGE FAILS BECAUSE THE DISCLOSURE PROVISIONS ALLOW FOR AN EXEMPTION UPON A SHOWING OF HARM, THREATS, HARRASSMENT, OR REPRISALS .........................29

CONCLUSION.......................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abood v. Detroit Board of Education*, 431 U.S. 209 (1977) ..............................................................21

*ACLU of Nev. v. Heller*, 378 F.3d 979 (9th Cir. 2004) ..................................................17, 20, 21

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952) ....................................................28

*Buckley v. Valeo*, 424 U.S. 1 (1976) ......................................................................................passim

*Burson v. Freeman*, 504 U.S. 191 (1992) .........................................................................................20

*Center for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) ...................................14, 18, 21, 23

*Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir. 2013) ..............................19

*Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124 (S.D.N.Y. 2017) ................8, 18

*Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) ........................................passim

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) .....................................................passim

*Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304 (3d Cir. 2015) .......................................19

*Doe v. Cuomo*, 755 F.3d 105 (2d Cir. 2014) ....................................................................................16

*Doe v. Reed*, 561 U.S. 186 (2010) ....................................................................................................29

*Hamlen v. Gateway Energy Servs. Corp.*, No. 16 Civ. 3526 (VB), 2018 WL 1568761 (S.D.N.Y. Mar. 29, 2018) .........................................................................................................................18

*Independence Institute v. FEC*, 137 S. Ct. 1204 (2017) ...................................................................15

*Independence Institute v. FEC*, 216 F. Supp. 3d 176 (D.D.C. 2016) .........................................3, 11

*Kovacs v. Cooper*, 336 U.S. 77 (1949) .............................................................................................29

*Lopez v. Gonzales*, 549 U.S. 47 (2006) ............................................................................................28

*Maynard v. Cartwright*, 486 U.S. 356 (1988) .................................................................................28

*McConnell v. Federal Election Comm'n*, 540 U.S. 93 (2003) ......................................................passim

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) ..............................................................20

*Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ............................................25

*Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106 (8th Cir. 2005) ................................22

*Montgomery v. Daniels*, 38 N.Y.2d 41 (1975) ............................................................................28

*National Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C.Cir. 2009) ..........................................passim

*National Organization for Marriage v. McKee*, 649 F.3d 34 (1st Cir. 2011) ....................14, 19, 24

*Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (1999) ........................................17

*Palladio, Inc. v. Diamond*, 321 F. Supp. 630 (S.D.N.Y. 1970) ..........................................17

*Talley v. State of California*, 362 U.S. 60 (1960) ......................................................20

*Turner Broadcasting Sys. v. F.C.C.*, 520 U.S. 180 (1997) ................................................16

*United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011) ............................................. 27, 28

*United States v. Harriss*, 347 U.S. 612 (1954) ....................................................... 3, 22

*United States v. Petrillo*, 332 U.S. 1 (1947) ..............................................................28

*United States v. Powell*, 423 U.S. 87 (1975) ..............................................................27

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) ..................................................28

*United States v. Williams*, 553 U.S. 285 (2008) ..........................................................27

*Van Hollen v. FEC*, 811 F.3d 486 (D.C. Cir. 2016) ....................................................20

*Vermont Right to Life Committee, Inc. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014) ..................11, 25, 28

*Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980) ................21

*Ward v. Rock Against Racism*, 491 U.S.781 (1989) ......................................................27

*Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002) ..................21

*White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163 (2d Cir. 2007)....................17

*Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014) ............................17, 24, 25

*Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015) ......................................................17

**Federal Statutes**

26 U.S.C. § 501 .......................................................................................................4

Bipartisan Campaign Reform Act of 2002, Pub L. No. 107-155 ...................................... 14, 28

Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443 ........................28

**State Statutes**

N.Y. EPTL § 8-1.4(a)(3) ...........................................................................................4

N.Y. EPTL § 8-1.4(h)-(m) .........................................................................................4

N.Y. Exec. Law § 172(1) ...........................................................................................4

N.Y. Exec. Law § 172-e .....................................................................................passim

N.Y. Exec. Law § 172-f......................................................................................passim

N.Y. Exec. Law § 175................................................................................................4

N.Y. Exec. Law § 177................................................................................................4

N.Y. Exec. Law §§ 171-A to 177................................................................................4

**Other Authorities**

Governor's Program Bill 2016 Memorandum, Statement in Support ...................................16

Memorandum in Support, New York State Assembly, 2016 N.Y. Sess. Laws 1404 ...........16

Press Release, Gov. Cuomo Advances National's Strongest Protections to Combat Citizens United

    (June 8, 2016)....................................................................................................16

Defendant Barbara D. Underwood, in her capacity as Attorney General of the State of New York (the "Attorney General"), respectfully submits this memorandum of law in opposition to Plaintiffs' motion for summary judgment and in support of Defendant's cross-motion for summary judgment.[1]

## PRELIMINARY STATEMENT

Plaintiffs,[2] nonprofit organizations exempt from tax under §§ 501(c)(3) and 501(c)(4) of the Internal Revenue Code, challenge the constitutionality of New York Executive Law §§ 172-e and 172-f (the "Disclosure Provisions"). Broadly speaking, the Disclosure Provisions require disclosure of donor names for: (i) 501(c)(4) organizations that spend in the aggregate in excess of $10,000 per calendar year on issue advocacy communications reaching a general public audience of 500 or more, which would be limited just to donors who contribute to segregated bank accounts funding such communications if such accounts are maintained by the 501(c)(4); and (ii) 501(c)(3) organizations that provide an in-kind donation in excess of $2,500 to any 501(c)(4) organization that engages in substantial lobbying activity. Plaintiffs assert that the Disclosure Provisions on their face impose unconstitutional burdens on their free speech and associational rights. The Citizens Union and ACLU plaintiffs also claim the Disclosure Provisions are unconstitutional as applied to them based on the alleged chilling effect the provisions would purportedly have on them and their donors.

---

[1]   The Attorney General also respectfully submits the accompanying Defendant's Local Civil Rule 56.1 Statement ("AG's Rule 56.1 Statement") in support of Defendant's cross-motion for summary judgment and Defendant's Local Civil Rule 56.1 Response in Opposition to Plaintiffs' Motion for Summary Judgment ("AG's Rule 56.1 Response").

[2]   Civil Action No. 16-cv-9592 was commenced by Citizens Union of the City of New York and Citizens Union Foundation, Inc. of the City of New York (collectively "Citizens Union"). Civil Action No. 16-cv-9854 was commenced by the American Civil Liberties Union Foundation, Inc., the New York Civil Liberties Union Foundation, and the New York Civil Liberties Union (collectively "ACLU"). Civil Action No. 17-cv-1655 was commenced by Lawyers Alliance for New York and the Nonprofit Coordinating Committee of New York (collectively "Lawyers Alliance").

Plaintiffs' facial challenge fails under the applicable "exacting scrutiny" standard because the Disclosure Provisions bear a substantial relation to sufficiently important state interests. As the Second Circuit recently held in rejecting a challenge to a different donor disclosure requirement: "if a substantial number of likely applications of the statute correspond to an important interest, a minority of potentially impermissible applications can be overlooked. The stronger the government interest and the weaker the First Amendment interest, the weaker the First Amendment claim." *Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) ("*Citizens United II*").

For more than four decades, the Supreme Court has recognized that donor disclosure requirements serve important state interests by providing the electorate with information, deterring and avoiding any appearance of corruption, and gathering the data necessary to enforce existing laws governing charitable organizations. *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 196 (2003), *overruled in part on other grounds*, *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) ("*Citizens United I*"), 558 U.S. at 366. Conversely, the Supreme Court has repeatedly held that the burden on First Amendment rights imposed by donor disclosure requirements is minimal because disclosure requirements are "the least restrictive means" of serving these governmental interests. *Buckley v. Valeo*, 424 U.S. 1, 68 (1976). New York's Disclosure Provisions pass constitutional muster because they correspond to governmental interests identified by the Supreme Court in *Buckley*, *McConnell* and *Citizens United I* as sufficiently important to justify imposing donor disclosure requirements on organizations that fund issue advocacy. And as the Court has already held in this case, Plaintiffs' factual assertions about the procedural manner in which the Disclosure Provisions were enacted and the purported motivations of the Governor are legally irrelevant. *See, e.g.*, AG's Rule 56.1 Response at ¶¶ 31, 115-16.

