Gibson, Dunn & Crutcher LLP
Patterson Belknap Webb & Tyler LLP
Gibbons P.C.

*Court Exhibit*
*11/28/18*

# Plaintiffs' Presentation
# November 28, 2018

*Citizens Union of the City of New York, et al.*

*v.*

*The Attorney General of the State of New York*

No. 16 Civ. 9592 (S.D.N.Y.)

# Table of Contents

- Overview — 1

- Factual and Procedural Background — 2

- Sections 172-e and 172-f Are Not Substantially Related to the State's Purported Interests — 14

- Sections 172-e and 172-f Are Unconstitutional as Applied to the ACLU Plaintiffs and the Citizens Union Plaintiffs — 30

- The Supreme Court's Campaign Finance Jurisprudence Has No Applicability Here — 35

# Overview

- Sections 172-e and 172-f are an unprecedented invasion of the First Amendment rights of nonprofit organizations and their donors to free speech, privacy, and association, requiring public disclosure of donations, even when supporting speech unrelated to any elections, campaigns, or lobbying.

- As this Court recognized at the outset of the litigation and the Attorney General conceded, "[n]o other jurisdiction has disclosure requirements similar to Sections 172-e and 172-f." Dkt. 34 at 6; Dkt. 26 at 2.

- The challenged provisions are facially unconstitutional because they are not "substantial[ly] relat[ed]" to a "sufficiently important governmental interest." *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010).

  - The State's "interests" in passing these laws relate to regulating elections and campaigns, yet these provisions admittedly apply "without regard to election campaigns." AG Opp. at 22.

  - Thus, these provisions reaching expressive activities unrelated to those interests are overbroad.

  - "[T]he government's authority to regulate in this area extends only to money raised and spent for speech that is clearly *election related*; ordinary political speech about issues, policy, and public officials must remain unencumbered." *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804, 810 (7th Cir. 2014).

- These provisions are also unconstitutional as applied to the Citizens Union and ACLU Plaintiffs.

  - Both take controversial positions, which subject them to a "reasonable probability" that donors will face "threats, harassment, or reprisals" if their names are disclosed. *Citizens United*, 558 U.S. at 367.

- The Attorney General relies on inapposite Supreme Court campaign finance jurisprudence upholding disclosure requirements *substantially related* to *election interests*. But those cases provide no justification for disclosure laws that reach far beyond *election-related interests*.

# Factual and Procedural Background

# "Good Government" Groups Criticized the Governor for Failing to Follow Through on Promised Ethics Reforms

- Prior to the enactment of the challenged provisions, Citizens Union and other "good government" groups openly criticized the Governor for failing to follow through on significant ethics reforms. Pls.' 56.1 ¶ 32.

- The Governor responded to this criticism by attacking "good government" groups, including Citizens Union, and demanding that they disclose their donors. Pls.' 56.1 ¶ 33.

  - On March 9, 2016, after Citizens Union's response to the Governor's attack was published, the Governor called Citizens Union's then-Executive Director and told him to "be careful" about the parties with whom Citizens Union associated, and said legislation would be proposed to regulate nonprofits like Citizens Union.  The Governor concluded with a parable about an ocean wave that would leave "some of you . . . standing and some of you . . . gone." Pls.' 56.1 ¶¶ 36–38.

  - On March 12, 2016, the press reported that "when good government groups held a press conference in Albany on Tuesday calling for Cuomo to lead on ethics, the administration's response was downright hostile." Pls.' 56.1 ¶ 33.  The Governor's spokesman was quoted as saying: "We will be discussing many ethics issues this session, including campaign finance reform, outside income for legislators and more disclosure by not-for-profits as to who actually funds them and whether they are *shadow lobbyists*." *Id.* (emphasis added).

3

# The Governor and Legislature Introduced a Broad Electoral Reform Bill Without Referencing the Challenged Provisions

- On June 8, 2016, the Governor announced a broad electoral reform bill, which ultimately included the challenged provisions. Pls.' 56.1 ¶¶ 108–109.
- The Governor stated that the bill's purpose was to "curb the power of independent expenditure campaigns unleashed by the 2010 Supreme Court case *Citizens United vs. Federal Election Commission.*" Pls.' 56.1 ¶ 110.
  - The Governor stated that the bill would "strengthen[] disclosure requirements" to shed light on the role of "undisclosed 'dark money' *on elections*" and limit "'quid pro quo' danger." Pls.' 56.1 ¶ 111; AG Opp. at 5 (emphasis added).
- The Governor's Program Bill Memorandum stated that the purpose of the bill was "to provide New York State with comprehensive ethics, lobbying, campaign finance, and public officer's law reform." Pls.' 56.1 ¶ 114.
- The Governor's Office's statements did not include *any* discussion of imposing donor disclosure requirements on 501(c)(3) and 501(c)(4) organizations unrelated to electoral politics or lobbying. Pls.' 56.1 ¶ 113.

4

# The Challenged Provisions Were Added to the Bill Without Any Prior Public Notice or Stated Justification

- After the Governor announced the bill, the challenged provisions were added.

- There is *no* evidence that these provisions had been previously disclosed to the public. Pls.' 56.1 ¶ 118.

- The available legislative history, like the Governor's pre-enactment statements, contains *no* reference to or justification for the challenged provisions. *See, e.g.,* Pls.' 56.1 ¶¶ 33, 126.