Plaintiffs maintain that *Buckley* and its progeny are limited in their application to the specific context of election campaigning and therefore not applicable to the Disclosure Provisions.

Plaintiffs' narrow reading of this precedent is without basis.  The Supreme Court has squarely

rejected the argument that there exists any distinction for First Amendment purposes between

donor disclosure requirements tied to express advocacy for or against a candidate in an election and

those that address "issue advocacy" more broadly.  *Independence Institute v. FEC*, 216 F. Supp. 3d 176,

190-91 (collecting cases) (D.D.C. 2016), *aff'd*, 137 S. Ct. 1204 (2017).  In addition, the Supreme

Court long ago upheld disclosure requirements applicable to lobbyists that were unrelated to election

campaigns.  *United States v. Harriss*, 347 U.S. 612, 625 (1954).  There is no election-related limitation

under the applicable Supreme Court precedent upholding donor disclosure requirements.

The as-applied challenges by Citizens Union and ACLU fare no better.  An as-applied

challenge to a donor disclosure requirement is viable only if the plaintiff can establish a reasonable

probability that disclosure would subject its donors to harm, threats, harassment, or reprisals.

Citizens Union and ACLU cannot meet this test because under the Disclosure Provisions, a

reporting entity may request that the Attorney General grant an exemption from the public

disclosure of donor names based upon a showing that mirrors the constitutional standard -- namely

that such disclosure may cause harm, threats, harassment, or reprisals to donors.  Moreover, the

reporting entity may appeal any denial of the request for an exemption to an independent judicial

hearing officer, which stays any public disclosure until the appeal is decided.  Because the showing

that the Citizens Union and ACLU plaintiffs are required to make for an exemption is the same

showing they must make to succeed on their as-applied challenge, and they have neither applied for

nor been denied an exemption, their as-applied challenge must fail.

Accordingly, the Court should deny Plaintiffs' motion for summary judgment, grant

Defendant's cross-motion for summary judgment, and dismiss these consolidated actions in their

entirety.

## FACTUAL BACKGROUND

### A. The Attorney General's Oversight Of Charitable Organizations

The Attorney General, through the Charities Bureau, is responsible for the supervision of all charitable operations in New York.  By statute, the Attorney General's oversight extends over charitable organizations that solicit funds in the State,[3] as well as foreign charitable nonprofits that do business or hold property in New York.  *See* N.Y. Exec. Law § 172(1); N.Y. Estates, Powers and Trusts Law ("EPTL") § 8-1.4(a) (3); AG's Rule 56.1 Statement ¶ 1.  The Attorney General is empowered to pursue a wide range of remedies to address violations of the charitable registration and solicitation laws; the Attorney General may commence proceedings to enjoin unlawful conduct, seek damages and restitution, impose civil penalties and costs, and, upon notice, may cancel a charitable organization's registration.  *See* N.Y. Exec. Law §§ 175, 177; N.Y. EPTL § 8-1.4(h)-(m); AG's Rule 56.1 Statement ¶ 2.  Nonprofit organizations must apply for and be granted tax-exempt status by the Internal Revenue Service ("IRS").  *See generally* 26 U.S.C. § 501.

Depending on an organization's mission and planned activities, it may choose to organize under different provisions of the Internal Revenue Code ("IRC").  For instance, organizations qualifying as tax exempt under IRC § 501(c)(3) must generally be engaged in charitable efforts, and are generally restricted from political lobbying, whereas "social welfare organizations" organized under IRC § 501(c)(4) are permitted to be more actively involved in the political process, so long as such is not their primary activity.  *See* 26 U.S.C. § 501(c)(3), (4); AG's Rule 56.1 Statement ¶ 4.

### B. New York's Disclosure Provisions

In June 2016, the Governor announced plans to advance ethics reform legislation to address the impact of *Citizens United I*, which struck down prohibitions on the use of corporate and union

---

[3]    In general, charitable solicitation in New York is governed by Article 7-A of the New York Executive Law.  *See* N.Y. Exec. Law §§ 171-A to 177.

funds for independent political expenditures, *see* 558 U.S. at 365. The Governor's promised provisions would be designed to "strengthen disclosure requirements and mandate that groups report the identity of anyone exerting control over them." AG's Rule 56.1 Statement ¶ 5. In his speech announcing the proposed legislation, the Governor stated:

> *Citizens United* ignited the equivalent of a campaign nuclear arms race. . . . [Justice Kennedy] should have known that corporations and unions can spend undisclosed 'dark money' on elections through nonprofit corporations, which are not subject to campaign finance disclosure. And what has been the upshot?
>
> 43 percent of the $35.6 million of independent spending in the 2014 Kentucky Senate race came from undisclosed sources. 31 percent of all independent spending in Colorado's 2014 Senate race came from non-disclosing groups. Dark money accounted for one-quarter of independent spending in the 2014 Alaska, Georgia, and North Carolina Senate campaigns. . . . New York State's campaign finance laws are likewise circumvented by *Citizens United* . . . . With *Citizens United* the dam burst and big, dark money flooded the political system. Reform must start by addressing this perversion. . . .
>
> I have been discussing the issue with the legislative leaders and will also propose incorporating these standards. . . . The current disclosure requirements for independent spending groups are so weak that we can't even tell who is running these groups or where their money comes from. We should require independent spenders to disclose the identity of their owners, directors, executives, or anyone else exerting control.

*Id.* ¶ 6.

On June 17, 2016, at the request of the Governor, the New York State Senate and New York State Assembly introduced two ethics reform bills (S08160 and A10742, respectively), accompanied by a "Message of Necessity" from the Governor.[4] *See* Citizens Union Amended Complaint (ECF No. 41)[5] at ¶¶ 42-43; AG's Rule 56.1 Statement ¶ 7. In his memorandum

---

[4]   The New York Legislature may not pass a bill unless provided to legislators "at least three calendar legislative days" prior to the final vote, except where the Governor issues a message of necessity certifying the facts which necessitate an immediate vote on the bill. N.Y. Const., Art. III, § 14.

[5]   Unless otherwise indicated, all citations to "ECF No." are references to the docket sheet in the lead case, 16-cv-9592.

accompanying the proposed legislation, the Governor explained that the "reform prevents organizations from corrupting the political process . . . . Disclosure of political relationships and funding behaviors widely recognized to be influential, but which operate in the shadows, is essential to restoring the public's faith and trust in our political process." AG's Rule 56.1 Statement ¶ 8.

The Senate and Assembly passed the bills, and on August 24, 2016, the Governor signed the bills into law. *Id.* ¶ 9. The provisions of the law relevant to these actions are those that amend the New York Executive Law to include §§ 172-e and 172-f (the "Disclosure Provisions"), which, as referenced in the Governor's speech and accompanying memorandum, expand disclosure requirements for 501(c)(3) and 501(c)(4) organizations that expend significant amounts of money on lobbying or other political speech. *Id.* ¶ 10.

Under § 172-e, an organization exempt under 501(c)(3) is a "covered entity" falling within the new reporting requirement where it provides an in-kind donation in excess of $2,500 to an organization exempt under 501(c)(4) that engages in substantial lobbying activity requiring the 501(c)(4) to file a source of funding report with the New York State Joint Commission on Public Ethics ("JCOPE") pursuant to N.Y. Legislative Law Art. 1-a, §§ 1-h and 1-j. N.Y. Exec. Law § 172-e.1(a)-(d), 2(a); AG's Rule 56.1 Statement ¶ 11. The § 172-e report must identify the covered entity and its managers, the entity receiving the in-kind donation, the date of the in-kind donation, and with respect to all donations received by the covered entity during the reporting period in excess of $2,500, a list of the donor names and dates associated with such donations. N.Y. Exec. Law § 172-e.2(a)(i)-(vi); AG's Rule 56.1 Statement ¶ 12.