## This Legislation Became Law Without Public Comment and Without Addressing Plaintiffs' Stated Constitutional Concerns

- On June 18, 2016, the Governor submitted the bill to both houses with a "message of necessity," which allowed the Legislature to circumvent the requirement that the bill be submitted at least three days before passage. Pls.' 56.1 ¶ 119.

  - The "message of necessity" was focused solely on election-related reforms:

    "This bill would enact a comprehensive series of ethics, campaign finance, lobbying, and public officers reforms.  In response to the Supreme Court's 2010 Citizens United decision, this bill would enact the strictest law in the country to prevent candidates and independent groups from improperly coordinating their political activities.  The bill will allow New York's electoral politics to achieve a clear and meaningful demarcation between candidates and unlimited expenditures and will provide an essential reform to New York's campaign finance system.  The bill would also increase penalties for egregious lobbying violations, and would require disclosures of political relationships and behaviors widely recognized to be influential but which operate in the shadows.  As passage of this bill would enact the strongest reforms in the country to combat outsized influence of dark money in politics, it is imperative that New York pass this bill."  Mastro Decl. Ex. 7.

- In other words, the Governor claimed an emergency to address the ramifications of a six-year-old Supreme Court decision on "dark money in politics" but never referred to these provisions at all, let alone made any attempt to justify their passage on an emergency basis.

6

# This Legislation Became Law Without Public Comment and Without Addressing Plaintiffs' Stated Constitutional Concerns

- Just hours after the bill was submitted, both houses passed this legislation, following a debate that lasted only 10-15 minutes. Pls.' 56.1 ¶¶ 115–16. Several lawmakers stated on the record that they did not know what they were voting on. Pls.' 56.1 ¶ 120.

- After the bill was passed but before the Governor signed it, numerous nonprofit organizations—including Citizens Union, the NYCLU, and Lawyers Alliance—wrote to the Governor to identify constitutional deficiencies with the challenged provisions. Pls.' 56.1 ¶ 128.

  - The NYCLU wrote that "the legislation includes several provisions that would regulate activity that is unrelated to electoral campaigns—including . . . types of activity . . . afforded broad constitutional protections against government regulation." Pls.' 56.1 ¶ 132.

  - Citizens Union wrote that Section 172-f's definition of "covered communications" is "enormously and dangerously overbroad" and covers "[a]ny comment for or against any government decision that was ever made." Pls.' 56.1 ¶ 135.

  - Lawyers Alliance wrote that Section 172-e would "affect 501(c)(3)'s, and their donors, whose contributions have nothing to do with lobbying." Pls.' 56.1 ¶ 129.

- Despite having proposed expedited passage through a "message of necessity," Governor Cuomo took 69 days to sign the bill into law, without even acknowledging the many submissions identifying constitutional concerns with the challenged provisions. Pls.' 56.1 ¶¶ 127, 138.

7

## Section 172-e Imposes on 501(c)(3)s the Obligation To Publicly Disclose Their Donors Whenever They Make "Donations" for Any Purpose to Certain 501(c)(4)s of at Least $2,500

- All donors and donations to a 501(c)(3) in excess of $2,500 must be publicly disclosed biannually whenever the 501(c)(3) makes "donations," even "in-kind donations," worth at least $2,500 to *any* 501(c)(4) that is required to submit a "source of funding" report under New York's Lobbying Act. N.Y. Exec. L. §§ 172-e(1)-(3).

- An "in-kind donation" is defined as "*donations* of staff, staff time, personnel, offices, office supplies, financial support of any kind or *any other resources*." N.Y. Exec. L. § 172-e(1)(b) (emphasis added).

- Disclosure is mandated *even if* neither the 501(c)(3)'s donation nor the contributions of its donors were intended for lobbying purposes—and, indeed, even if they were earmarked for *non-lobbying* purposes.

- A 501(c)(4) is required to file a "source of funding" report if it (1) retains or employs "any person or organization to carry on lobbying activities" on its behalf, (2) expends in excess of $15,000 on lobbying in the calendar year or 12 months preceding a reporting period, and (3) devotes at least 3% of its total expenditures to lobbying in New York. N.Y. Legis. Law §§ 1-c(b), 1-h(c)(4)(i), 1-j(c)(4)(ii).

- The recipient 501(c)(4) need not itself lobby; it is enough for it to merely hire lobbyists. *See* N.Y. Exec. L. § 172-e(1)(d).

8

Section 172-e Imposes on 501(c)(3)s the Obligation To Publicly Disclose Their Donors Whenever They Make "Donations" for Any Purpose to Certain 501(c)(4)s of at Least $2,500

- The statute's "in-kind donations" could include:
    - a 501(c)(3) contributing to a 501(c)(4) to fund language classes for immigrants
    - a civil rights nonprofit representing a 501(c)(4) in pro bono litigation
    - a law school clinic helping a 501(c)(4) with its tax reporting
- In other words, the donations made by the 501(c)(3) need *not* have been intended to go toward any election-related or lobbying purpose in order to trigger this provisions' reporting requirement. Rather, the donation itself suffices, regardless of whether it was intended for another purpose or even earmarked for another purpose unrelated to any election, campaign, or lobbying.
- Of note, this provision applies to *any* donation worth at least $2,500 at *any* time, not just during an election cycle, further demonstrating its overbreadth.