Under § 172-f, an organization exempt under 501(c)(4) is a "covered entity" falling within the new reporting requirement where it spends in the aggregate in excess of $10,000 per calendar year on communications reaching a general public audience of 500 or more that advocate for or against an elected official or the position of any elected official or administrative or legislative body

relating to the outcome on any existing or pending legislation, rule, regulation, hearing or decision by such body.  N.Y. Exec. Law § 172-f.1(a)-(d); AG's Rule 56.1 Statement ¶ 13.  The § 172-f report must identify the covered entity and its managers, contain a description of the covered communications, list the amount of, date of, and person receiving the payment for each covered communication, and provide the name and address of any individual or entity that made a donation of $1,000 or more to the covered entity and the date of such donation.  N.Y. Exec. Law § 172-f.2(a)(i)-(v); AG's Rule 56.1 Statement ¶ 14.  The § 172-f reporting requirement is subject to a limitation for those covered entities that maintain segregated bank accounts exclusively for covered communications, in which case only information concerning donations of $1,000 or more deposited into such accounts need be disclosed.  N.Y. Exec. Law § 172-f.2(c); AG's Rule 56.1 Statement ¶ 15.

Under both §§ 172-e and 172-f, a covered entity may request that the Attorney General grant an exemption from the public disclosure of donor names based upon a showing that "such disclosure may cause harm, threats, harassment, or reprisals to the source of the donation or to individuals or property affiliated with the source of the donation."  N.Y. Exec. Law §§ 172-e(3), 172-f(3); AG's Rule 56.1 Statement ¶ 16.  An organization may appeal the denial of an exemption by the Attorney General to a judicial hearing officer "who is independent and not affiliated with or employed by the department of law," pending the resolution of which any public disclosure is stayed.  N.Y. Exec. Law §§ 172-e(3), 172-f(3); AG's Rule 56.1 Statement ¶ 17.

### C.  Plaintiffs' Lawsuits

Plaintiffs, tax-exempt 501(c)(3) and 501(c)(4) organizations, commenced these separate actions seeking an order declaring the Disclosure Provisions void and permanently enjoining their enforcement by the Attorney General, the entity responsible for receiving the reports required under §§ 172-e and 172-f.[6]  *See* Citizens Union Amended Complaint (ECF No. 41) at 44-45; ACLU

---

[6]   There are some differences in scope among the three actions: Lawyers Alliance challenges

Complaint (16-cv-9854, ECF No. 1) at 22-23; Lawyers Alliance Complaint (17-cv-1655, ECF No. 1) at 15; AG's Rule 56.1 Statement ¶ 18.  Plaintiffs originally named other entities as defendants in addition to the Attorney General, but those other entities are no longer parties.[7]  By separate "so ordered" stipulations, the Attorney General agreed to stay enforcement of the Disclosure Provisions to maintain the status quo pending the Court's decision on Plaintiffs' preliminary injunction applications (*see* ECF No. 16; 16-cv-9854, ECF No. 31; 17-cv-1655, ECF No. 16), which stay the Attorney General later agreed to extend until the Court's resolution of the pending summary judgment motions (*see* ECF No. 135 at ¶ 5).  AG's Rule 56.1 Statement ¶ 20.

Pursuant to the Court's January 11, 2017 decision and order permitting "limited expedited discovery" (ECF No. 34, at 7), Citizens Union sought discovery from the Governor as well as the New York State Assembly and Senate concerning the legislative history and enactment of the Disclosure Provisions, most of which the Court denied.  *See Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 147-48, 170-72 (S.D.N.Y. 2017) (Parker, M.J.).  The other Plaintiffs did not seek any discovery, and none of the Plaintiffs sought discovery from the Attorney General.  *Id.*; AG's Rule 56.1 Statement ¶ 21.

Prompted by the Court's encouragement to "meet and confer (again) regarding the issues" in the case (ECF No. 34 at ¶ 4), the parties' representatives and counsel convened a meeting on February 6, 2017, as reported by counsel to the Court at the status conference held on March 16, 2017 (ECF No. 66 at 12:9-15).  AG's Rule 56.1 Statement ¶ 22.  The February 6 meet and confer did

---

§ 172-e but not § 172-f and does not bring an as-applied challenge to the Disclosure Provisions. These differences are not material to the outcome here, however, given that Plaintiffs raise their claims collectively for the Court's consideration in a joint motion for summary judgment.

[7]  The ACLU originally named JCOPE and its executive director as defendants, but voluntarily dismissed those parties by stipulation and order entered on January 4, 2017.  *See* 16-cv-9854, ECF No. 32.  Citizens Union originally named the Governor as a defendant.  By decision and order entered June 23, 2017, the Court dismissed the Governor as a party defendant.  *See* ECF No. 95; AG's Rule 56.1 Statement ¶ 19.

not narrow or resolve any of the disputed constitutional issues that are central to this litigation.  For

this reason, counsel for the Attorney General and the Plaintiffs agreed at the March 16 conference

that the Court should decide the constitutional issues.[8]  ECF No. 66 at 12:23-13:5, 14:3-4; AG's Rule

56.1 Statement ¶ 23.

On the same date as the March 16 conference, the Court issued an order consolidating the

Plaintiffs' three separate actions "for all purposes."  ECF No. 60; AG's Rule 56.1 Statement ¶ 25.

Following Citizen Union's "limited expedited discovery" of the Governor and the Legislature and

the Second Circuit's issuance of its decision in *Citizens United II* – pending which these actions were

stayed (*see* ECF No. 123) – the Court entered a scheduling order to govern the filing of the parties'

summary judgment motions now before the Court.  ECF No. 135; AG's Rule 56.1 Statement ¶ 26.

## ARGUMENT

I.  **PLAINTIFFS' FACIAL CHALLENGE FAILS BECAUSE NEW YORK'S DISCLOSURE PROVISIONS BEAR A SUBSTANTIAL RELATION TO WELL-RECOGNIZED IMPORTANT GOVERNMENTAL INTERESTS**

### A.  Plaintiffs' First Amendment Challenge Is Subject To Review Under The Intermediate "Exacting Scrutiny" Standard

The Second Circuit recently addressed a different New York donor disclosure requirement

in *Citizens United II*.  In that case, the Second Circuit affirmed the dismissal of an action challenging

on First Amendment grounds, among others, a New York regulation requiring 501(c)(3) and

501(c)(4) organizations to disclose to the Attorney General on an annual basis an IRS schedule

containing the names of their largest donors.  882 F.3d at 378.  The court rejected the plaintiffs'

---

[8]   Plaintiffs note that the Attorney General represented at an earlier January 4, 2017 status conference that the regulations were in the process of being promulgated.  Memorandum of Law in Support of Plaintiffs' Joint Motion for Summary Judgment (ECF No. 139) ("Pls. MOL") at 9, n.4.  However, as Plaintiffs are well aware based on the discussion during the March 16 conference, the Attorney General put the rule-making process on hold because of Plaintiffs' position that nothing could be done to address any of their issues through that process.  ECF No. 66 at 12:23-13:5; AG's Rule 56.1 Statement ¶ 24.

argument that strict scrutiny should apply to their facial First Amendment challenge, holding instead that these disclosure requirements are "[c]ontent-neutral speech regulations" that should "receive exacting, or 'intermediate,' scrutiny." *Id.* at 382 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993)).  Like the regulation at issue in *Citizens United II*, the Disclosure Provisions at issue here are "content-neutral speech regulations" that "do not inherently discriminate among speakers" and therefore should be reviewed under exacting scrutiny, a "lower degree of scrutiny" than strict scrutiny.  *Citizens United II*, 882 F.3d at 382.

A few months ago, the Lawyers Alliance and ACLU plaintiffs agreed.  *See* ECF No. 129 at 4 ("By applying [the exacting scrutiny] test in the context of a disclosure law pertaining to charities and their donors, *Citizens United II* clarifies that the same standard will govern here."); ECF No. 133 at 5 (analyzing the Disclosure Provisions under "the exacting scrutiny balancing test").  These plaintiffs now reverse course and argue, together with Citizens Union, that the Court should instead apply strict scrutiny because the Disclosure Provisions are triggered "by 'the topic[s] discussed,' or 'cannot be justified without reference to the content of the regulated speech . . . .'"  Pls. MOL at 13.  The Lawyers Alliance and ACLU plaintiffs got it right the first time around.