## Section 172-f Imposes on 501(c)(4)s the Obligation to Publicly Disclose Their Donors if Engaged in Any "Communications" Referencing and Advocating For or Against the "Substance" of Any Issue Subject to "Potential Legislation"

- All donors and donations to a 501(c)(4) in excess of $1,000 must be publicly disclosed whenever the 501(c)(4) spends at least $10,000 on expenditures for "covered communications." N.Y. Exec. L. §§ 172-f(1)-(3).

- A "covered communication" is defined as a communication conveyed to at least 500 members of the public that "*refers to and advocates for or against* a clearly identified elected official or the *position* of any elected official or administrative or legislative body relating to the outcome of any vote or *substance* of *any legislation, potential legislation, pending legislation, rule, regulation, hearing, or decision* by any legislative, executive or administrative body." N.Y. Exec. L. § 172-f(1)(b) (emphasis added).

- Beyond its own communications, a covered entity must also prepare disclosures for any "covered communication" of a third party to whom it has contributed any amount of money "for the purpose of supporting or engaging in covered communications"—whether or not the third party is under the covered entity's control. N.Y. Exec. L. §§ 172-f(1)(c), (2)(a)-(b).

10

## Section 172-f Imposes on 501(c)(4)s the Obligation to Publicly Disclose Their Donors if Engaged in Any "Communications" Referencing and Advocating For or Against the "Substance" of Any Issue Subject to "Potential Legislation"

- The statute could thus cover general expressions of support for such diverse and non-controversial topics subject to "potential legislation" as:
  o Veterans' benefits
  o Neighborhood recycling
  o Funding for medical research
- By its terms, the statute would apply, whether or not such expressions related to any candidate for office, any campaign, any election, or any legislation or regulation. As long as the "substance" of any issue that could be subject to "potential legislation" is communicated, the statute applies.
- Thus, this definition of "covered communications" encompasses speech on all conceivable public matters—past, present, or future, no matter the context.
- Of note, this provision applies to *any* donations of at least $1,000 at *any* time, not just during an election cycle, further demonstrating its overbreadth.

# 501(c)(3) and 501(c)(4) Organizations Are Already Subject to Substantial Disclosure Requirements

- The IRS requires all tax-exempt organizations to file a Form 990, including a non-public Schedule B identifying its major donors, on an annual basis. Pls.' 56.1 ¶¶ 93–96.

- Under New York's Executive Law, 501(c)(3)s and 501(c)(4)s must annually file financial disclosures with the Attorney General's Office, including Form 990 and Schedule B, which are kept confidential. Pls.' 56.1 ¶¶ 99–101.

- Under New York's Lobbying Act, certain 501(c)(4)s[1] must file biannual "source of funding" reports with the Joint Commission on Public Ethics ("JCOPE") specifying the topic of their lobbying and identifying any contributors of $2,500 or more. N.Y. Legis. Law §§ 1-c(b), 1-h, 1-j.

- New York law requires any party that makes "independent expenditures," meaning any communications urging the "election or defeat" of a "clearly identified candidate" within a set time period before an election, to register with the Board of Elections and identify any person who contributed $1,000 or more toward the expenditure. Pls.' 56.1 ¶¶ 106–107.

---

[1] A 501(c)(4) must file a "source of funding" report if it (1) retains or employs "any person or organization to carry on lobbying activities" on its behalf, (2) expends in excess of $15,000 on lobbying in the calendar year or in the 12 months preceding a reporting period, and (3) devotes at least 3% of its total expenditures to lobbying in New York. *See* N.Y. Legis. Law §§ 1-c(b), 1-h(c)(4)(i), 1-j(c)(4)(ii).

# The Plaintiffs and the Case's Procedural History

- Three sets of Plaintiffs filed these actions, which were subsequently consolidated:
  - Citizens Union Plaintiffs: A 501(c)(3) and 501(c)(4) that work together to promote increased civic participation and public accountability in New York. Pls.' 56.1 ¶ 15.
  - ACLU Plaintiffs: Two 501(c)(3)s and one 501(c)(4) that engage in public advocacy, education, and litigation in defending and preserving civil liberties. Pls.' 56.1 ¶¶ 39, 53.
  - Lawyers Alliance Plaintiffs: Two 501(c)(3)s that provide support, and advocate for, New York's nonprofit sector. Pls.' 56.1 ¶¶ 75, 84.
- By stipulation, the Attorney General agreed to stay execution of Sections 172-e and 172-f pending resolution of any summary judgment motions. Pls.' 56.1 ¶ 155.
  - At a January 4, 2017 hearing, counsel for the Attorney General represented that "necessary regulations" would be "enacted in a timely manner." Pls.' 56.1 ¶ 156.
  - To date, no proposed regulations have been posted for notice and comment. Pls.' 56.1 ¶ 156.
- Plaintiffs moved for summary judgment on May 24, 2018; the Attorney General cross-moved on June 25, 2018; and the cross-motions have been fully briefed since August 2, 2018.
- The parties agree that there are no genuine issues of material fact that would preclude the Court from otherwise granting summary judgment here.