The reporting obligation under § 172-e is triggered by the amount of the in-kind donation made by a 501(c)(3) organization and whether the recipient 501(c)(4) entity files a source of funding report with JCOPE; it does not depend at all on the content of any speech.  N.Y. Exec. Law § 172-e(2).  The reporting obligation under § 172-f is triggered when a 501(c)(4) organization spends more than $10,000 to publish to an audience of 500 or more "covered communications," which includes any communication which "refers to and advocates *for or against* a clearly identified elected official or the position of any elected official or administrative or legislative body relating to the outcome of any vote or substance of any legislation, potential legislation, pending legislation, rule, regulation, hearing, or decision by any legislative, executive or administrative body."  N.Y. Exec. Law § 172-

f(1)(b) (emphasis added).  Because application of this provision does not depend on whether the "covered communication" advocates a particular point of view, the provision is a "content-neutral speech regulation[]" (*Citizens United II*, 882 F.3d at 382), no different from the disclosure requirement for "electioneering communication" under the Bipartisan Campaign Reform Act of 2002 that the Supreme Court has repeatedly analyzed and upheld under the exacting scrutiny standard.  *See Independence Institute v. FEC*, 216 F. Supp. 3d 176, 190-91 (D.D.C. 2016) (collecting cases), *aff'd*, 137 S. Ct. 1204 (2017); *see also Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F3d 118, 132-33 (2d Cir. 2014) (applying exacting scrutiny to Vermont's election laws containing disclosure requirement for "electioneering communications").

## B.  New York's Disclosure Provisions Pass Constitutional Muster Under The "Exacting Scrutiny" Standard

The "exacting scrutiny" standard "requires a 'substantial relation between the disclosure requirement and a sufficiently important governmental interest' where 'the strength of the governmental interest' is commensurate with 'the seriousness of the actual burden on First Amendment rights.'"  *Citizens United II*, 882 F.3d at 382 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)); *see also Citizens United I*, 558 U.S. at 366-67 (quoting *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976)).  As the Second Circuit has explained:

> [I]f a substantial number of likely applications of the statute correspond to an important interest, a minority of potentially impermissible applications can be overlooked.  The stronger the government interest and the weaker the First Amendment interest, the weaker the First Amendment claim.

*Citizens United II*, 882 F. 3d at 383 (citing *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218, 2227 (2015), *David v. FEC*, 554 U.S. 724, 744 (2008), and *Buckley*, 424 U.S. at 64).  The Disclosure Provisions survive Plaintiffs' facial challenge under exacting scrutiny.

11

1. **The Same Important Governmental Interests The Supreme Court Has Repeatedly Recognized In Other Donor Disclosure Cases Apply Here**

Over the past four decades, the Supreme Court has repeatedly recognized the strong governmental interests served by donor disclosure requirements.  Shortly after the passage of the Federal Election Campaign Act of 1971 ("FECA"), candidates for federal office and political parties and organizations brought a suit challenging the constitutionality of FECA, including the act's requirement that political committees and candidates report and disclose contributions and expenditures above certain threshold levels.  *Buckley*, 424 at 62-63.  Citing to the legislative history of FECA, the Supreme Court in *Buckley* upheld the constitutionality of FECA's disclosure requirements based in part on three recognized categories of governmental interests served by the disclosure requirements:

> First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office. . . .
>
> Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. . . .
>
> Third, and not least significant, recordkeeping, reporting and disclosure requirements are an essential means of gathering the data necessary to detect violations of [campaign contribution laws].

*Id.* at 67-68 (citations omitted).  The Court concluded, "disclosure requirements, as a general matter, directly serve substantial governmental interests."  *Id.* at 68.

In *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), *overruled in part on other grounds*, *Citizens United I*, 558 U.S. at 366, the Supreme Court again considered the constitutionality of donor disclosure requirements, namely those contained in the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which amended FECA.  In *McConnell*, plaintiffs challenged as facially overbroad BCRA's donor disclosure provisions requiring the identification of individuals or groups who contributed threshold amounts towards "electioneering communications," defined as any broadcast clearly

identifying a candidate for federal office, aired within a specific time period, and targeted to an identified audience of at least 50,000 viewers or listeners. *Id.* at 193-95. Plaintiffs in *McConnell* argued that "*Buckley* drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." *Id.* at 191. Accordingly, they contended, BCRA's disclosure requirement for "electioneering communications" was constitutionally overbroad because it swept in communications involving purely issue advocacy in addition to those that met *Buckley's* definition of express advocacy. *Id.*

The Supreme Court rejected the *McConnell* plaintiffs' reading of *Buckley*, holding instead that the First Amendment does *not* "erect a rigid barrier between express advocacy and so-called issue advocacy." *Id.* at 193. The Court explained that drawing such a distinction "cannot be squared with our longstanding recognition that the presence or absence of magic words cannot meaningfully distinguish electioneering speech from a true issue ad." *Id.* The Court concluded:

> [T]he important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements – providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions – apply in full to BCRA. Accordingly, *Buckley* amply supports application of [FECA's disclosure requirements] to the entire range of "electioneering communications."

*Id.* at 196.

More recently, in *Citizens United I*, the Supreme Court again considered, *inter alia*, whether BCRA's donor disclosure requirement was unconstitutional on an as-applied basis. 558 U.S. at 366. In *Citizens United I*, the plaintiff nonprofit organization challenged the application of BCRA's disclosure requirement to its ads promoting a documentary about then-Senator Hillary Clinton being made available free of charge on a video-on-demand channel. *Id.* at 319-20. Citizens United claimed that the disclosure requirement should be "confined to speech that is the functional equivalent of express advocacy" and therefore should not apply to its ads that merely urge viewers

13

to watch the film.  *Id.* at 368.  As it did in *McConnell*, the Court in *Citizens United I* declined to draw

any constitutional distinction between express advocacy and issue advocacy, rejecting the contention

that BCRA's disclosure requirements "must be limited to speech that is the functional equivalent of

express advocacy."  *Id.* at 369; *see also National Organization for Marriage v. McKee*, 649 F.3d 34, 55 (1st

Cir. 2011) (noting the Supreme Court "explicitly rejected" the distinction between issue and express

advocacy for purposes of analyzing disclosure requirements); *Center for Individual Freedom v. Madigan*,

697 F.3d 464, 484 (7th Cir. 2012) ("Whatever the status of the express advocacy/issue discussion

distinction may be in other areas of campaign finance law, *Citizens United* left no doubt that

disclosure requirements need not hew to it to survive First Amendment scrutiny.").  Notably, the

Court held that the government's interest in providing information to the electorate was alone

sufficient to justify application of BCRA's disclosure requirements to Citizens United's ads, which

seek only to persuade viewers to watch the documentary:

> Even if the ads only pertain to a commercial transaction, the public has an interest in
> knowing who is speaking about a candidate shortly before an election.  Because the
> informational interest alone is sufficient to justify application of [BCRA's disclosure
> requirements] to these ads, it is not necessary to consider the Government's other
> asserted interests.

*Citizens United I,* 558 U.S. at 369.  As the Court explained, the transparency that comes with

disclosure "enables the electorate to make informed decisions and give proper weight to different

speakers and messages."  *Id.* at 371.

Finally, the Supreme Court's most recent ruling on donor disclosure requirements was its

summary affirmance last year of a district court panel decision upholding BCRA's disclosure

requirements in *Independence Institute*.[9]  In *Independence Institute*, the plaintiff nonprofit organization

---

[9]   In any action challenging the constitutionality of BCRA, the plaintiff must file suit in the United
States District Court for the District of Columbia, which comes before a three-judge district
court panel.  The panel's decision is appealable as of right directly to the Supreme Court.
Bipartisan Campaign Reform Act of 2002, Pub L. No. 107-155 § 403, 116 Stat. 113.

sought to run a radio advertisement urging Colorado listeners to contact their senators to request

that they support a bipartisan prison reform bill.  216 F. Supp. 3d at 180-81.  Based on the ad's

content, timing and intended audience, if the Institute were to run the ad it would have needed to

disclose the names of those donors who contributed at least $1,000 to fund the ad under BCRA's

disclosure requirements.  *Id.* at 185.  The Institute argued that the disclosure requirements as applied

to the ad violated its First Amendment rights because: (i) the ad was "genuine issue advocacy" that

must be exempt from disclosure requirements; and (ii) its status as a nonprofit barred from engaging

in political activity requires that it be exempt from BCRA's disclosure requirements.  *Id.*

Citing to *McConnell* and *Citizens United I*, the panel noted that the Supreme Court has twice

"rejected the very type of issue-centered exception for which the Institute argues."  *Id.*  The panel

rejected the Institute's contention that a different result should apply because its ad identified

specific political candidates as part of issue advocacy focused on pending legislation.  *Id.* at 187.  The

panel found, *inter alia*, that the Supreme Court and every court of appeals to consider the issue have

rejected the argument that the constitutionality of a disclosure provision turns on the content of the

advocacy including a specific reference to an electoral candidate (*i.e.*, express advocacy), and that

applying the disclosure rule to the ad advanced the substantial and important informational interests

identified in *McConnell*.  *Id.* at 190-91.  The Supreme Court adopted the panel's holdings and

reasoning by summarily affirming the panel's decision.  *Independence Institute v. FEC*, 137 S. Ct. 1204

(2017).