# Sections 172-e and 172-f Are Not Substantially Related to the State's Purported Interests

## Exacting Constitutional Scrutiny Requires That, at a Minimum, Disclosure Requirements Be "Substantially Related" to a "Sufficiently Important" Government Interest

- Because the challenged provisions compel disclosure based on "the topic[s] discussed" and "cannot be justified without reference to the content of the regulated speech," strict scrutiny should apply here, meaning the law would have to be narrowly tailored to a "compelling" state interest in order to survive constitutional scrutiny. *Citizens United v. Schneiderman*, 882 F.3d 374, 381 (2d Cir. 2018); *accord, Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2370 n.2 (2018) (applying strict scrutiny to a disclosure requirement because it was "content-based" without reaching whether the law "discriminate[d] based on viewpoint").

- The State has conceded that, at minimum, the challenged provisions must survive "exacting scrutiny," which requires a "substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Citizens United v. FEC*, 558 U.S. 310, 366-67 (2010).

- The challenged provisions here "no more than tenuously relate[]" to the State's purported interests, and thus "fail exacting scrutiny," let alone strict scrutiny. *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 204 (1999).

15

# The Challenged Provisions Impose Facially Significant Burdens on the Constitutional Rights of 501(c)3 and 501(c)4 Organizations

- "Disclosure chills speech." *Van Hollen, Jr. v. FEC,* 811 F.3d 486, 487 (D.C. Cir. 2016).

- Compelled disclosure discourages the exercise of First Amendment rights by hindering the ability of nonprofit organizations to associate with donors who support their charitable missions, and it chills the speech of donors who prefer to remain anonymous. *See Buckley v. Valeo,* 424 U.S. 1, 64 (1976); *Talley v. California,* 362 U.S. 60, 64-65 (1960); *Wis. Right To Life, Inc. v. Barland,* 751 F.3d 804, 840 (7th Cir. 2014).

- "[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Davis v. FEC,* 554 U.S. 724, 744 (2008).

- Section 172-e also burdens 501(c)(3)s' own constitutionally protected right to associate with donors or other organizations who support their charitable missions. "[C]haritable appeals for funds . . . involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Vill. of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632 (1980).

- The potential under these provisions to apply for an exemption from public disclosure *after* the donations have been given does not ameliorate the First Amendment burden, as the Attorney General suggests, because it is for six months only, at the discretion of the Attorney General, and a risk that donors should not have to take in exercising their rights.

16

# The Challenged Provisions Impose Facially Significant Administrative Burdens on 501(c)3 and 501(c)4 Organizations

- The administrative burdens on covered entities are also substantial.
  - Section 172-e requires 501(c)(3)s to track its contributions to 501(c)(4)s in a new way, keep track of which 501(c)(4) donees are registered as lobbyists, and file a new and complex report with the state.
    - Yet a 501(c)(3) that provides support to a 501(c)(4) may not know whether the 501(c)(4) has reached the lobbying thresholds that trigger the reporting obligations, let alone whether the 501(c)(4) will later reach those thresholds.
    - These burdens are exacerbated by 172-e's vague definition of a triggering "in-kind donation" to include "anything of value." These vague formulations force 501(c)(3)s "to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt,* 377 U.S. 360, 372 (1964).
  - Section 172-f requires 501(c)(4)s to prepare a separate disclosure for every expenditure on a "covered communication" it makes within a reporting period, with detail regarding, for example, the substance of the communication and the amount of money paid for it.
    - Beyond its own communications, a covered entity must also prepare disclosures for any "covered communication" of a *third party* to whom it has contributed "for the purpose of supporting or engaging in covered communications"—whether or not the third party is under the covered entity's control.
    - Vague terms, such as "covered communication" or "refers to and advocates for or against," will cause 501(c)(4)s to steer clear of any possible violation.
  - "[I]f the challenged provisions go into effect, [Citizens Union] would be forced to expend additional resources and staff hours in compliance costs." Gotbaum Decl. ¶ 9.

17

# No Justification Was Ever Given For These Specific Provisions

- Although general election-related interests were given as a justification for passing the broader reform bill of which the provisions challenged here are a part, the State never articulated any specific interest in enacting these particular provisions, let alone any "sufficiently important interest."

- Any attempt now by the State to come up with new reasons or *post hoc* rationalizations for passing the challenged provisions should not be credited or even considered.

- When applying exacting scrutiny, "'[s]ubstantially related' means that the explanation must be exceedingly persuasive.  The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation."  *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) (citations and some internal quotation marks omitted), *aff'd*, 570 U.S. 733 (2013).

18

# The State's Proffered Interests Are Directed at Electoral Politics

- The State purports to root its goals for the challenged provisions in "the same" interests the Supreme Court upheld in campaign finance cases:
  - Providing the electorate with information;
  - Deterring actual corruption and avoiding any appearance thereof; and
  - Gathering the data necessary to enforce existing laws.  AG Opp. 15 (quoting *McConnell v. FEC*, 540 U.S. 93, 196 (2003)); AG Reply 9.
- These interests are manifestly concerned with elections, campaigns, and electoral politics—as the Governor's own statements, quoted by the Attorney General, make plain:
  - Addressing the role of "undisclosed 'dark money' on elections";
  - "strengthen[ing] disclosure requirements and mandat[ing] that groups report the identity of anyone exerting control over them" so that "we know exactly where and from whom this dark money flows";
  - "prevent[ing] organizations from corrupting the political process"; and
  - "allow[ing] New York's electoral politics to achieve a clear and meaningful demarcation between candidates and unlimited expenditures" and "restor[ing] the public's faith and trust in our political process."  AG Opp. 5–6, 16 (citations omitted).