New York's Disclosure Provisions were designed by the Governor and the Legislature to

serve the same three important governmental interests repeatedly invoked by the Supreme Court

over the past half a century in upholding donor disclosure laws: "providing the electorate with

information, deterring actual corruption and avoiding any appearance thereof, and gathering the data

necessary to enforce" existing laws.  *McConnell*, 540 U.S. at 196.  As the Governor's statements

accompanying the legislation make clear, the governmental interests underlying the enactment of the

Disclosure Provisions are the same, namely to: (i) "strengthen disclosure requirements and mandate

that groups report the identity of anyone exerting control over them" so that "we know exactly

where and from whom this dark money flows;"[10] (ii) "prevent[] organizations from corrupting the

political process;"[11] and (iii) "allow New York's electoral politics to achieve a clear and meaningful

demarcation between candidates and unlimited expenditures" to "restor[e] the public's faith and

trust in our political process."[12]  The Legislature shared these goals.  As the Assembly stated, "[t]his

reform prevents organizations from corrupting the political process and utilizing funds that are not

intended for political purposes.  Disclosure of political relationships and funding behaviors widely

recognized to be influential, but which operate in the shadows, is essential to restoring the public's

faith and trust in our political process."[13]

     The Plaintiffs make much of the timing of the passage of the Disclosure Provisions on the

last day of the legislative session, contending they are unconstitutional because the Legislature did

not include "studies, analyses, or factual findings."[14]  Pls. MOL at 18.  Their argument is

---

[10]    Press Release, Gov. Cuomo Advances National's Strongest Protections to Combat Citizens United (June 8, 2016), *available at* https://www.governor.ny.gov/news/governor-cuomo-advances-nations-strongest-protections-combat-citizens-united (Exhibit 2 to Mastro Declaration, ECF No. 147); AG's Rule 56.1 Statement ¶ 5.

[11]    Governor's Program Bill 2016 Memorandum, Statement in Support, *available at* https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/GPB39ethicspackage-memo.pdf (Exhibit 4 to Mastro Declaration, ECF No. 147); AG's Rule 56.1 Statement ¶ 8.

[12]    *Id.*

[13]    Memorandum in Support, New York State Assembly, 2016 N.Y. Sess. Laws 1404 (Exhibit 9 to Mastro Declaration, ECF No. 147); AG's Rule 56.1 Statement ¶ 8.

[14]    Federal courts, respecting the separation of powers, have refused to judicially impose procedural requirements on how legislatures enact their laws.  *See, e.g., Turner Broadcasting Sys. v. F.C.C.*, 520 U.S. 180, 213 (1997) ("Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review."); *Doe v. Cuomo*, 755 F.3d 105, 113 (2d Cir. 2014) ("There is no serious dispute that the New York State Legislature provided constitutionally adequate process simply by enacting [the laws at issue], publishing them, and affording those within the statute's reach a reasonable opportunity both to

contradicted by the key case they cite, *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377

(1999).[15]  In *Nixon*, the State of Missouri submitted no legislative history at all, merely an affidavit

from a state senator whose committee considered the bill, but the Supreme Court nevertheless

found the affidavit to be more than sufficient, along with the District Court's post-hoc citation to

three articles (one of which was an opinion piece) in the *St. Louis Post-Dispatch* and the *Kansas City

Star.   Id.* at 393.  The Court noted that even this limited showing "does not present a close call,"

since it was enough to show that the Missouri legislature was motivated by the same concerns about

public corruption that were considered in *Buckley.  Id.*  The Court declared that "[t]he quantum of

empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up

or down with the novelty and plausibility of the justification raised.  *Buckley* demonstrates that the

dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are

neither novel nor impossible."  *Id.* at 391.

     Any evidentiary requirement should be even lower in this case, since donor disclosure

---

familiarize themselves with the general requirements imposed and to comply with those
requirements." (quoting *United States v. Locke*, 471 U.S. 84, 108 (1985) (internal quotation marks
and alterations omitted)); *Palladio, Inc. v. Diamond*, 321 F. Supp. 630, 633 (S.D.N.Y. 1970) ("there
is no constitutional requirement that the legislature conduct hearings and build a record when it
passes a law").

[15]   The other cases cited by Plaintiffs are not on point.  *White River Amusement Pub, Inc. v. Town of
Hartford*, 481 F.3d 163, 171 (2d Cir. 2007), is factually inapposite in that it concerns an ordinance
prohibiting public nudity and the Court analyzed only case law evaluating municipal public
indecency statutes.  *See id.* at 169-73 (analyzing public indecency cases). *Wisconsin Right to Life, Inc.
v. Barland*, 751 F.3d 804 (7th Cir. 2014), is legally inapposite since the statute at issue in that case
"impose[d] full-blown PAC duties," an "elaborate regulatory scheme" that included not only
disclosure requirements but also registration and recordkeeping requirements, mandatory
attribution and disclaimers in communications, and statutory limits on contributions and
expenditures.  *Id.* at 810, 841.  And the holding in *ACLU of Nev. v. Heller*, 378 F.3d 979, 996 (9th
Cir. 2004), striking down a disclosure requirement for being unrelated to political campaigning, is
no longer operative after *Citizens United I* "reject[ed the] contention that [] disclosure requirements
must be limited to speech that is the equivalent of express advocacy."  *Citizens United I*, 558 U.S.
at 369; *cf. Yamada v. Snipes*, 786 F.3d 1182, 1203 n.14 (9th Cir. 2015) (stating that *Citizens United*
overruled *Heller* in the temporal context).

requirements have a longer history than the contribution limits at issue in *Nixon* and impose much less of a burden on First Amendment rights. *See Citizens United I*, 558 U.S. at 366 ("disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities and do not prevent anyone from speaking."); *Madigan*, 697 F.3d at 480, 482 (noting that disclosure requirements have existed since 1910 and characterizing their burden as "modest"). The legislative history described above, including the Governor's speech calling for disclosure, his press releases and bill memorandum, and the Assembly's statement in support, are more than sufficient to meet the slight evidentiary burden required to establish the government's interests in the legislation. *See Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 141-43 (S.D.N.Y. 2017) (Parker, M.J.) (reviewing the case law and concluding that "courts have routinely adjudicated the constitutionality of donor disclosure requirements without the type of expansive evidence that Plaintiffs request").[16]

### 2. The Disclosure Provisions Are Substantially Related To The Government's Important Interests

Just as the donor disclosure requirements under FECA and BCRA were substantially related to the government's interests in providing information on who is paying, deterring corruption, avoiding the appearance of corruption, and promoting the government's ability to enforce existing laws, so too are the Disclosure Provisions at issue here.

By targeting 501(c)(4) organizations that spend in excess of $10,000 on political

---

[16]  In contrast to this legislative history, the facts asserted by Plaintiffs in their Rule 56.1 Statement (ECF No. 140) concerning the procedural means by which the legislation was enacted and the purported motivations of the Governor are legally irrelevant to the constitutional issues raised in this case, as the Court has already ruled. *See Citizens Union*, 269 F. Supp. 3d at 146 (citing *U.S. v. O'Brien*, 391 U.S. 367, 383 (1968)). Indeed, this Court's prior ruling, to which Plaintiffs did not object, is law of the case. *See Hamlen v. Gateway Energy Servs. Corp.*, No. 16 Civ. 3526 (VB), 2018 WL 1568761, at *2 (S.D.N.Y. Mar. 29, 2018) (law of the case doctrine applies "regardless of the judge making the determination or whether that judge has life-tenure.").

communications to audiences of 500 or more and 501(c)(3) organizations that make in-kind

donations to 501(c)(4) organizations engaging in significant lobbying activity, the Disclosure

Provisions will reveal the funders of issue advocacy communications and coordination among tax-

exempt organizations (including donors who seek to funnel money to 501(c)(4)s and then to Super

PACs through 501(c)(3)s).  This will accomplish the stated goals of providing the public with much-

needed information on important issues before executive, legislative, and administrative bodies, and

helping to deter corruption and avoid the appearance of corruption.[17]  *See National Ass'n of Mfrs. v.*

*Taylor*, 582 F.3d 1, 14-15 (D.C.Cir. 2009); *McKee*, 649 F.3d at 57.