## The State Makes No Attempt to Justify a "Fit" Between Its Purported Interests and the Challenged Provisions

- The Attorney General's opposition brief essentially made no attempt to justify a "fit" between the State's purported interests and these overbroad statutes, confining its discussion of state "interests" to two pages. *See* AG Opp. 15–17.

- The Attorney General's reply brief argues that the State's "interests" are premised on regulating:
    - "undue influence in politics,"
    - the "corrupting influence of undisclosed contributions in New York politics,"
    - "who is funding issue advocacy in support of an elected official's proposed legislation,"
    - "whether that official has provided any *quid pro quo* favors to that donor." AG Reply 10–11.

- The Attorney General makes *no* attempt to justify these overbroad disclosure provisions on purported "data gathering" grounds and cites no actual evidence to support them. *See* AG Reply 11.

## Sections 172-e and 172-f Are Not Tailored to the State's Purported Interests and Are Thus Unconstitutionally Overbroad

- In essence, the State's purported "interests" are in regulating elections, campaigns and lobbying.
- The challenged provisions, which are not directed to elections, campaigns or lobbying, and which sweep in far more speech than necessary to achieve the State's objectives, fail exacting scrutiny as not substantially related to those interests.
- There is simply *no* reason why the State's concerns justify compelled disclosures for donations, for example, to:
  - a 501(c)(3) *not* earmarked for lobbying;
  - a 501(c)(3) that provides a 501(c)(4) with pro bono legal services;
  - a 501(c)(3) that shares research with a 501(c)(4);
  - a 501(c)(3) that shares office space or staff with at 501(c)(4);
  - a 501(c)(4) that has a website saying "Support Our Troops"
  - a 501(c)(4) that encourages recycling, or voting, or civic engagement of any kind;
  - a 501(c)(4) that comments on the effects of past civil rights legislation.

21

## Numerous Courts Have Struck Down Disclosure Laws for Insufficient Tailoring to Purported Government Interests

- *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014)

  - Wisconsin forced "issue-advocacy groups[] and § 501(c)(4)[s] . . . to register and report as a PAC if they spend more than $300 to communicate their views about any political issue close to an election and include the name or likeness of a candidate in a way that could be construed . . . as a reference to the candidate's qualifications or as 'support' or 'condemnation' of the candidate[]." *Id.* at 838.

  - The court held that the requirements failed exacting scrutiny because imposing such a "pervasive regulatory regime on issue-advocacy groups that only occasionally engage in express advocacy" was not "a relevantly correlated and reasonably tailored means of achieving the public's informational interest," and because a "simpler, less burdensome disclosure rule" would otherwise be constitutional. *Id.* at 841.

# Numerous Courts Have Struck Down Disclosure Laws for Insufficient Tailoring to Purported Government Interests (cont'd)

- *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576 (8th Cir. 2013)
  - Iowa required independent expenditure committees to file *ongoing* annual disclosures of, *inter alia*, certain contributor names and addresses, triggered once the committee made an expenditure supporting a candidate but regardless of whether the committee made any such expenditures during the particular period for which reporting was required. *Id.* at 583–84, 596–97.
  - The court held that the law was unconstitutional because "[r]equiring a group to file perpetual, ongoing reports regardless of its purpose and regardless of whether it ever makes more than a single independent expenditure is no more than tenuously related to Iowa's informational interest," and because "less problematic," narrower alternatives were available. *Id.* at 597.
- *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864 (8th Cir. 2012) (en banc)
  - Minnesota required that any association that directly makes an independent expenditure supporting a particular candidate to do so by creating and registering a "political fund" and file *ongoing* annual reports disclosing, *inter alia*, names and addresses of certain contributors, regardless of whether the association made any such expenditures in the particular year for which disclosure was required. *Id.* at 868–69.
  - Reviewing the denial of a preliminary injunction, the court held that the law "almost certainly" failed exacting scrutiny because "its ongoing reporting requirement . . . does not match any sufficiently important disclosure interest," and because the state could "accomplish any disclosure-related interests . . . through less problematic measures." *Id.* at 876.

23

# Numerous Courts Have Struck Down Disclosure Laws for Insufficient Tailoring to Purported Government Interests (cont'd)

- The Attorney General's attempt to distinguish these cases as involving "PAC-style" requirements is unavailing.

- The reporting requirements in those cases, like the ones here, were overbroad, insufficiently tailored to the government's stated objectives, and thus unconstitutional.

- Indeed, at least they were temporally and substantially related to elections, candidates, and campaigns, unlike the provisions at issue here, and even then, they failed to pass constitutional muster.

24

# The Attorney General Ignores the Actual Text of Sections 172-e and 172-f and Their Overbroad Application

- The Attorney General contends that because Section 172-f's definition of "covered communication" requires that the communication "refer to and *advocate*" for some matter of public concern, the statute is limited in scope. But expressing *any* view or inclination about *any* public matter could be construed as "advocating for or against"; it does nothing to limit the statute's reach. AG Reply 3; *see, e.g., Wisconsin Right to Life, Inc. v. Barland,* 751 F.3d 804, 837 (7th Cir. 2014) ("[s]tating . . . views on a policy issue . . . might be construed as 'support' or 'condemnation' within the meaning of the rule" at issue).