       Because the Disclosure Provisions are substantially related to important governmental

interests, they pass constitutional muster under the exacting scrutiny standard.  *Citizens United I*, 558

U.S. at 369; *McConnell*, 540 U.S. at 196; *Buckley*, 424 U.S. at 68; *Independence Institute*, 216 F. Supp. 3d at

187-91; *cf. Citizens United II*, 882 F. 3d at 384 ("Publication of member or donor lists is not per se

impermissible under the First Amendment, of course.  It may even be defensible on the grounds

that it promotes the transparency necessary for full and open debate.").

**C. Plaintiffs Rely On Inapposite Cases Involving On-Publication Identity Disclosure Laws Reviewed Under Strict Scrutiny**

       Plaintiffs rely on Supreme Court precedent that is inapplicable and all but ignore *Buckley*,

*McConnell*, and *Citizens United I*.

       There is "unmistakable tension that exists" between speech rights and disclosure rules in

---

[17]    Contrary to Plaintiffs' suggestion that "no prior law has ever attempted to regulate election-related speech by requiring disclosures from apolitical or issue-oriented entities like 501(c)(3)s," (Pl's MOL at 18), such laws exist and have been upheld.  *See, e.g., Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308-09 (3d Cir. 2015) (rejecting 501(c)(3) organization's argument that it was exempt from state donor disclosure law because it was a "neutral communicator" and had (c)(3) status); *Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270, 289-90 (4th Cir. 2013) (holding that it was unconstitutional to exempt 501(c)(3) organizations from donor disclosure requirements based on their tax status).

Supreme Court precedent.  *Van Hollen v. FEC*, 811 F.3d 486, 500 (D.C. Cir. 2016).  On the one

hand, the Court has upheld the public's right to speak anonymously as a "shield from the tyranny of

the majority" (*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995)), while on the other hand, the

Court has upheld disclosure requirements as serving the government's important interests in

providing information to the public, avoiding corruption, and enforcing existing laws (*McConnell*, 540

U.S. at 196).  *See Van Hollen*, 811 F.3d at 499-500 (discussing cases).  These competing interests run

through two separate lines of cases, with discernably different results.  One line of cases –

exemplified by *Talley v. State of California*, 362 U.S. 60 (1960), and *McIntyre* – involves "on-publication

identity disclosure requirements" mandating that a speaker reveal her identity on the face of her

communication as a condition to distribution.  *See ACLU of Nev. v. Heller*, 378 F.3d 979, 991-92 (9th

Cir. 2004) (discussing cases).  The other line of cases – exemplified by *Buckley*, *McConnell*, and *Citizens

Union I* – involves "after-the-fact reporting requirements" mandating disclosure of donor

information in post-communication reports.  *Id.* at 991.

     In the on-publication identity disclosure cases, the Supreme Court has applied strict scrutiny

to assess infringement on speech that it considers "more intrusive" than after-the-fact donor

disclosure reporting requirements and supported by "different and less powerful state interests."

*McIntyre*, 514 U.S. at 356; *see also Heller*, 378 F.3d at 987 (noting on-publication identity disclosure

requirements "go beyond requiring the reporting of funds used to *finance* speech to affect the *content

of the communication itself*") (emphasis in original), 992-93 (noting strict scrutiny applies).[18]  In contrast,

---

[18]   The Supreme Court has, on occasion, used the terms "exacting" and "strict" interchangeably to
describe the same test.  *See, e.g., Burson v. Freeman*, 504 U.S. 191, 198 (1992); *McIntyre*, 514 U.S. at
347.  The adjective used to describe the test "is beside the point," however, because the Court
"has clearly described what the test is" being applied in each instance.  *Taylor*, 582 F.3d at 10.  In
the on-publication identity disclosure cases the Court will "uphold the restriction only if it is
narrowly tailored to serve an overriding state interest" (*McIntyre*, 514 U.S. at 348), while in after-
the-fact donor disclosure reporting cases the Court will uphold the law where there exists a
"'substantial relation between the disclosure requirement and a sufficiently important

in after-the-fact donor disclosure reporting cases, the Supreme Court has applied exacting scrutiny

to analyze "the lesser burdens that disclosure generally imposes on First Amendment interests . . . ."

*Taylor*, 582 F.3d at 9.  As the reasoning in these two lines of cases indicates, "requiring a publisher to

reveal her identity on her election-related communication is considerably more intrusive than simply

requiring her to report to a government agency for later publication how she spent her money."

*Heller*, 378 F.3d at 992.  It is no surprise then that the Supreme Court has generally invalidated laws

imposing on-publication identity disclosure requirements and upheld laws mandating after-the-fact

donor disclosure reporting requirements.  *See id.* at 991-92 (collecting on-publication identity

disclosure cases and noting "constitutionally determinative distinction between on-publication

identity disclosure requirements and after-the-fact reporting requirements"); *Taylor*, 582 F.3d at 9-10

(collecting after-the-fact donor disclosure reporting cases); *Madigan*, 697 F.3d at 470 n.1 (collecting

after-the-fact donor disclosure reporting cases).

Plaintiffs seriously err in relying heavily upon on-publication identity disclosure cases while

all but ignoring after-the-fact donor disclosure reporting cases, including most notably the

triumvirate of Supreme Court decisions establishing that donor disclosure requirements serve three

distinct and important governmental interests – *Buckley*, *McConnell*, and *Citizens United I*.[19]  Pls. MOL

at 25, n.8.  The thrust of Plaintiffs' argument is that decades of Supreme Court precedent upholding

---

governmental interest.'"  *Citizens United II*, 882 F.3d at 382 (quoting *Reed*, 561 U.S. at 196).

[19]    The cases cited by Plaintiffs have nothing to do with after-the-fact donor disclosure reporting
requirements analyzed under exacting scrutiny.  *See* Pls. MOL at 15, 20, 22 (citing *Watchtower Bible
and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 160 (2002) (involving
challenge to village ordinance requiring anyone seeking to canvas door-to-door to obtain in
advance a permit disclosing the person's name), at 16, 23 (citing *Abood v. Detroit Board of
Education*, 431 U.S. 209, 235-36 (1977) (involving challenge to practice by unions financing
political speech of using fees paid by non-members who oppose the views being expressed by
the union), at 16 (citing *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632
(1980), (involving challenge to ordinance requiring charitable organizations to establish that they
will use at least 75% of any donations solicited door-to-door directly for charitable purposes in
order to obtain a permit for conducting such solicitations).

after-the-fact donor disclosure reporting requirements must be narrowly construed as applying only to disclosure laws that are pegged to elections and therefore do not apply to the Disclosure Provisions, which focus on issue advocacy involving matters that may be acted upon by legislative, executive and administrative bodies without regard to election campaigns.  Pls. MOL at 25.

Plaintiffs' argument cannot be squared with Supreme Court and circuit court cases upholding disclosure requirements for lobbyists unrelated to any election.  In *United States v. Harriss*, 347 U.S. 612 (1954), the Court addressed whether certain provisions of the Federal Regulation of Lobbying Act were constitutional, including a provision requiring any person engaged in lobbying activities to register with Congress and disclose, *inter alia*, how much he is being paid and by whom. *Id.* at 613-15 & n.2.  The Court held the disclosure requirement survived plaintiff's First Amendment challenge because it served to provide Congress with necessary information:

> [T]he voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal.  This is the evil which the Lobbying Act was designed to help prevent.
>
> . . .  [Congress has] provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose.  It wants only to know who is being hired, who is putting up the money, and how much.

*Id.* at 625.  Circuit courts have similarly upheld lobbyist disclosure statutes based on the government's interest in "providing greater public information about who is lobbying Congress and what they are lobbying about."  *Taylor*, 582 F.3d at 12; *see also Minn. Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1111 (8th Cir. 2005) (noting courts "have upheld lobbyist-disclosure statutes based on the government's 'compelling' interest in requiring lobbyists to register and report their activities, and avoiding even the appearance of corruption.") (quoting *Buckley*, 424 U.S. at 66).