- Without mentioning the actual text of the statute, the Attorney General argues that the State "intended § 172-f to prevent the flow of undisclosed contributions by requiring donor disclosure triggered by a 501(c)(4)'s funding of advocacy communications—the means by which 501(c)(4) organizations carry out their anonymous donors' political agendas," and that the challenged provision was motivated by the same state interests credited by the Supreme Court's campaign finance cases, and thus, the challenged provisions are *ipso facto* constitutional. AG Reply 12. But this is not an election-related case; rather, it concerns the discussion of public matters and ensnares virtually any such public discussion within its wide swath.

25

## The Attorney General Ignores the Actual Text of
## Sections 172-e and 172-f and Their Overbroad Application (cont'd)

- Similarly, without referencing the actual text of the provision, the Attorney General summarily (and incorrectly) states that Section 172-e is sufficiently tailored because "donors can advance their political agendas without attribution by donating to affiliated disclosure-exempt 501(c)(3) and 501(c)(4) organizations that work hand-in-hand to use undisclosed contributions for issue advocacy." AG Reply 12.

- But that argument ignores the wide swath of 501(c)(4)s ensnared by this provision, thereby curtailing donors' advocacy options.

- Moreover, the "in-kind donations" trigger is so overly broad and untethered to any election-related advocacy as to render 172-e unconstitutional.

## The Provisions Cannot Survive Exacting Scrutiny: They Are Overbroad and Not Substantially Related To Any Sufficiently Important Government Interest

- The Attorney General offers no rebuttal to the provisions' overreach, arguing only that Plaintiffs' concerns are "misplaced" because the "exacting scrutiny" standard does not require narrow tailoring, but merely a "substantial relation." AG Reply 11.

- This makes a mockery of the heightened constitutional scrutiny required here. "In the First Amendment context, fit matters." *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (plurality op.).

- "Exacting scrutiny is more than a rubber stamp," and "[t]he Supreme Court has not hesitated to hold laws unconstitutional under this standard." *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 876 (8th Cir. 2012) (en banc) (collecting cases).

- Exacting scrutiny "require[s] a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means, but a means narrowly tailored to achieve the desired objective." *McCutcheon v. FEC*, 572 U.S. 185, 218 (2014) (plurality op.) (alteration and citation omitted).

- The Attorney General makes *no* showing of substantial relatedness to any sufficiently important government interest. It essentially advocates for *no* tailoring at all. That overbroad disclosure provisions may incidentally cover *some* contemplated scenarios is not sufficient to survive First Amendment scrutiny. *See Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (statute "sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected").

- In fact, this record is devoid of any evidence that nonprofit "good government" groups have engaged in any of the political machinations motivating this broader electoral reform package.

27

# This Court Has Already Found, and the Attorney General Has Conceded, That The Challenged Provisions Are Unprecedented

- This Court has already found that the challenged provisions are "unique to New York State," and that "[n]o other jurisdiction has disclosure requirements similar to Sections 172-e and 172-f." Dkt. 34 at 6.

- The Attorney General has also *already conceded* that "[no] other jurisdiction . . . has enacted legislation similar to the Disclosure Provisions." Dkt. 26 at 2 (Dec. 30, 2016 AG Letter to Court).

- Nevertheless, the Attorney General now seeks to characterize the challenged provisions as just another iteration of campaign finance laws upheld by the Supreme Court.  That is simply not so.

28

# This Court Has Already Found, and the Attorney General Has Conceded, That The Challenged Provisions Are Unprecedented (cont'd)

- The Attorney General's belated claim that two state laws require disclosures from nonprofits even though not engaging in election-related speech is false. AG Opp. 19 n.17.
  - The statute at issue in *Delaware Strong Families v. Attorney General*, 793 F.3d 304 (3d Cir. 2015), required disclosures by persons making expenditures "during an election period" for any "electioneering communication," defined as a communication that "[r]efers to a clearly identified candidate" and "[i]s publicly distributed within 30 days before a primary election . . . or 60 days before a general election." *Id.* at 307 (citations omitted).
  - The statute at issue in *Center for Individual Freedom, Inc. v. Tennant*, 706 F.3d 270 (4th Cir. 2013), was similarly concerned with "express advocacy," defined as "any communication that . . .[i]s susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," and "electioneering communications," defined as a communication that "[r]efers to a clearly identified candidate" for office. *Id.* at 281–82 (citations omitted).
- Thus, both address election-related communications, unlike the provisions here.

Sections 172-e and 172-f Are
Unconstitutional as Applied to the ACLU
Plaintiffs and the Citizens Union Plaintiffs

30

# Sections 172-e and 172-f Are Unconstitutional As Applied to the ACLU and Citizens Union Plaintiffs

- Even facially valid statutes may violate the First Amendment on an as-applied basis if there is "a reasonable probability that disclosure of [a group's] contributors' names would subject them to threats, harassment, or reprisals from either Government officials or private parties." *Citizens United*, 558 U.S. at 367 (citations and quotation marks omitted).

- Where a plaintiff organization "presents well pleaded facts of a likelihood of a substantial restraint upon the exercise by its members of their right to freedom of association or expression," the First Amendment protects against public disclosures. *Schneiderman*, 882 F.3d at 383.

  - "[E]vidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself" is sufficient to show that reasonable probability. *Buckley*, 424 U.S. at 74; *see also Brown v. Socialist Workers '74 Comm.*, 459 U.S. 87, 93 (1982).