Relying on the reasoning of *Harriss*, the Seventh Circuit in *Madigan* upheld an Illinois disclosure requirement applicable to ballot initiative committees "when they accept contributions or make expenditures in support of or in opposition to any question of public policy in amounts

exceeding $3,000 in a 12-month period." 697 F.3d at 480. The court in *Madigan* rejected the argument that *Citizens United I* should be limited to candidate campaigns, noting that "[e]ducating voters is at least as important, if not more so, in the context of initiatives and referenda as in candidate elections." *Id.* "Because the issues can be complex and the public debate confusing, voters' interest in knowing the source of messages promoting or opposing ballot measures is especially salient in such campaigns." *Id.* The same is true with initiatives that come before legislative, executive and administrative bodies, which are the focus of the Disclosure Provisions here and about which voters may want to communicate with their elected and appointed representatives.

Moreover, the Supreme Court's flat (and repeated) rejection of any distinction between express advocacy and issue advocacy leaves no room to argue that disclosure requirements are constitutionally permissible only when they relate to elections. The three important governmental interests identified by the Supreme Court – providing the public with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce existing laws – are no more compelling during the run up to an election than they are between election cycles. After all, even when there is no upcoming election, the public still benefits from information about "who is speaking" in issue advocacy communications so they can assess such communications and weigh in with their elected officials and appointed representatives on important matters coming before legislative, executive, and administrative bodies (*Citizens United I*, 558 U.S. at 369), and the government still has the same interest in preventing corruption and enforcing restrictions on charitable organizations that apply year round. *See also McConnell*, 540 U.S. at 197 (noting that donor disclosure rules promote the "interests of individual citizens seeking to make informed choices in the political marketplace." (quotation omitted). As aptly noted by Judge Garland in *Taylor*:

> [J]ust as disclosure serves the important "information interest" of "help[ing] voters to define more of the candidates' constituencies," it likewise helps the public to

23

understand *the constituencies behind legislative or regulatory proposals*. Transparency in government, no less than transparency in choosing our government, remains a vital national interest in a democracy.

. . . [T]he government has a compelling interest in providing the public and its elected representatives with information regarding "who is being hired, who is putting up the money, and how much" they are spending *to influence public officials*.

582 F.3d at 203-04 (quoting *Buckley*, 424 U.S. at 81, and *Harriss*, 347 U.S. at 625, respectively) (emphasis added); *see also McKee*, 649 F.3d at 57 ("In an age characterized by the rapid multiplication of media outlets and the rise of internet reporting, the 'marketplace of ideas' has become flooded with a profusion of information and political messages. Citizens rely ever more on a message's source as a proxy for reliability and a barometer of political spin. Disclosing the identity and constituency of a speaker engaged in political speech thus 'enables the electorate to make informed decisions and give proper weight to different speakers and messages.'") (quoting *Citizens United I*, 558 U.S. at 370).[20]

Accordingly, the Court should reject the Plaintiffs' narrow construction of Supreme Court precedent upholding after-the-fact disclosure reporting requirements as applicable only in the context of elections.[21]

---

[20]   Plaintiffs' contention that the court in *McKee* upheld Maine's donor disclosure requirement because the law was election-related (Pls. MOL at 22) is wrong. While the court certainly noted that the challenged law was focused on campaigns, it by no means suggested it would have found the law unconstitutional absent such a limitation; to the contrary, the court took pains to point out that the government's informational interest "is not limited to the choice between candidates for political office" and applies broadly to "identifying the speakers behind politically oriented messages." 649 F.3d at 57.

[21]   The only case cited by Plaintiffs in support of their "election related" limitation on after-the-fact donor disclosure cases is the Seventh Circuit's decision in *Barland*, and more specifically the Seventh Circuit's statement that *Buckley* holds "'the government's authority to regulate in this area extends only to money raised and spent for speech that is clearly *election related*' and that "ordinary political speech about issues, policy, and public officials must remain unencumbered." Pls. MOL at 25 (quoting *Barland*, 751 F.3d at 810). Plaintiffs take this quote from *Barland* wildly out-of-context. In the quoted passage, the Seventh Circuit discusses the section of *Buckley* that is addressing FECA's *campaign expenditure limitations*, which place ceilings on how much candidates, their campaigns and political parties can spend. *Barland*, 751 F.3d at 810-811 (citing *Buckley*, 424

**D.  Plaintiffs Overstate The Burden Imposed On Their First Amendment Rights By The Disclosure Provisions**

"There are two quite different ways in which a statute may be considered invalid 'on its face' – either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'"  *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) (quoted by *Sorrell*, 758 F3d at 127).  Plaintiffs appear to argue that the Disclosure Provisions are overbroad in their reach in addition to being unconstitutional in every conceivable application.  However, Plaintiffs premise their "overbreadth" argument on a flawed interpretation of the law.

First, Plaintiffs misconstrue the Disclosure Provisions as mandating *public disclosure of donor names* in all instances where: (i) a 501(c)(3) makes an in-kind donation in excess of $2,500 to a 501(c)(4) required to file a source of funding report with JCOPE; and (ii) a 501(c)(4) spends more than $10,000 per year on a "covered communication."  That is not so.  Those circumstances trigger an obligation merely to file with the Attorney General "a financial disclosure report."  N.Y. Exec.

_____

U.S. at 42-44 (section of opinion discussing "Expenditure Limitations")).  This passage has nothing to do with FECA's *disclosure requirements*, which the Court discussed in a later section of the opinion and acknowledged "in most applications appear to be the least restrictive means of curbing the evils of campaign ignorance and corruption that Congress found to exist."  *Buckley*, 424 U.S. at 68.  Accordingly, the passage from *Barland* cited by Plaintiffs speaks only to the government's authority to impose expenditure limitations that restrain speech during an election and has nothing to do with the separate topic of the government's authority to require donor disclosure, which of course does not directly restrain speech at all.

Nor does the Seventh Circuit's ruling in *Barland* to strike down the disclosure requirement in Wisconsin's campaign finance regulation under exacting scrutiny more generally help Plaintiffs' cause.  Unlike the Disclosure Provisions here, the disclosure requirements in *Barland* imposed obligations that went far beyond simply disclosing donor information; they imposed the same "pervasive regulatory regime" applicable to political action committees – "with its organizational prerequisites, registration duties, and comprehensive, continuous financial reporting."  *Barland*, 751 F.3d at 841.  On that basis – which readily distinguishes *Barland* from this case – the Seventh Circuit found a "substantial mismatch" between the Wisconsin regulation and the "important governmental interests" served by providing the public with information about who is speaking. *Id.*

Law §§ 172-e(2)(a), 172-f(2)(a).  Whether the Attorney General forwards any financial disclosure
report to JCOPE for publication on JCOPE's website is instead entirely dependent on whether the
reporting entity seeks and obtains an exemption from public disclosure based on a showing that
"such disclosure may cause harm, threats, harassment, or reprisals to the source of the donation or
to individuals or property affiliated with the source of the donation" (N.Y. Exec. Law §§ 172-e(3),
172-f(3)), a test that mirrors the language adopted by the Supreme Court in donor disclosure cases
(*Citizens United II*, 882 F.3d at 381 (discussing *National Ass'n for the Advancement of Colored People v. State
of Alabama*, 357 U.S. 449 (1958)).  Moreover, even where the Attorney General denies a request for
an exemption, the reporting entity may appeal the denial, in which case public disclosure will depend
on the decision rendered on the appeal by an independent judicial hearing officer.  N.Y. Exec. Law
§§ 172-e(3), 172-f(3)).  Plaintiffs argue that the Disclosure Provisions chill "the protected speech of
donors who prefer to remain anonymous" due to, among other reasons, fear of "retaliation" (Pls.
MOL at 15), but that entirely ignores the exemption built into the law to eliminate that concern.

Plaintiffs maintain that "the possibility of a statutory exemption" does not allay their fears
because, they contend, the exemption does not give them or their donors "advance assurance" of
anonymity and must be renewed every six months.  Pls. MOL at 30.  However, nothing in § 172-e(3)
or § 172-f(3) suggests that the process for seeking an exemption would necessarily conclude after,
rather than before, the start of the reporting period for which the exemption would apply.  Nor do
the provisions specify the number of reporting periods for which an exemption shall be effective.