  - However, past or present harassment is not necessary; all that is required is that a regulation be reasonably likely to have "the practical effect of discouraging the exercise of constitutionally protected political rights." *Local 1814, Int'l Longshoremen's Ass'n AFL-CIO v. Waterfront Com. of N.Y. Harbor*, 667 F.2d 267, 271–72 (2d Cir. 1981).

31

# The ACLU and Citizens Union Plaintiffs and Their Donors Face a Reasonable Probability of Threats, Reprisals, and Harassment

- Both the ACLU and Citizens Union Plaintiffs take public positions that put them at odds with both Government officials and private actors on controversial issues, including, for example:
  - "Freedom of speech and religion, immigrants' rights, LGBT rights, racial justice, reproductive rights, rights of people with disabilities, and voting rights, among others," Lieberman Decl. ¶ 23.
  - "Openly criticizing the Governor for paying lip service to ethics issues but then failing to follow through with any significant reforms," Dadey Decl. ¶ 9.
- Plaintiffs have shown a more-than-reasonable probability these disclosures will give rise to threats, harassment, or reprisals, because the organizations themselves already experience such threats.
- Based on its sometimes controversial stances, the ACLU Plaintiffs have been subject to threats, retaliation, and harassment "rang[ing] in severity" from "mildly disturbing" to "serious threats of injury or death," including statements like "may your love[d] ones be the next victims and not mine" or "I sure hope no terrorists bomb your bldg." Lieberman Decl. ¶¶ 24–26; *see also* Pls.' 56.1 Statement, ¶¶ 164–187
- NYCLU and other ACLU affiliates have repeatedly faced direct threats of physical violence, including threats to bomb offices and officials' homes. Lieberman Decl. ¶¶ 27–43; Pls.' 56.1 Statement, ¶¶ 187–201
- After criticizing Governor Cuomo directly, the then-Executive Director of CU received a phone call directly from the Governor telling him to "be careful" and threatening political retaliation using a parable to suggest that CU would be in jeopardy. Dadey Decl. ¶¶ 13–17; Pls.' 56.1 Statement, ¶¶ 36–38.

# Public Disclosure Will Chill the ACLU and Citizens Union Plaintiffs' Activities and Donors

- Many of the ACLU and Citizen Union Plaintiffs' donors donate on condition of anonymity.   Lieberman Decl. ¶ 44; Dadey Decl. ¶¶ 19–20.
- The ACLU Plaintiffs have express policies guaranteeing their donors anonymity, at both the national and state levels.   Lieberman Decl. ¶ 44.
- When the challenged provisions were enacted, multiple donors contacted CU's then-Executive Director to express their concern about the consequences of these disclosures.   Dadey Decl. ¶ 19; Pls.' 56.1 Statement ¶¶ 21–24.
- Some said they have contractual relationships with government officials and might face retaliation.  Dadey Decl. ¶ 20; Pls.' 56.1 Statement ¶ 27.
- Others said that they worried about other organizations' using the disclosed information to harass them for contributions as well.  Dadey Decl. ¶ 20; Pls.' 56.1 Statement ¶ 29.
- These organizations depend on fundraising and the financial support of donors to operate and engage in expressive activity.  Pls.' 56.1 Statement ¶¶ 13, 17, 18, 46–49, 56 (undisputed).

33

# The Possibility of a Statutory Exemption Is Insufficient To Address This As-Applied Challenge

- Sections 172-e and 172-f provide a potential post-donation exemption for nonprofits if they can demonstrate that public disclosure "may cause harm, threats, harassment, or reprisals to the source of the donation or to individuals or property affiliated with the source of the donation."  N.Y. Exec. L. §§ 172-e(3), 172-f(3).

- The Attorney General relies on the mere existence of a statutory exemption, but that provision is insufficient to protect nonprofits and their donors for many reasons, including:

  - The statute grants unbridled discretion to the Attorney General to determine who is entitled to the exemption and therefore cannot be relied upon to protect Plaintiffs' First Amendment rights;

  - No regulations have been promulgated to give any context to the process for applying for the exemption or the criteria required to secure it;

  - The exemption lasts for only six months and must be renewed, which does not give donors any confidence that their contributions will remain anonymous.

  - Only the potential harm to donors is considered, not to the non-profits themselves.

- Nor is there any issue of ripeness, because the Attorney General's failure to promulgate regulations prevents Plaintiffs from even applying for that exemption.

- Finally, the exemption is insufficient on its face: it applies only *after* an organization files its funding reports; therefore, donors have no assurance *when donating* whether their anonymity will be respected.

- That level of uncertainty makes the exemption "practically worthless" since it cannot be granted to donors "well in advance of speaking." *John Doe No. 1 v. Reed*, 561 U.S. 186, 203 (2010) (Alito, J., concurring).

34

# The Supreme Court's Campaign Finance Jurisprudence Has No Applicability Here

# The Attorney General Has Already Conceded, And This Court Has Already Found, That The Challenged Provisions Are Unprecedented

- The Attorney General's entire case is based on the false premise that the Supreme Court's campaign finance cases control, and that the challenged provisions *ipso facto* pass constitutional muster, simply because the State has purported to share the same government interests upheld in those cases. *E.g.*, AG Opp. 2–3, 12–16.

- But as previously explained, the Attorney General has *already conceded* that these provisions are unprecedented and *sui generis*. Dkt. 26 at 2 (Dec. 30, 2016 AG Letter to Court) ("[no] other jurisdiction . . . has enacted legislation similar to the Disclosure Provisions").