Second, with respect to § 172-f, Plaintiffs misconstrue the burden imposed by the Disclosure
Provisions in contending that 501(c)(4)s "must provide disclosures regarding all its donors who
contributed more than $1,000 within a calendar year – regardless of whether those donations related
in any way to the organization's 'expenditures on covered communications.'"  Pls. MOL at 23
(quoting N.Y. Exec. Law § 172-9(2)(a)(iv)).  Plaintiffs ignore § 172-f(2)(c), which provides that if a

26

501(c)(4) maintains segregated bank accounts dedicated to the purpose of funding covered communications, then its "financial report need only include donations deposited into such accounts." N.Y. Exec. Law § 172-f(2)(a)(iv). Thus, Plaintiffs' contention that § 172-f "mandates the disclosure of *all* donors who contribute more than $1,000 to a covered entity in a calendar year, regardless of any limitations or conditions placed on the donation" is wrong. Pls. MOL at 24 (emphasis in original). Donors can choose to donate only to 501(c)(4)s that maintain segregated bank accounts for funding covered communications and can direct that their donations not be used to fund such accounts, thereby ensuring their anonymity.

The question for the Court under the Second Circuit's formulation is: do a substantial number of likely applications of the Disclosure Provisions to 501(c)(3)s and 501(c)(4)s *that are unable to show that disclosure will cause harm, threats, harassment, or reprisals,* and otherwise meet the monetary thresholds for reporting (*as narrowed in scope by the segregated bank account option*), correspond to important governmental interests? *Citizens United II*, 882 F.3d at 383. For the reasons articulated above, the answer is "yes."

### E. Plaintiffs' Arguments Based On Vagueness And Burden Are Without Support

Plaintiffs maintain that the definitions of "Donation" and "Covered Communication" in the Disclosure Provisions are unconstitutionally vague. Pls. MOL at 17, 27.

The void for vagueness doctrine is an outgrowth of the Due Process Clause of the Fifth Amendment. *United States v. Williams*, 553 U.S. 285, 304 (2008); *United States v. Farhane*, 634 F.3d 127, 136 (2d Cir. 2011). Some ambiguity does not necessarily violate due process standards; "perfect clarity and precise guidance have never been required." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). Even a finding that the legislature "might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." *United States v. Powell*, 423 U.S. 87, 94

27

(1975) (quoting *United States v. Petrillo*, 332 U.S. 1, 7 (1947)).  Rather, a vagueness challenge "may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).  Due process requires only that a statute provide "minimal guidelines" as to the conduct it proscribes when understood through common sense and ordinary practice; the Constitution does not demand "meticulous specificity . . . at the cost of flexibility and reasonable breadth."  *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013); *see Farhane*, 634 F.3d at 139.  Further, it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."  *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952).

The Court need not dwell on Plaintiffs' vagueness arguments for long because definitions very similar to those they challenge in the Disclosure Provisions have already been upheld as sufficiently clear to withstand constitutional challenge.  *Taylor*, 582 F.3d at 25 (findings terms used in a lobbyist disclosure requirement not unconstitutionally vague where the Supreme Court had held nearly identical terms in a different regulation were not too vague).  The definition of "Donation" closely tracks the language upheld in FECA and BCRA (*compare* N.Y. Exec. Law § 172-e(1)(c) *with* Federal Election Campaign Act Amendments of 1974, Pub. L. No. 93-443 § 102(c), 88 Stat. 1269, *and* Bipartisan Campaign Reform Act of 2002, Pub L. No. 107-155 § 101(a), 116 Stat. 82) as well as the definition of "expenditure" in the disclosure provisions of Vermont's election laws upheld by the Second Circuit (*Sorrell*, 758 F3d at 130-31).  The definition of "Covered Communication" uses language similar to BCRA's definition of "public communication."  *Compare* N.Y. Exec. Law § 172-f(1)(b) *with* BCRA § 101, 116 Stat. 86.  Moreover, the "everyday understanding" and "regular usage" of the terms employed in these definitions provide sufficient clarity to defeat Plaintiffs' vagueness challenge.  *Lopez v. Gonzales*, 549 U.S. 47, 53-54 (2006); *see also Montgomery v. Daniels*, 38 N.Y.2d 41, 58 (1975) (rejecting void for vagueness challenge where abstract words have "through daily use

acquired a content that conveys to any interested person a sufficiently accurate concept") (quoting *Kovacs v. Cooper*, 336 U.S. 77, 79 (1949)).

Similarly, Plaintiffs' contention that the Court should strike down the Disclosure Provisions because they impose "substantial administrative burdens" (Pls. MOL at 16, 23) is without any record support. Plaintiffs cite no testimony or documentary evidence in support of the "substantial administrative burdens" they claim the Disclosure Provisions will impose, despite filing six affidavits from current and former executives of their organizations. If anything, the affidavit testimony of Plaintiffs' employees establishes that Plaintiffs already have sophisticated systems in place for meeting their current obligations to track and report donor information to the IRS and for their own internal purposes. *See* Delaney Declaration, ECF No. 141, at ¶ 12; Dougherty Declaration, ECF No. 143, at ¶¶ 12, 16; Lieberman Declaration, ECF No. 144, at ¶¶ 10, 12; Gotbaum Declaration, ECF No. 145, at ¶¶ 6-7. There is no factual basis in the record to conclude that adjusting their system tracking and reporting requirements to capture donations at a lower dollar threshold will impose any undue burden on Plaintiffs.

## II.   PLAINTIFFS' AS-APPLIED FIRST AMENDMENT CHALLENGE FAILS BECAUSE THE DISCLOSURE PROVISIONS ALLOW FOR AN EXEMPTION UPON A SHOWING OF HARM, THREATS, HARRASSMENT, OR REPRISALS

An as-applied challenge is viable only if plaintiffs can establish a reasonable probability that their donors "would face threats, harassment, or reprisals if their names were disclosed." *Citizens United I*, 558 U.S. at 370 (citing *McConnell*, 540 U.S. at 198). "[T]he alleged harms must be sufficiently likely and of sufficient magnitude that they outweigh the governmental interest in policing charities for fraud and self-dealing." *Citizens United II*, 882 F.3d at 385. It is "rare" that disclosure will result in such "serious and widespread harassment." *Doe v. Reed*, 561 U.S. 186, 215 (2010) (Sotomayor, J., concurring).

Citizens Union and ACLU, relying on affidavit testimony from their staff, argue that they

and their donors will face threats and harassment if the Disclosure Provisions are applied to them. Pls. MOL at 29-30.  But the Court need not decide whether their claims of threats and harassment are "sufficiently likely and of sufficient magnitude" (*Citizens United II*, 882 F.3d at 385), or instead are "highly speculative" (*Buckley v. Valeo*, 424 U.S. 1, 70 (1976)), because these plaintiffs can apply for a statutory exemption.  N.Y. Exec. Law §§ 172-e(3), 172-f(3); *supra* at 7, 26.

The Plaintiffs have neither applied for, nor been denied, an exemption, which is understandable given that, by stipulation and order, the Attorney General's enforcement of the Disclosure Provisions is stayed pending this Court's decision on the present motions.  *See supra* at 8. Moreover, Plaintiffs have not, and cannot, allege that the Attorney General will necessarily deny them an exemption, or that an independent hearing officer would necessarily uphold any denial on appeal.  Unless and until Plaintiffs unsuccessfully apply for an exemption and lose on appeal before an independent hearing officer, they have no basis to bring an as-applied challenge.  *Citizens United II*, 882 F.3d at 385 (rejecting as-applied challenge to donor disclosure requirement based on "a bare assertion that the Attorney General has a vendetta against Appellants").

<u>CONCLUSION</u>

For the reasons set forth above, the Attorney General respectfully requests that the Court deny Plaintiffs' motion for summary judgment, grant Defendant's cross-motion for summary judgment, dismiss these consolidated actions in their entirety, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 25, 2018

                                        BARBARA D. UNDERWOOD
                                        Attorney General
                                        State of New York

                                        By: /s/ Andrew Amer
                                        Andrew Amer
                                        Special Litigation Counsel
                                        James M. Thompson
                                        Assistant Attorney General
                                        28 Liberty Street
                                        New York, NY  10005
                                        (212) 416-6127

                                        *Attorneys for Defendant The Attorney General of the State of New York*

31