- And this Court has already found that the challenged provisions are "unique to New York State," and that "[n]o other jurisdiction has disclosure requirements similar to Sections 172-e and 172-f." Dkt. 34 at 6.

36

# The Supreme Court's Cases Upholding Disclosure Requirements in the Context of Election Campaigns Do Not Control

- The *Buckley-McConnell-Citizens United* line of cases dealt specifically with *election-related* donor disclosure requirements regulating only "those communications that (i) clearly identify an electoral candidate (ii) in the sixty days preceding a general election and the thirty days preceding a primary." *Independence Inst. v. FEC*, 216 F. Supp. 3d 176, 187 (D.D.C. 2016), *aff'd*, 137 S. Ct. 1204 (2017); *McConnell v. FEC*, 540 U.S. 93, 194–96 (2003) (same); *Citizens United v. FEC*, 558 U.S. 310, 368–69 (2010) ("[T]he public has an interest in knowing who is speaking about a candidate shortly before an election.").

- Contrary to the Attorney General's contention, although these cases permit disclosure requirements related to "issue advocacy," that does not allow compelled disclosure for *any* speech related to public issues. "Issue advocacy" and "express advocacy" are used to described "different types of *election-related speech*." *Del. Strong Families v. Attorney General of Delaware*, 793 F.3d 304, 308 (3d Cir. 2015) (emphasis added).

- As the D.C. District Court recently summarized, in an opinion summarily affirmed by the Supreme Court, "Under *McConnell* and *Citizens United*, then, *it is the tying of an identified candidate to an issue or message* that justifies the Bipartisan Campaign Reform Act's tailored disclosure requirement because *that linkage* gives rise to the voting public's informational interest in knowing 'who is speaking about a candidate shortly before an election.'" *Independence Inst.*, 216 F. Supp. 3d at 188 (quoting *Citizens United*, 558 U.S. at 369) (emphasis added).

- The challenged provisions utterly lack that "linkage" between "an identified candidate" and an "issue or message . . . shortly before an election." *Independence Inst.*, 216 F. Supp. 3d at 188.

37

## The Attorney General's Expansive View of "Issue Advocacy" Is Not Supported by the Case Law

- The Attorney General's expansive view of "issue advocacy" is not supported by the case law and therefore cannot justify the challenged provisions.

  - The Attorney General's characterization of the provisions as within the *Buckley* line of cases because they "focus on issue advocacy," only involving "matters that may be acted upon by legislative, executive and administrative bodies" as opposed to "election campaigns," is (a) an incorrect description of the provisions, which go far beyond that misleadingly narrow portrayal, and (b) wrong as a matter of law, because the Court has never upheld disclosure requirements for "issue advocacy" so far removed from elections or campaigns. AG Opp. 21–22.

- The Attorney General's reliance on *Vermont Right to Life Committee, Inc. v. Sorrell*, 758 F.3d 118 (2d Cir. 2014) is misplaced.

  - That case—which dealt explicitly with *election* laws—simply held that disclosure statutes need not be limited to groups having "the major purpose" of nominating or electing a candidate—it said nothing about whether disclosure was appropriate where the regulated speech had nothing to do with elections at all. *See* AG Reply 8.

# The Attorney General's Lobbying and Ballot Initiative Disclosure Cases Are Inapposite

- The lobbying and ballot initiative cases that the Attorney General cites are not relevant here. AG Opp. 22-23– AG Reply 6–7.

  - Requiring disclosures from lobbyists seeking to influence elected officials, and from ballot initiative committees seeking to influence the public vote during a ballot initiative campaign, are qualitatively different from the far-reaching nonprofit disclosure provisions at issue here untethered to any balloting or elections. *See United States v. Harriss,* 347 U.S. 612 (1954); *Center for Individual Freedom v. Madigan,* 697 F.3d 464 (7th Cir. 2012).

  - Those cases are far more akin to the *Buckley* line of cases—and address the same interests of providing the electorate with information, deterring corruption, and gathering data to enforce electioneering restrictions—than they are to the *sui generis* disclosure provisions here.

# The Second Circuit's Recent *Schneiderman* Decision Supports Plaintiffs' Position In This Litigation

- Contrary to the Attorney General's claims, the Second Circuit's recent decision in *Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018), supports Plaintiffs' position.

- Federal law requires most 501(c)(3) and (c)(4) organizations to file with the IRS a "Schedule B" form listing donors. In *Schneiderman*, the Second Circuit upheld a New York State regulation requiring those organizations to submit a copy to the Attorney General, who, as the Court expressly noted, is legally required to keep that list "confidential." 882 F.3d at 379–80.

- Each reason given by the Second Circuit to uphold the regulation cuts *against* the Attorney General's position in this case:

  - The law here imposes an increased burden on Plaintiffs, rather than requiring it to submit "the selfsame information" it submits under federal law. 882 F.3d at 384.

  - The law here does not serve state interests in "polic[ing] of fraud" and preventing "self-dealing by charities" (which is already accomplished by the confidential Schedule B disclosures), and has absolutely *no fit* to the purported campaign finance justifications. 882 F.3d at 384.

  - The law here requires *public disclosure*, which the Second Circuit expressly stated would "raise the [First Amendment] stakes." 882 F.3d at 384.