UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X
                                     :
CITIZENS UNION OF THE CITY OF NEW    :
YORK, et al.,                        :
                                     :       16cv9592 (DLC)
                        Plaintiffs,  :
                                     :       OPINION AND ORDER
             -v-                     :
                                     :
ATTORNEY GENERAL OF THE STATE OF NEW :
YORK,                                :
                                     :
                        Defendant.   :
                                     :
-------------------------------------X


APPEARANCES

For plaintiffs Citizens Union of the City of New York and
Citizens Union Foundation, Inc. of the City of New York:
Randy M. Mastro
Akiva Shapiro
Timothy Sun
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166

For plaintiffs American Civil Liberties Union Foundation, New
York Civil Liberties Union Foundation, and New York Civil
Liberties Union:
William F. Cavanaugh
Stephanie Teplin
D. Brandon Trice
Michael D. Schwartz
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036

For plaintiffs Lawyers Alliance for New York and Nonprofit
Coordinating Committee of New York:
Lawrence S. Lustberg
J. David Pollock
Gibbons P.C.

One Gateway Center
Newark, NJ 07102

For the defendant:
Andrew Amer
James M. Thompson
Office of the New York Attorney General
28 Liberty Street
New York, New York 10005


DENISE COTE, District Judge:

In 2016, New York state enacted an Ethics Law addressing
several issues related to elections, campaigning, and conduct in
office by state officials.  Two provisions of the Ethics Law
require entities that are exempt from federal taxation -- under
26 U.S.C. § 501(c)(3) and 501(c)(4) -- to publicly report their
donors under certain circumstances.  The plaintiffs assert that
these two provisions unconstitutionally burden their First
Amendment rights of free speech and association.  For the
following reasons, the plaintiffs' motion for summary judgment
is granted.  These provisions of the Ethics Law, N.Y. Exec. Law
§§ 172-e and 172-f, are invalid on their face.

## Background

Before addressing the legal issues at stake in this summary
judgment motion, this Opinion describes the federal law that
governs 501(c)(3) and 501(c)(4) entities, and transfers of funds
or support from a 501(c)(3) to a 501(c)(4); the legislative

history of §§ 172-e and 172-f, the two sections of the New York
Ethics Law that are challenged in this lawsuit; the provisions
of §§ 172-e and 172-f; and the procedural history of this
litigation.

I.   Federal Regulation of Tax-Exempt Entities

Certain entities are exempt from federal taxation.  To
qualify for tax exemption under 26 U.S.C. § 501(c)(3), an entity
must have an exempt purpose.  It must be "organized and operated
exclusively for religious, charitable, scientific, testing for
public safety, literary, or educational purposes, . . . no part
of the net earnings of which inures to the benefit of any
private shareholder or individual."  Such an entity is commonly
known as a "501(c)(3)."  In addition to a 501(c)(3) being itself
exempt from taxation, donations to a 501(c)(3) are tax-
deductible.  Id. § 170.

Section 501(c)(3) places two restrictions on such an
entity's activities.  These restrictions concern lobbying and
political activity.  An entity loses its 501(c)(3) tax exemption
if "a substantial part of the activities of such organization
consists of carrying on propaganda, or otherwise attempting, to
influence legislation."  Id. § 501(h)(1); see also id. §
501(c)(3).  This language limits a 501(c)(3)'s ability to engage
in lobbying, such as "contact[ing], or urg[ing] the public to

3

contact, members or employees of a legislative body for the
purpose of proposing, supporting, or opposing legislation" or
"advocat[ing] the adoption or rejection of legislation."[1]   The
Internal Revenue Service ("IRS") evaluates whether a
"substantial part" of the 501(c)(3)'s activities consist of
lobbying, based on "a variety of factors, including the time
devoted (by both compensated and volunteer workers) and the
expenditures devoted by the organization to the activity."[2]
Alternatively, a 501(c)(3) may choose to have its lobbying
activity evaluated under the "expenditure test," which, based on
the organization's size, provides a maximum amount that the
501(c)(3) may spend on lobbying.  26 U.S.C. §§ 501(h), 4911.[3]

---

[1] IRS, Charities and Nonprofits: Lobbying (Aug. 7, 2019),
https://www.irs.gov/charities-non-profits/lobbying.

[2] IRS, Measuring Lobbying: Substantial Part Test (Dec. 13, 2018),
https://www.irs.gov/charities-non-profits/measuring-lobbying-
substantial-part-test; see also All. for Justice, Lobbying Under
the Insubstantial Part Test (last visited Sept. 29, 2019),
https://bolderadvocacy.org/wp-content/uploads/2018/06/Lobbying_
under_the_insubstantial_part_test.pdf ("Most tax practitioners
generally advise that charities can safely devote 3-5% of their
overall activities toward lobbying.").

[3] The lobbying ceiling is determined by the 501(c)(3)'s exempt
purpose expenditures.  26 U.S.C. §§ 501(h), 4911; 26 C.F.R. §§
1.501(h)-1, 56.4911-1, 56.4911-4.  For example, if a 501(c)(3)'s
exempt purpose expenditures are less than or equal to $500,000,
the lobbying ceiling is 20% of the exempt purpose expenditures;
or, if the exempt purpose expenditures exceed $17,000,000, the
lobbying ceiling is $1,000,000.  IRS, Measuring Lobbying
Activity: Expenditure Test (Feb. 25, 2019), https://www.irs.gov/

An entity also loses its tax-exempt status if it
"participate[s] in, or intervene[s] in (including the publishing
or distributing of statements), any political campaign on behalf
of (or in opposition to) any candidate for public office."  26
U.S.C. § 501(c)(3).  "Contributions to political campaign funds
or public statements of position (verbal or written) made on
behalf of the organization in favor of or in opposition to any
candidate for public office clearly violate the prohibition
against political campaign activity."[4]  A 501(c)(3), however, may
participate in "certain voter education activities (including
presenting public forums and publishing voter education guides)
conducted in a non-partisan manner."[5]

In order to retain its tax exemption, an entity "must be
both organized and operated exclusively for" charitable
purposes.  26 C.F.R. § 1.501(c)(3)-1(a)(1).  "If an organization
fails to meet either the organizational test or the operational
test, it is not exempt."  Id.  In order to satisfy the

_____

charities-non-profits/measuring-lobbying-activity-expenditure-
test.

[4] IRS, The Restriction of Political Campaign Intervention by
Section 501(c)(3) Tax-Exempt Organizations (Aug. 7, 2019),
https://www.irs.gov/charities-non-profits/charitable-
organizations/the-restriction-of-political-campaign-
intervention-by-section-501c3-tax-exempt-organizations.

[5] Id.

organizational test, an entity must have articles of organization that (1) "[l]imit the purposes of such organization to one or more exempt purposes" and (2) "[d]o not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes."   Id. § 1.501(c)(3)-1(b).

To satisfy the operational test, an entity must "engage[] primarily in activities which accomplish one or more of such exempt purposes."   Id. § 1.501(c)(3)-1(c)(1).   "It is well-settled that an incidental non-exempt purpose will not disqualify an organization, but a single substantial nonexempt purpose or activity will destroy the exemption, regardless of the number or quality of exempt purposes."   Family Tr. of Mass., Inc. v. United States, 892 F. Supp. 2d 149, 159 (D.D.C. 2012) (citation omitted).   "[T]he presence of a single substantial purpose that is not described in section 501(c)(3) precludes exemption from tax . . . ."   Giving Hearts, Inc. v. Comm'r of Internal Revenue, 118 T.C.M. (CCH) 102 (T.C. 2019).   An organization fails the operational test if "a substantial part of its activities is attempting to influence legislation by propaganda or otherwise."   26 C.F.R. § 1.501(c)(3)-1(c)(3)(i) to (ii).   "[A]n organization will be regarded as attempting to

influence legislation if the organization" (1) "[c]ontacts, or urges the public to contact, members of a legislative body for the purpose of proposing, supporting, or opposing legislation;" or (2) "[a]dvocates the adoption or rejection of legislation." Id. § 1.501(c)(3)-1(c)(3)(ii).

There is a second type of tax-exempt entity that is relevant to the discussion that follows.  Under 26 U.S.C. § 501(c)(4), "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare" are tax-exempt.  An entity exempt from federal taxation under this provision is commonly referred to as a "501(c)(4)." In order to be a 501(c)(4), an organization must be "primarily engaged in promoting in some way the common good and general welfare of the people of the community."  26 C.F.R. § 1.501(c)(4)-1(a)(2)(i).  Unlike a 501(c)(3), a 501(c)(4) may engage in substantial lobbying.  Compare 26 U.S.C. § 501(c)(3), with id. § 501(c)(4); see also Regan v. Taxation Without Representation of Wash., 461 U.S. 540, 543 (1983).[6]

---

[6] See also IRS, Action Organizations (May 13, 2019), https://www.irs.gov/charities-non-profits/action-organizations ("Seeking legislation germane to the organization's programs is a permissible means of attaining social welfare purposes.  Thus, a section 501(c)(4) social welfare organization may further its exempt purposes through lobbying as its sole or primary activity without jeopardizing its exempt status."); All. for Justice, Comparison of 501(c)(3) and 501(c)(4) Permissible Activities (last visited Sept. 29, 2019), https://www.bolderadvocacy.org/

There are limitations, however, on the extent to which a 501(c)(4) may participate in political activities.  "The promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office."  26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii).  But a 501(c)(4) "may engage in some political activities, so long as that is not its primary activity."  IRS, Social Welfare Organizations (May 13, 2019), https://www.irs.gov/charities-non-profits/other-non-profits/ social-welfare-organizations (emphasis added); see also 26 C.F.R. §1.501(c)(4)-1(a).  Unlike donations to 501(c)(3)s, donations to 501(c)(4)s are generally not tax-deductible.[7] Congress has chosen "not to subsidize lobbying as extensively" as the activities to which a 501(c)(3) may properly be dedicated.  Regan, 461 U.S. at 544.

As a result of the requirement that a 501(c)(3) be organized and operated "exclusively for" charitable purposes, a 501(c)(3) is limited in its ability to transfer funds or offer

---

wp-content/uploads/2018/06/Comparison_of_501c3_and_50c4_ Permissible_Activities.pdf.

[7] IRS, Donations to Section 501(c)(4) Organizations (Mar. 26, 2019), https://www.irs.gov/charities-non-profits/other-non-profits/donations-to-section-501c4-organizations; see also 26 U.S.C. § 170(c)(2)(B).

in-kind support to a 501(c)(4).  A 501(c)(3) must at a minimum "keep records adequate to show that tax deductible contributions are not used to pay for lobbying."  <u>Regan</u>, 461 U.S. at 544 n.6; <u>see also</u> <u>Bob Jones Univ. Museum & Gallery, Inc. v. Comm'r</u>, 71 T.C.M. (CCH) 3120 (T.C. 1996) (holding that a tax-exempt entity may pay rent to a taxable entity, where the rent is an "ordinary and necessary business expense[]" and not paid for the purpose of "funnel[ing] tax-deductible contributions" to the taxable entity.).  Some commentators describe it as a best practice for a 501(c)(3) to not subsidize a 501(c)(4) in any way.[8]  But the

---

[8] <u>See</u> All. for Justice, <u>501(c)(3) and 501(c)(4) Collaboration</u> 10 (last visited Sept. 29, 2019), https://bolderadvocacy.org/wp-content/uploads/2019/08/BA-Power-of-Collaboration.pdf ("When (c)(3)s and (c)(4)s share resources, the key principle to keep in mind is that a (c)(3) may not subsidize a (c)(4)."); Carolyne R. Dilgard et al., <u>Section 501(c)(3) Tax-Exempt Entities Forming Affiliations With Other Entities</u> 14 (June 2011), https://www.probonopartner.org/wp-content/uploads/2016/05/Affiliation-Primer-Unabridged.pdf ("To the extent sister entities or a tax-exempt entity and a joint venture in which it participates have a landlord-tenant relationship, detailed record keeping and appropriate allocation of fair value costs remain best practices."); Gene Takagi, <u>Affiliated Organizations: Sharing Resources</u> (Apr. 21, 2018), http://www.nonprofitlawblog.com/affiliated-organizations-sharing-resources ("[T]he 501(c)(3) organization should generally make sure that it pays only its fair share for shared resources if such resources may be used by its affiliate to engage in or support political intervention activities."); Hurwit & Assocs., <u>Nonprofit Lobbying & 501(c)(4) Primer</u> (last visited Sept. 29, 2019), https://www.hurwitassociates.com/lobbying-advocacy/lobbying-amp-501-c-4-primer ("[F]unds given to the 501(c)(3) for its charitable purposes may not be used by or commingled with the 501(c)(4).").

IRS has not articulated a bright line beyond which a 501(c)(3)'s support of a 501(c)(4) indicates a "substantial" lobbying purpose sufficient to jeopardize the 501(c)(3)'s tax exemption. See All. for Justice, 501(c)(3) and 501(c)(4) Collaboration 9 (last visited Sept. 29, 2019), https://bolderadvocacy.org/wp-content/uploads/2019/08/BA-Power-of-Collaboration.pdf ("While there are lines that (c)(3)s may not cross, many of the issues that arise do not have bright-line answers.").[9]

In short, a 501(c)(3) may not freely transfer funds to a 501(c)(4), but it may provide some financial support to a 501(c)(4) without losing its 501(c)(3) status.  Lobbying cannot constitute a "substantial part" of a 501(c)(3)'s activities, but there is no restriction on a 501(c)(4)'s ability to engage in lobbying.  A 501(c)(3) may not participate in political campaigns.  A 501(c)(4) may participate in political activities so long as such work is not the entity's "primary" activity.

---

[9] If a 501(c)(3) has chosen to have its lobbying activity measured using the expenditure test and is part of an "affiliated group of organizations," the lobbying expenditures of any member of the group count against the lobbying ceiling. 26 U.S.C. § 4911(f)(1); see also id. § 4911(f)(2) (defining "affiliation" in this context).

II.  The Challenged Provisions

    A.   Legislative History

    Sections 172-e and 172-f were enacted as part of a larger
ethics bill that was introduced on June 17, 2016 and passed in
the early morning hours of the following day (the "Ethics Law").
The entire bill contained eleven sections, which made a variety
of statutory changes, such as adding a new definition of
"coordination" to New York election law that narrowed the scope
of "independent expenditures," establishing rules for the
disposition of campaign funds after the death of a candidate,
increasing the possible fine to be imposed against a lobbyist
who accepts a contingent fee, creating a registration
requirement for political consultants, and adding certain
procedural requirements for investigations by New York's
Commission on Public Ethics.  See 2016 N.Y. Laws ch. 286; see
also 2016 Sess. Law News of N.Y., Legis. Memo ch. 286
(McKinney's).  Only two sections of the Ethics Law are
challenged here; the following legislative history focuses on
those portions of the record that may shed light on the state's
interest in these two provisions.

    New York Governor Andrew Cuomo first announced proposed
ethics-reform legislation on June 8, 2016 through a press
release and a speech at Fordham University.  The press release

described the legislation as "first-in-the-nation action to curb the power of independent expenditure campaigns unleashed by the 2010 Supreme Court case <u>Citizens United vs. Federal Election Commission</u>." <u>Citizens United</u>, of course, had held that a federal statute prohibiting corporations from using their general treasury funds to make independent electoral expenditures advocating for or against candidates, violated the First Amendment. <u>Citizens United v. Fed. Election Comm'n</u> (<u>Citizens United I</u>), 558 U.S. 310, 365 (2010). The press release described a number of policy goals for the legislation: "limit[ing] the 'quid pro quo' danger posed by colossal corporate donations," "ensur[ing] that independent expenditure groups remain autonomous from the entities they support," and "strengthen[ing] disclosure requirements." According to the press release, <u>Citizens United</u> "ignited the equivalent of a campaign nuclear arms race and created a shadow industry in New York -- maligning the integrity of the electoral process and drowning out the voice of the people." The press release listed specific steps that the legislation would take, including "[r]equir[ing] additional disclosures for individuals and entities making independent expenditures."

On June 17, the Governor's office and legislative leaders from the New York Senate and Assembly released a statement

announcing their "agreement on a 5 Point Ethics Reform Plan to toughen election, lobbying, and ethics enforcement laws."  The announcement included a statement from Governor Cuomo, saying that Citizens United "decimates the right to free speech by allowing it to be eclipsed by paid speech" and that under the new legislation "independent expenditure groups and PACs will be required to adhere to unprecedented disclosure requirements." New York Senate Majority Leader John J. Flanagan said the legislation would "strengthen[] our campaign finance laws to crack down on coordination between candidates and Independent Expenditure groups, who all too often operate in the shadows while enjoying an outsized influence on our politics."  Assembly Speaker Carl Heastie said that the legislation would "close the gaps that have allowed lobbying organizations and outside groups to gain undue influence on state government."  Senate Independent Democratic Conference Leader Jeffrey Klein said that the legislation would "require[] disclosure of political relationships and behaviors widely recognized to be influential, but which operate in the shadows."

    The announcement also described the specific provisions challenged in this legislation.  The first would "[r]equire 501(c)(4) organizations, which are entities that can engage in unlimited lobbying, to disclose financial support and in-kind

13

donations from 501(c)(3) organizations, which are organizations that are not permitted to engage in political activity."  The announcement described the purpose of this provision as "prevent[ing] organizations from corrupting the political process and utilizing funds that are not intended for political purposes."  The second provision would "[r]equire 501(c)(4) organizations to disclose their sources of funding if they engage in activities to influence electoral politics using 'issue advocacy.'"

Governor Cuomo submitted to the legislature a memorandum in support of the Ethics Law.  The memorandum described the purpose of the bill as "provid[ing] New York State with comprehensive ethics, lobbying, campaign finance, and public officer's law reform."  As relevant to the provisions challenged here, the memorandum said that "[d]isclosure of political relationships and funding behaviors widely recognized to be influential, but which operate in the shadows, is essential to restoring the public's faith and trust in our political process."

The Governor also submitted a message of necessity[10] that said the Ethics Law would "require disclosures of political

---

[10] The New York Constitution requires that a bill be "printed and upon the desks of the members [of the legislature], in its final form, at least three calendar legislative days prior to its final passage, unless the governor . . . shall have certified . . . the facts which in his or her opinion necessitate an

relationships and behaviors widely recognized to be influential but which operate in the shadows."  The message continued, "As passage of this bill would enact the strongest reforms in the country to combat the outsized influence of dark money in politics, it is imperative that New York pass this bill."

The Ethics Law was passed by the New York Senate around 3:00 a.m., after approximately fifteen minutes of discussion. In the New York Assembly, the bill was passed around 4:50 a.m., after approximately ten minutes of discussion.  Assemblymember Charles D. Lavine began that discussion with a brief overview of the bill, describing it as providing "the most powerful protections in the nation, to date, against the corrosive effect of the misguided Citizens United case."  He said that New York would "lead the nation in safeguarding our citizens from the corrupting influence of money and special interests in government."  He noted that the bill was "composed of 11 separate components" and said that he would "describe very briefly what they are."  Regarding the challenged provisions, Assemblymember Lavine said, "[The Ethics Law] deals with sources of funding disclosures, or 501(c)3s and 4s in certain

―――――――――――――

immediate vote thereon."  N.Y. Const. art. III, § 14.  Because the ethics bill was introduced on the last day of the legislative section, Governor Cuomo was required to submit such a message of necessity.

15

circumstances. . . .  It deals with in-kind disclosures.  It
deals with issue advocacy disclosures."

Governor Cuomo signed the bill on August 24, 2016.  In his
approval message, Governor Cuomo wrote,

> I am proud to sign this bill, which is a critical step
> toward restoring the public's faith and trust in our
> political process.  First, this bill provides much-
> needed reform to New York's campaign finance system.
> It takes the strongest stand in the nation to reverse
> the indisputably unfair protections afforded to
> corporate interests by the <u>Citizens United v. Federal
> Election Commission</u> decision. . . .  Second, the bill
> enacts sweeping ethics reform. . . .  It will also
> implement various measures to shed light on the dark
> money that runs rampant through our political process.

B.   Section 172-e

Section 172-e requires any 501(c)(3) that makes an in-kind
donation in excess of $2,500 to a 501(c)(4) engaged in lobbying
activity to file a funding disclosure report.  N.Y. Exec. Law §
172-e(2).  The funding disclosure report must include, among
other things, any donation in excess of $2,500 to the 501(c)(3)
and the identities of any donors who made such a donation.  <u>Id.</u>

The full text of § 172-e provides:

1. Definitions.  For the purposes of this section:

(a) <u>"Covered entity" shall mean any</u> corporation or
<u>entity that is qualified as an exempt</u> organization or
<u>entity</u> by the United States Department of the Treasury
<u>under I.R.C. 501(c)(3)</u> that is required to report to
the department of law pursuant to this section.

(b) "In-kind donation" shall mean donations of staff,
staff time, personnel, offices, office supplies,
financial support of any kind or any other resources.

16

(c) "Donation" shall mean any contribution, including a gift, loan, in-kind donation, advance or deposit of money or anything of value.

(d) "Recipient entity" shall mean any corporation or entity that is qualified as an exempt organization or entity by the United States Department of the Treasury under I.R.C. 501(c)(4) that is required to file a source of funding report with the joint commission on public ethics pursuant to sections one-h and one-j of the legislative law.

(e) "Reporting period" shall mean the six month period within a calendar year starting January first and ending June thirtieth or the six month period within a calendar year starting July first and ending December thirty-first.

2. Funding disclosure reports to be filed by covered entities. (a) Any covered entity that makes an in-kind donation in excess of two thousand five hundred dollars to a recipient entity during a relevant reporting period shall file a funding disclosure report with the department of law.  The funding disclosure report shall include:

     (i) the name and address of the covered entity that made the in-kind donation;

     (ii) the name and address of the recipient entity that received or benefitted from the in-kind donation;

     (iii) the names of any persons who exert operational or managerial control over the covered entity.  The disclosures required by this paragraph shall include the name of at least one natural person;

     (iv) the date the in-kind donation was made by the covered entity;

     (v) any donation in excess of two thousand five hundred dollars to the covered entity during the relevant reporting period including the identity of the donor of any such donation; and

> (vi) the date of any such donation to a covered
> entity.

(b) The covered entity shall file a funding disclosure
report with the department of law within thirty days
of the close of a reporting period.

3. Public disclosure of funding disclosure reports.
The department of law shall promulgate any regulations
necessary to implement these requirements and <u>shall
forward the disclosure reports to the joint commission
on public ethics for the purpose of publishing such
reports on the commission's website</u>, within thirty
days of the close of each reporting period; provided
however that the attorney general, or his or her
designee, <u>may determine that disclosure of donations
to the covered entity shall not be made public if,
based upon a review of the relevant facts presented by
the covered entity, such disclosure may cause harm,
threats, harassment, or reprisals to the source of the
donation or to individuals or property affiliated with
the source of the donation</u>.  The covered entity may
appeal the attorney general's determination and such
appeal shall be heard by a judicial hearing officer
who is independent and not affiliated with or employed
by the department of law, pursuant to regulations
promulgated by the department of law.  The covered
entity's sources of donations that are the subject of
such appeal shall not be made public pending final
judgment on appeal.

N.Y. Exec. Law §172-e (emphasis added).

A "recipient entity" is defined as any 501(c)(4) "that is

required to file a source of funding report with the joint

commission on public ethics" pursuant to N.Y. Legislative Law

section 1-h or 1-j.  <u>Id.</u> § 172-e(1)(d).  Sections 1-h and 1-j

are provisions of a separate statute, the New York Lobbying Act,

which defines "lobbyist" as "every person or organization

retained, employed or designated by any client to engage in

lobbying." N.Y. Legis. Law § 1-c(a). "Lobbying" is defined as an "attempt to influence" any of ten categories of official action, such as "the passage or defeat of any legislation or resolution by either house of the state legislature including but not limited to the introduction or intended introduction of such legislation or resolution or approval or disapproval of any legislation by the governor." Id. § 1-c(c).[11]

N.Y. Legislative Law § 1-h requires any lobbyist that performs lobbying on its own behalf, rather than on behalf of a client, to file a source of funding report if it has spent over $15,000 on lobbying during the twelve months prior to the reporting date and at least 3% of its total expenditures were devoted to lobbying in New York. Id. § 1-h(c)(4). Section 1-j requires any client that retains or employs a lobbyist to file a source of funding report if the client has spent over $15,000 on lobbying in the twelve months prior to the reporting date and at

---

[11] See also N.Y. Comp. Codes R. & Regs. tit. 19, §§ 943.1, 943.5-943.7 (defining types of lobbying that trigger disclosures under the New York Lobbying Act); November Team, Inc. v. N.Y. State Joint Comm'n on Pub. Ethics, 233 F. Supp. 3d 366, 368 (S.D.N.Y. 2017) ("The Act regulates both direct lobbying, which involves direct contact with a public official, and grassroots lobbying, which seeks to influence a public official indirectly through the intermediary of the public."); N.Y. State Joint Comm'n on Public Ethics, Am I Lobbying? (Jan. 2019), https://jcope.ny.gov/system/files/documents/2019/01/am-i-lobbying-1232019.pdf (describing types of lobbying and required disclosures).

least 3% of the client's total expenditures were devoted to lobbying in New York.  Id. § 1-j(c)(4).  Under either provision, a source of funding report must include the names of each source of funding that contributed over $2,500 that was used to fund the lobbying activities.  Id. §§ 1-h(c)(4)(ii), 1-j(c)(4)(ii).

To summarize:  Section 172-e requires a 501(c)(3) to disclose all donors who contributed over $2,500 in the following circumstance.  The disclosure of such donors must be made if the 501(c)(3) itself makes an in-kind donation to a 501(c)(4) that engages in lobbying in New York, either on its own behalf or through a retained lobbyist.

C.   Section 172-f

Section 172-f requires a 501(c)(4) that expends more than $10,000 in a calendar year on "covered communications" to file a financial disclosure report.  N.Y. Exec. Law § 172(f)(2).  A "covered communication" is a published statement that is "conveyed to five hundred or more members of a general public audience" and

> refers to and advocates for or against a clearly
> identified elected official or the position of any
> elected official or administrative or legislative body
> relating to the outcome of any vote or substance of
> any legislation, potential legislation, pending
> legislation, rule, regulation, hearing, or decision by
> any legislative, executive or administrative body.

Id. § 172-f(1)(b).

20

In pertinent part, § 172-f provides:

1. Definitions. (a) "Covered Entity" means any
corporation or entity that is qualified as an exempt
organization or entity by the United States Department
of the Treasury under I.R.C. 501(c)(4).

> (b) "Covered communication" means a
> communication, that does not require a report
> pursuant to article one-A of the legislative law
> or article fourteen of the election law, by a
> covered entity conveyed to five hundred or more
> members of a general public audience in the form
> of: (i) an audio or video communication via
> broadcast, cable or satellite; (ii) a written
> communication via advertisements, pamphlets,
> circulars, flyers, brochures, letterheads; or
> (iii) other published statement which: refers to
> and advocates for or against a clearly identified
> elected official or the position of any elected
> official or administrative or legislative body
> relating to the outcome of any vote or substance
> of any legislation, potential legislation,
> pending legislation, rule, regulation, hearing,
> or decision by any legislative, executive or
> administrative body.

> * * *

> (c) "Expenditures for covered communications"
> shall mean: (i) any expenditure made, liability
> incurred, or contribution provided for covered
> communications; or (ii) any other transfer of
> funds, assets, services or any other thing of
> value to any individual, group, association,
> corporation whether organized for profit or not-
> for-profit, labor union, political committee,
> political action committee, or any other entity
> for the purpose of supporting or engaging in
> covered communications by the recipient or a
> third party.

> (d) "Donation" shall mean any contribution,
> including in-kind, gift, loan, advance or deposit
> of money or anything of value made to a covered
> entity unless such donation is deposited into an

account the funds of which are not used for
making expenditures for covered communications.

(e) "Reporting period" shall mean the six month
period within a calendar year starting January
first and ending June thirtieth or the six month
period within a calendar year starting July first
and ending December thirty-first.

2. Disclosure of expenditures for covered
communications. (a) Any covered entity that makes
expenditures for covered communications in an
aggregate amount or fair market value exceeding ten
thousand dollars in a calendar year shall file a
financial disclosure report with the department of
law.  The financial disclosure report shall include:

> (i) the name and address of the covered
> entity that made the expenditure for covered
> communications;

> (ii) the name or names of any individuals
> who exert operational or managerial control
> over the covered entity.  The disclosures
> required by this paragraph shall include the
> name of at least one natural person;

> (iii) a description of the covered
> communication;

> (iv) the dollar amount paid for each covered
> communication, the name and address of the
> person or entity receiving the payment, and
> the date the payment was made; and

> [(v)] the name and address of any
> individual, corporation, association, or
> group that made a donation of one thousand
> dollars or more to the covered entity and
> the date of such donation.

(b) The covered entity shall file a financial
disclosure report with the department of law
within thirty days of the close of a reporting
period.

(c) If a covered entity keeps one or more segregated bank accounts containing funds used solely for covered communications and makes all of its expenditures for covered communications from such accounts, then with respect to donations included in subparagraph (iv) of paragraph (a) of this subdivision, the financial report need only include donations deposited into such accounts.

3. The department of law shall make the financial disclosure reports available to the public on the department of law website within thirty days of the close of each reporting period, provided however that the attorney general, or his or her designee, may determine that disclosure of donations shall not be made public if, based upon a review of the relevant facts presented by the covered entity, such disclosure may cause harm, threats, harassment, or reprisals to the source of the donation or to individuals or property affiliated with the source of the donation. The covered entity may appeal the attorney general's determination and such appeal shall be heard by a judicial hearing officer who is independent and not affiliated with or employed by the department of law, pursuant to regulations promulgated by the department of law.  The covered entity shall not be required to disclose the sources of donations that are the subject of such appeal pending final judgment on appeal.

N.Y. Exec. Law § 172-f (emphasis added).

Several provisions of § 172-f bear emphasis. Communications that already "require a report" under the New York Lobbying Act are carved out from § 172-f.  Id. at § 172-f(1)(b).  Similarly carved out are communications that are already subject to reporting requirements under New York election law, id., such as communications that "call for the election or defeat of [a] clearly identified candidate" or that

"refer[] to and advocate[] for or against a clearly identified candidate . . . on or after January first of the year of the election in which such candidate is seeking office."  N.Y. Elec. Law §§ 14-107.

A financial disclosure report required under § 172-f must include, among other things, "a description of the covered communication," "the dollar amount paid for each covered communication, the name and address of the person or entity receiving the payment, and the date the payment was made," and -- the item most vigorously challenged by plaintiffs -- "the name and address of any individual, corporation, association, or group that made a donation of one thousand dollars or more to the covered entity and the date of such donation."  N.Y. Exec. Law § 172-f(2).  "If a covered entity keeps one or more segregated bank accounts containing funds used solely for covered communications and makes all of its expenditures for covered communications from such accounts, then . . . the financial report need only include donations deposited into such accounts."  Id. § 172-f(2)(c); see also id. § 172-f(1)(d) (excluding from the definition of "donation" one that is "deposited into an account the funds of which are not used for making expenditures for covered communications").

24

To summarize:  Section 172-f requires a 501(c)(4) to disclose donors who contributed $1,000 or more, in the following circumstance.  Disclosure of such donors must be made if the 501(c)(4) expends more than ten thousand dollars in a calendar year on communications made to at least 500 members of the public concerning the position of any elected official relating to any "potential" or pending legislation, unless the donors made contributions only into a segregated account not used to support such communications.

 D. Public Disclosure Requirements and Exemptions

As reflected in the statutory provisions recited above, the Ethics Law requires that a funding disclosure report filed under § 172-e be made available on the New York Joint Commission on Public Ethics website, and that a financial disclosure report filed under § 172-f be made available on the New York Department of Law website.  N.Y. Exec. Law §§ 172-e(3), 172-f(3).  The New York Attorney General may determine, however, that disclosure should not occur if disclosure may cause "harm, threats, harassment, or reprisals to the source of the donation or to individuals or property affiliated with the source of the donation."  Id. § 172-e(3); see also id. § 172-f(3) (containing a parallel exemption).  An entity denied an exemption from the

disclosure requirements may appeal the attorney general's
determination.  Id. §§ 172-e(3), 172-f(3).

III. Procedural History

Citizens Union brought this suit on December 12, 2016,
which was originally assigned to the Honorable Richard M.
Berman.[12]  On December 28, 2016, the Attorney General stipulated
to a stay of enforcement of §§ 172-e and 172-f, until resolution
of plaintiffs' then-pending application for a preliminary
injunction.  The Attorney General ultimately agreed to extend
the stay of enforcement pending disposition of any summary
judgment motion.  At a January 4, 2017 hearing, counsel for the
Attorney General represented that "necessary regulations"
concerning implementation of the challenged provisions were in
the process of being promulgated and that such regulations would
be "enacted in a timely manner."  No such regulations have yet
been promulgated.[13]

_____

[12] On March 6, 2017, Judge Berman consolidated the cases pending
before him which challenge §§ 172-e and 172-f.

[13] The Attorney General represents in its motion papers that it
met with the plaintiffs in March 2017 to "solicit their input
regarding how regulations could be designed in such a way as to
mitigate any concerns," that plaintiffs took the position that
"no regulation could positively impact their constitutional
concerns," and that the Attorney General put the rule-making
process "on hold" because of plaintiffs' position.

On January 11, 2017, Judge Berman issued an order authorizing "limited expedited discovery" in connection with plaintiffs' then-pending applications for a preliminary injunction.  On October 18, 2017, Judge Berman granted the Attorney General's request to hold this litigation in abeyance until the Second Circuit's decision in Citizens United v. Schneiderman (Citizens United II), which issued on February 15, 2018.  882 F.3d 374, 390 (2d Cir. 2018).

On May 24, 2018, plaintiffs filed a joint motion for summary judgment.  On June 25, the Attorney General filed a cross-motion for summary judgment.  Those motions became fully submitted on August 2.  On November 28, Judge Berman held oral argument on the motions.  On January 29, 2019, Judge Berman stayed the motions because the Governor had submitted to the legislature substantive amendments to the challenged provisions. The New York legislature did not take up consideration of the proposed amendments, and on April 1, 2019, Judge Berman granted the parties' request to lift the stay.

The consolidated cases were reassigned to this Court on August 28, 2019, and the parties were invited to submit supplemental briefing.  The parties filed their supplemental briefs on September 13.

## Discussion

I.   Summary Judgment Standard

A motion for summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113 (2d Cir. 2017) (citation omitted).  In evaluating cross-motions for summary judgment, each motion must be examined "on its own merits," and "all reasonable inferences must be drawn against the party whose motion is under consideration."  Vugo, Inc. v. City of New York, 931 F.3d 42, 48 (2d Cir. 2019) (citation omitted).

Once the moving party has cited evidence showing that the non-movant's claims or affirmative defenses cannot be sustained, the party opposing summary judgment "must set forth specific facts demonstrating that there is a genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted).  "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co., 651 F.3d 309, 317 (2d

Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

II. First Amendment Standard

The first issue to be resolved is the standard under which the constitutionality of the two state law provisions must be evaluated. The Supreme Court has held that content-neutral disclosure requirements challenged under the First Amendment are subject to "exacting scrutiny." See John Doe No. 1 v. Reed, 561 U.S. 186, 196 (2010); Citizens United II, 882 F.3d at 382.

Exacting scrutiny requires a "substantial relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." John Doe No. 1, 561 U.S. at 196 (citation omitted); see also Citizens United II, 882 F.3d at 382. This test is easier for the government to satisfy than strict scrutiny and is sometimes equated with intermediate scrutiny. See Citizens United II, 882 F.3d at 382 ("Content-neutral speech regulations receive exacting, or 'intermediate,' scrutiny. This includes neutral disclosure requirements." (citation omitted)).

In a facial challenge to a statute under the First
Amendment, "a law may be overturned as impermissibly overbroad
because a 'substantial number' of its applications are
unconstitutional, 'judged in relation to the statute's plainly
legitimate sweep.'"  Wash. State Grange v. Wash. State
Republican Party, 552 U.S. 442, 449 n.6 (2008) (citation
omitted).  A claim is a facial challenge when it is not limited
to a plaintiff's particular case, but challenges the application
of the law more broadly.  John Doe No. 1, 561 U.S. at 194.
"[F]acial review thus focuses on whether too many of the
applications interfere with expression for the First Amendment
to tolerate."  Citizens United II, 882 F.3d at 383.  Applying
exacting scrutiny, "if a substantial number of likely
applications of the statute correspond to an important interest,
a minority of potentially impermissible applications can be
overlooked.  The stronger the government interest and the weaker
the First Amendment interest, the weaker the First Amendment
claim."  Id.

There is no question that public disclosure of donor
identities burdens the First Amendment rights to free speech and
free association.  Citizens United I, 558 U.S. at 366 (burden on
speech); Buckley v. Valeo, 424 U.S. 1, 64 (1976) (per curiam)
(burden on privacy of association and belief); NAACP v. Alabama

30

ex rel. Patterson, 357 U.S. 449, 460 (1958) (noting "close nexus between the freedoms of speech and assembly").  The Supreme Court has recognized three governmental interests that may justify donor disclosure in the context of election campaigns despite their burden on First Amendment rights.  The Court described these interests in 1976 as follows:

> First, disclosure provides the electorate with information as to where political campaign money comes from and how it is spent by the candidate in order to aid the voters in evaluating those who seek federal office.  It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches.  The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office.

> Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. . . .

> Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of [limits on campaign contributions].

Buckley, 424 U.S. at 66-67 (citation omitted); see also McConnell v. Fed. Election Comm'n, 540 U.S. 93, 196 (2003).  These will be referred to as the informational, corruption-deterrence, and violation-detection interests.

Both the Supreme Court and Second Circuit have considered First Amendment challenges to disclosure provisions. Those decisions most relevant to this litigation are discussed below in the following categories: (1) cases striking down disclosure requirements as facially overbroad, (2) cases upholding disclosure requirements, and (3) cases finding disclosure requirements unconstitutional as applied to particular plaintiffs.

A.   Cases Striking Down Disclosure Requirements as Facially Overbroad

In Talley v. California, the Court examined a Los Angeles ordinance that prohibited the distribution of any handbill or other printed matter unless its cover was printed with the names and addresses of its author and distributor. 362 U.S. 60, 65 (1960). The Court opined that "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind," noting that "[e]ven the Federalist Papers . . . were published under fictitious names." Id. at 64-65. The Court had "no doubt" that the ordinance's "identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." Id. at 64. The state argued that the ordinance was "aimed at providing a way to identify those responsible for fraud, false advertising and libel." Id. But the Court found that the ordinance was "in no

32

manner so limited." Id.  The Court found that the ordinance's
identification requirement and resulting "fear of reprisal might
deter perfectly peaceful discussions of public matters of
importance" and thus held that it was facially invalid. Id. at
65.

In McIntyre v. Ohio Elections Commission, the Court struck
down another statute similar to that at issue in Talley.  514
U.S. 334, 357 (1995).  Ohio's statute provided:

> No person shall write, print, post, or distribute . .
> . any . . . form of general publication which is
> designed to . . . influence the voters in any
> election, or make an expenditure for the purpose of
> financing political communications through newspapers
> . . . or other similar types of general public
> political advertising, or through flyers, handbills,
> or other nonperiodical printed matter, unless there
> appears on such form of publication in a conspicuous
> place or is contained within said statement the name
> and residence or business address of the chairman,
> treasurer, or secretary of the organization issuing
> the same, or the person who issues, makes, or is
> responsible therefor.

Id. at 337 n.3 (citation omitted) (emphasis added).  Margaret
McIntyre had distributed handbills signed "CONCERNED PARENTS AND
TAX PAYERS," expressing her opposition to a proposed school tax
levy. Id. at 337.

The Court explained that "[a]nonymity . . . provides a way
for a writer who may be personally unpopular to ensure that
readers will not prejudge her message simply because they do not
like its proponent" and characterized Talley as having "embraced

33

a respected tradition of anonymity in the advocacy of political causes." Id. at 342-43. Like California in Talley, Ohio argued that the challenged provision was designed to prevent "fraudulent, false, or libelous statements." Id. at 343-44. The Court again rejected this argument, finding that the statute applied "even when there is no hint of falsity or libel." Id.

Ohio argued that its statute was distinguishable from Talley because it applied only to documents "designed to influence voters in an election," while the Los Angeles ordinance prohibited "all anonymous handbilling in any place under any circumstances." Id. at 344 (citation omitted). The Court rejected this argument as well, explaining that "the category of speech regulated by the Ohio statute occupies the core of the protection afforded by the First Amendment: Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." Id. at 346 (citation omitted).

Alongside fraud and libel prevention, Ohio argued that it had an "interest in providing the electorate with relevant information." Id. at 348. In response, the Court opined that "the identity of the speaker is no different from other components of the document's content that the author is free to

include or exclude."  Id.[14]  The Court continued, "The simple
interest in providing voters with additional relevant
information does not justify a state requirement that a writer
make statements or disclosures she would otherwise omit."  Id.

The Court also distinguished Buckley (which is discussed at
greater length in the following section).  Buckley involved the
mandatory reporting and disclosure of "the amount and use of
money expended in support of a candidate," which the Court found
"a far cry from compelled self-identification on all election-
related writings."  Id. at 355.  The Court elaborated:

> A written election-related document -- particularly a
> leaflet -- is often a personally crafted statement of
> a political viewpoint.  Mrs. McIntyre's handbills
> surely fit that description.  As such, identification
> of the author against her will is particularly
> intrusive; it reveals unmistakably the content of her
> thoughts on a controversial issue.  Disclosure of an
> expenditure and its use, without more, reveals far
> less information.  It may be information that a person

---

[14] In a footnote, the Court quoted the following passage from a
case that struck down a New York statute similar to Ohio's:

> Don't underestimate the common man.  People are
> intelligent enough to evaluate the source of an
> anonymous writing.  They can see it is anonymous.
> They know it is anonymous.  They can evaluate its
> anonymity along with its message, as long as they are
> permitted, as they must be, to read that message.  And
> then, once they have done so, it is for them to decide
> what is 'responsible', what is valuable, and what is
> truth.

McIntyre, 514 U.S. at 348 n.11 (quoting People v. Duryea, 351
N.Y.S.2d 978, 996 (N.Y. Sup. Ct. 1974)).

> prefers to keep secret, and undoubtedly it often gives
> away something about the spender's political views.
> Nonetheless, even though money may 'talk,' its speech
> is less specific, less personal, and less provocative
> than a handbill -- and as a result, when money
> supports an unpopular viewpoint it is less likely to
> precipitate retaliation.

Id.

The Court found that Ohio's statute rested on "different and less powerful state interests" than those present in Buckley. Id. at 356. While the Buckley Court upheld financial disclosures for expenditures that "expressly advocate the election or defeat of a clearly identified candidate," such expenditures create a risk that "individuals will spend money to support a candidate as a quid pro quo for special treatment after the candidate is in office." Id. (citation omitted). The McIntyre Court suggested that Ohio's statute, which also reached "issue-based ballot measures," was not limited to promoting the anti-corruption interest applicable in candidate elections. Id. The Court concluded that "anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent," invalidated the Ohio statute, and reversed the judgment fining McIntyre. Id. at 357.

In Vermont Right to Life Committee, Inc. v. Sorrell (VRLC I), the Second Circuit considered a Vermont statute that defined a "political advertisement" as "any communication . . . which

expressly or <u>implicitly</u> advocates the success or defeat of a candidate."  221 F.3d 376, 380 (2d Cir. 2000) (citation omitted) (emphasis added).  Any such advertisement was required to "contain the name and address of the person who paid for the advertisement."  <u>Id.</u> (citation omitted).  Drawing heavily on the teachings in <u>Buckley</u>, 424 U.S. at 1, the panel majority wrote, "The term 'implicitly' . . . extends the reach of [the] disclosure requirement to advocacy with respect to public issues."  <u>VRLC I</u>, 221 F.3d at 387.  The panel held the statute facially invalid, reasoning that it intruded on "communications that constitute protected issue advocacy."  <u>Id.</u> at 386.[15]

     B.   Cases Upholding Disclosure Requirements

     Both the plaintiffs and the government emphasize the importance of an early Supreme Court decision that upheld a federal statute requiring disclosure of those financially supporting lobbyists.  In <u>United States v. Harriss</u>, the Court evaluated a challenge to the Federal Regulation of Lobbying Act, Pub. L. No. 79-601, 60 Stat. 812, 839-42 (1946).  347 U.S. 612, 613, 617 (1954).  The statute applied to any person who "solicits, collects, or receives money or any other thing of

---

[15] The Court of Appeals declined to adopt a construction of the statute where the statute was not "readily susceptible" to the construction.  <u>VRLC I</u>, 221 F.3d at 386 (citation omitted).

value to be used principally to aid, or the principal purpose of
which person is to aid, in the accomplishment" of the "passage
or defeat of any legislation by the Congress of the United
States," or "[t]o influence, directly or indirectly, the passage
or defeat" of such legislation.  Id. at 619 (citation omitted).
A person of such description, if also "'receiving any
contributions or expending any money' for the purpose of
influencing the passage or defeat of any legislation by
Congress," was required to make quarterly disclosures to the
Clerk of the House of Representatives that included the name and
address of any person who had made contributions for lobbying
purposes of $500 or more and of any person who received
expenditures of $10 or more.  Id. at 614 & n.1.

     The statute required a distinct set of disclosures from any
person who "engage[d] himself for pay or for any consideration
for the purpose of attempting to influence the passage or defeat
of any legislation."  Id. at 615 & n.2.  Such a person was
required to make detailed quarterly disclosures to the Clerk of
the House of Representatives and the Secretary of the Senate.
Id.  The statute also required these detailed disclosures,
unlike those discussed in the previous paragraph, to be printed
in the Congressional Record.  Id. at 615 n.2; see also §§ 305,
308, 60 Stat. 840-42.

The Court began its analysis by construing the statute to require disclosures only from (1) persons that "solicited, collected, or received contributions," (2) where "one of the main purposes of such person, or one of the main purposes of such contributions [was] to influence the passage or defeat of legislation by Congress," and (3) "the intended method of accomplishing this purpose [was] through <u>direct</u> communication with members of Congress."  347 U.S. at 623-24 (emphasis added) (citation omitted).  This third limitation was a somewhat atextual one, based on the Court's belief that the statute "should be construed to refer only to lobbying in its commonly accepted sense," that is "direct communication with members of Congress on pending or proposed federal legislation."  <u>Id.</u> at 620 (citation omitted).  The Court's examination of legislative history led it to conclude that Congress "would have intended the Act to operate on this narrower basis, even if a broader application to organizations seeking to propagandize the general public were not permissible."  <u>Id.</u> at 620-21.

So construed, the Court held that the statute did not violate the First Amendment, reasoning that Congress had not sought to prohibit the "myriad pressures" exerted by various interest groups, but had "merely provided for a modicum of information from those who for hire attempt to influence

39

legislation or who collect or spend funds for that purpose.  It wants only to know who is being hired, who is putting up the money, and how much." Id. at 625.  Striking down such a statute "would be to deny Congress in large measure the power of self-protection." Id. at 625-26.  The Court concluded by saying that the risk that the disclosures would "as a practical matter act as a deterrent to [the] exercise of First Amendment rights" by persons other than those encompassed by the Court's narrowing construction of the statute was "too remote to require striking down a statute which on its face is otherwise plainly within the area of congressional power and is designed to safeguard a vital national interest." Id. at 626.

In Buckley v. Valeo, the Court considered a challenge to numerous provisions of the Federal Election Campaign Act ("FECA"), including its contribution limits, expenditure limits, and disclosure provisions.  424 U.S. at 6.  As particularly relevant here, the statute required any "individual or group, other than a political committee or candidate, who makes contributions or expenditures of over $100 in a calendar year other than by contribution to a political committee or candidate" to file quarterly reports with the Federal Election Commission ("FEC"). Id. at 63-64 (citation omitted).  Such reports were "to be made available by the Commission for public

inspection and copying."  Id. at 63 (citation omitted); see also
2 U.S.C. §§ 434(e), 438(a)(4) (1970 Supp. IV).

The Court set forth general principles to guide its
analysis of the overbreadth challenge to the disclosure
provisions.  It observed that "[u]nlike . . . overall
limitations on contributions and expenditures . . . disclosure
requirements impose no ceiling on campaign-related activities."
Buckley, 424 U.S. at 64.  But, the Court continued, "compelled
disclosure, in itself, can seriously infringe on privacy of
association and belief guaranteed by the First Amendment."  Id.
"Moreover, the invasion of privacy of belief may be as great
when the information sought concerns the giving and spending of
money as when it concerns the joining of organizations, for
financial transactions can reveal much about a person's
activities, associations, and beliefs."  Id. at 66 (citation
omitted).  The government argued that the disclosure
requirements at issue in Buckley served the informational,
corruption-deterrence, and violation-detection interests
described above.  The plaintiffs conceded, and the Court agreed,
that "disclosure requirements -- certainly in most applications
-- appear to be the least restrictive means of curbing the evils
of campaign ignorance and corruption that Congress found to
exist."  Id. at 68.

The Court described the provision requiring disclosures from groups that made independent expenditures as "part of Congress' effort to achieve 'total disclosure' by reaching 'every kind of political activity' in order to insure that the voters are fully informed and to achieve through publicity the maximum deterrence to corruption and undue influence possible." Id. at 76.  Before turning to its First Amendment analysis, the Court adopted a narrowing construction to avoid regulation of pure "issue discussion."  Id. at 78-80.  The Court construed the disclosure provision "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate."  Id. at 80.  That is, the provision applied only to "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [or] 'reject.'"  Id. at 44, 80 & nn. 52, 108.  The disclosure provision at issue, therefore,

> Impose[d] independent reporting requirements on individuals and groups that are not candidates or political committees only in the following circumstances: (1) when they make contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, and (2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.

Id. at 80.

42

Having adopted this narrowing construction, the Court concluded that the disclosure provision had "a sufficient relationship to a substantial governmental interest." Id.  It served an "informational interest" and went "beyond the general disclosure requirements to shed the light of publicity on spending that is unambiguously campaign related but would not otherwise be reported because it takes the form of independent expenditures or of contributions to an individual or group not itself required to report the names of its contributors." Id. at 81.  Finally, the Court distinguished Talley, reasoning that while the authorship disclosures there made a poor fit with the government's asserted anti-fraud interests, the financial disclosures were "narrowly limited to those situations where the information sought has a substantial connection with the governmental interests sought to be advanced." Id.

Thirty-four years later, in Citizens United I, the Court held that it violates the First Amendment to prohibit corporations from spending their general treasury funds on independent election-related expenditures.  558 U.S. at 365. Citizens United, a nonprofit corporation, desired to pay for Hillary: The Movie, a film it had produced, to be placed on a video-on-demand service.  Id. at 319-20.  Citizens United also sought to promote the film with ten- and thirty-second

43

television ads that contained "a short . . . pejorative[]
statement about Senator Clinton, followed by the name of the
movie and the movie's Web site address."  Id. at 320.

In addition to the bar on corporate expenditures, Citizens
United also challenged a "disclaimer" provision of the
Bipartisan Campaign Reform Act ("BCRA"), id. at 366, that
requires "electioneering communications" not made by a
candidate's political committee to "clearly state the name and
permanent street address, telephone number, or World Wide Web
address of the person who paid for the communication."  52
U.S.C. § 30120(a)(3) (formerly codified at 2 U.S.C. § 441d).
The plaintiff further challenged a BCRA disclosure provision
that requires "any person who spends more than $10,000 on
electioneering communications within a calendar year [to] file a
disclosure statement with the FEC."  Citizens United I, 558 U.S.
at 366; see also 52 U.S.C. § 30104(f)(1) (formerly codified at 2
U.S.C. § 434(f)(1)).  Such a disclosure statement must include,
among other things, "[t]he amount of each disbursement of more
than $200 during the period covered by the statement and the
identification of the person to whom the disbursement was made"
and the names and addresses of those who contributed $1,000 or
more in support of electioneering communications.  52 U.S.C. §
30104(f)(2).  The FEC is required to make the reported

information publicly available on the internet.  Id. §
30104(a)(11)(B).

It aids the discussion of Citizens United I that follows to
describe two categories of communication identified in the
Court's jurisprudence: "express advocacy" and "electioneering."
The first category encompasses communications that "expressly
advocate the election or defeat of a candidate."  Citizens
United I, 558 U.S. at 320; see also McConnell, 540 U.S. at 126;
Buckley, 424 U.S. at 44 & n.52.  "Electioneering
communications," a defined term in BCRA, are those
communications that "refer[] to a clearly identified candidate
for Federal office" and are "made within 30 days of a primary or
60 days of a general election."  Citizens United I, 558 U.S. at
321 (citation omitted).

The Court held that the communications at issue in Citizens
United I -- ads that "referred to then-Senator Clinton by name
shortly before a primary and contained pejorative references to
her candidacy" -- fell within BCRA's definition of an
electioneering communication.  Id. at 368.  It also held that
the disclaimers required by BCRA serve "the governmental
interest in providing information to the electorate."  Id.
"Identification of the source of advertising may be required as
a means of disclosure, so that the people will be able to

45

evaluate the arguments to which they are being subjected." Id. (citation omitted). "At the very least, the disclaimers avoid confusion by making clear that the ads are not funded by a candidate or political party." Id.

The Court also rejected the argument that BCRA's disclosure requirements could only be imposed on "speech that is the functional equivalent of express advocacy," noting that "disclosure is a less restrictive alternative to more comprehensive regulations of speech." Id. at 368-69; see also McCutcheon v. Fed. Election Comm'n, 572 U.S. 185, 223 (2014) ("Disclosure requirements burden speech, but . . . do not impose a ceiling on speech."). "Even if the ads only pertain to a commercial transaction," i.e. seeking out Hillary: The Movie on a video-on-demand service, "the public has an interest in knowing who is speaking about a candidate shortly before an election." Id. The Court thus concluded that "the informational interest alone [was] sufficient to justify application" of disclosure requirements to the ads. Id.

Following Citizens United I, the Court of Appeals for the Second Circuit has upheld disclosure statutes in two decisions of significance to the discussion below. In Vermont Right to Life Committee, Inc. v. Sorrell (VRLC II), the Second Circuit considered a version of the Vermont statute that had been

46

revised since VRLC I.  758 F.3d 118, 122 (2d Cir. 2014).  The
new statute contained a definition of "electioneering
communication," encompassing "any communication that refers to a
clearly identified candidate for office and that promotes or
supports a candidate for that office or attacks or opposes a
candidate for that office, regardless of whether the
communication expressly advocates a vote for or against a
candidate." Id. (citation omitted).  Such communications were
required to include the name and address of the person or entity
who funded them.  Id.  The statute also defined "mass media
activity" to include "television commercials, radio commercials,
mass mailings, literature drops, newspaper advertisements,
robotic phone calls, and telephone banks, which include the name
or likeness of a clearly identified candidate for office." Id.
at 123 (citation omitted).  A person who made expenditures of at
least $500 on mass media activity was required to file a report
with the Vermont Secretary of State and "send a copy of the
report to each candidate whose name or likeness is included in
the activity without that candidate's knowledge." Vt. Stat.
Ann. tit. 17, § 2971(a); see also VRLC II, 758 F.3d at 133-34.

Finally, the statute defined a "political committee" as:

any formal or informal committee of two or more
individuals or a corporation, labor organization,
public interest group, or other entity, not including
a political party, which accepts contributions of

47

$1,000.00 or more and makes expenditures of $1,000.00
or more in any two-year general election cycle for the
purpose of supporting or opposing one or more
candidates, influencing an election, or advocating a
position on a public question in any election, and
includes an independent expenditure-only political
committee.

VRLC II, 758 F.3d at 123 (citation omitted).  Political
committees were required to file certain disclosures with the
Vermont Secretary of State, which then would be made publicly
available.  Id. at 123-24; see also Vt. Stat. Ann. tit. 17 §
2961(a)(2).

The Second Circuit rejected vagueness and First Amendment
challenges to all three disclosure requirements.  The panel
noted that under Citizens United, it was clear that disclosure
requirements need not be limited to express advocacy.  VRLC II,
758 F.3d at 132.  The Court of Appeals found that the
disclosures triggered by electioneering communications and mass
media activity were "within the scope of regulation permitted
under Citizens United."  Id. at 133.  The former would "only
apply during a campaign for public office" and therefore had "a
substantial relation to the public's "interest in knowing who is
speaking about a candidate shortly before an election."  Id.
(citation omitted).  The latter would "identify the source of
election-related information and encourage candidate response."
Id. at 134.

The Second Circuit likewise upheld Vermont's "political committee" disclosures.  Id. at 139.  Under the statute, such political committees were only required to "disclose transactions that have the purpose of supporting or opposing a candidate."  Id. at 137.  The panel distinguished Vermont's regime from a "Wisconsin regulation struck down by the Seventh Circuit that imposed a disclosure regime 'on every independent group that crosses the very low $300 threshold in express-advocacy spending,'" id. at 138 (quoting Wis. Right to Life, Inc. v. Barland, 751 F.3d 804, 841 (7th Cir. 2014)), and from "perpetual reporting and organizational requirements that raised concern for the Eighth Circuit," id. (citing Minn. Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 867–69, 872–73 (8th Cir. 2012) (en banc)).  In short, the disclosures were "substantially related to the recognized governmental interest in providing the electorate with information about the sources of election-related spending."  Id.

In Citizens United II, the eponymous group challenged New York's yearly reporting requirements for 501(c)(3) and (c)(4) organizations.  882 F.3d at 379-80.  The state requires that each nonprofit submit to the Attorney General an IRS Form 990, which includes a Schedule B listing "the organization's donors, the donors' addresses, and the amounts of their donations."  Id.

at 379.[16]  Citizens United refused to submit the portion of the Schedule B including its list of donors.  Id. at 379-80.  The Attorney General was prohibited from publicizing donor lists, but Citizens United contended that "by collecting lists of names associated with political preferences that he could release at any time, the Attorney General holds the unconstitutional power to intimidate donors from paying for the communication of their views."  Id. at 380, 384.

The Second Circuit found that filing the Schedule B with the Attorney General served "important government interests" of "preventing fraud and self-dealing in charities," and that "the small extent of speech chilling is more than commensurate with the government's goals."  Id. at 384.  Of particular relevance to the present case, the panel wrote that it "would be dealing with a more difficult question if these disclosures went beyond the officials in the Attorney General's office . . . .  Certainly if that office were to publicize donor lists, it would raise the stakes . . . ."  Id.

---

[16] In 2018, the IRS attempted to eliminate the Schedule B requirement for 501(c) groups except 501(c)(3)s, but that action was set aside on Administrative Procedure Act grounds.  See Bullock v. Internal Revenue Serv., No. CV-18-103-GF-BMM, 2019 WL 3423485, at *2, *11 (D. Mont. July 30, 2019).

C.   Cases Finding Disclosure Requirements Unconstitutional
     As Applied to Particular Plaintiffs

In NAACP v. Alabama ex rel. Patterson, the Court evaluated

a state court order for an organization to produce the names and

addresses of all its members in the state.  357 U.S. at 451.

The Alabama attorney general had sought a state-court injunction

prohibiting the NAACP from operating in Alabama, alleging that

it had failed to comply with a statute that required out-of-

state corporations to register before doing business there.  Id.

at 451-52.  The NAACP admitted that it had engaged in the

activities identified in the attorney general's complaint, such

as opening a regional office in Alabama and supporting the

Montgomery bus boycott, but the NAACP contended that it was

exempt from the registration statute.  Id. at 452-53.  The

attorney general sought production of various NAACP records,

including membership lists, arguing that they were necessary to

determine whether the organization engaged in activity that

subjected it to the registration statute.  Id. at 453.  The

NAACP produced "substantially all the data called for by the

production order except its membership lists, as to which it

contended that Alabama could not constitutionally compel

disclosure," but was nonetheless held in contempt by the state

court.  Id. at 454.

51

The Court observed that "[e]ffective advocacy of both
public and private points of view, particularly controversial
ones, is undeniably enhanced by group association." Id. at 460.
The Court then found that the NAACP had "made an uncontroverted
showing that on past occasions revelation of the identity of its
rank-and-file members has exposed these members to economic
reprisal, loss of employment, threat of physical coercion, and
other manifestations of public hostility." Id. at 462. "Under
these circumstances," the Court found it "apparent that
compelled disclosure of [the NAACP's] Alabama membership is
likely to affect adversely the ability of [the NAACP] and its
members to pursue their collective effort to foster beliefs
which they admittedly have the right to advocate." Id. at 462-
63. The Court then turned to "the substantiality of Alabama's
interest" and found that disclosure of the names of the NAACP's
members would not have a "substantial bearing" on the merits of
the suit seeking to enjoin the NAACP's activities, since the
organization had admitted to its complained-of operations in the
state. Id. at 464-65. The Court concluded that the government
had "fallen short of showing a controlling justification for the
deterrent effect on the free enjoyment of the right to associate
which disclosure of membership lists is likely to have" and
reversed the contempt judgment. Id. at 466.

In Brown v. Socialist Workers '74 Campaign Committee
(Ohio), the Court confronted an as-applied challenge to a state
statute that required all political parties to report the names
and addresses of campaign contributors and recipients of
campaign disbursements.  459 U.S. 87, 88 (1982).  The Socialist
Workers Party had approximately sixty members in Ohio and had
achieved "little success at the polls."  Id. at 88-89.

Expressing themes familiar from NAACP and Buckley, the
Court wrote that "[t]he Constitution protects against the
compelled disclosure of political associations and beliefs" and
that "[s]uch disclosures can seriously infringe on privacy of
association and belief guaranteed by the First Amendment."  Id.
at 91 (citation omitted).  The Court reaffirmed Buckley's "test
for determining when the First Amendment requires exempting
minor parties from compelled disclosures."  Id. at 92-93.  That
is,

> The evidence offered need show only a reasonable
> probability that the compelled disclosure of a party's
> contributors' names will subject them to threats,
> harassment, or reprisals from either Government
> officials or private parties. . . .  The proof may
> include, for example, specific evidence of past or
> present harassment of members due to their
> associational ties, or of harassment directed against
> the organization itself.

Id. at 93-94 (citation omitted).

The state argued that it had an enhanced interest in disclosure of the identities of recipients of campaign funds (in comparison to the identities of those who contribute funds) because such disclosures were necessary to prevent "corruption" and "misuse of campaign funds." Id. at 94-95.  The Court rejected this argument, observing that the corruption-prevention interest was weak as applied to minor parties unlikely to win elections.  Id. at 95.  Further, the Court found a substantial First Amendment risk in compelling minor parties to disclose campaign disbursements, because "individuals who receive disbursements for 'merely' commercial transactions . . . may well be deterred from providing services by even a small risk of harassment" and therefore compelled disclosures could "cripple a minor party's ability to operate effectively and thereby reduce the free circulation of ideas both within and without the political arena."  Id. at 97-98 (citation omitted).

The Court also affirmed the district court's application of Buckley, finding a reasonable probability of reprisals against the Socialist Workers Party, based on evidence of "numerous instances of recent harassment" and that hostility towards the organization resisting disclosure was "ingrained and likely to continue."  Id. at 100-01.  Thus the Court held that Ohio's

disclosure statute could not constitutionally be applied to the Socialist Workers Party.  Id. at 102.

III. Section 172-e

The plaintiffs contend that § 172-e violates the First Amendment because it chills speech and burdens donors' rights to free association and privacy.  The challenge to the constitutionality of § 172-e is evaluated under the exacting scrutiny standard.  Applying that standard, it must be stricken as unconstitutional on its face.

If a 501(c)(3) makes an in-kind donation of greater than $2,500 to a 501(c)(4) engaged in lobbying, § 172-e requires that the 501(c)(3) file a public funding disclosure report that includes the identity of all donors who gave it more than $2,500.  Such disclosures are required whether or not the 501(c)(3) donor intended to support a 501(c)(4) or exercised any control over the 501(c)(3)'s donation to the 501(c)(4).  The disclosure is required by § 172-e even though, to obtain or retain its 501(c)(3) tax exemption, an entity must have an exempt purpose, which cannot be either campaigning for candidates for office or lobbying elected officials.  And, any support the entity provides to a 501(c)(4) must not render lobbying a "substantial part" of its activities, or the entity will lose its status as a 501(c)(3).  26 U.S.C. § 501(c)(3).

Section 172-e places a significant burden on the First Amendment interest in freedom of association. "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." NAACP, 357 U.S. at 460. As the Court more recently observed in Buckley, "The right to join together for the advancement of beliefs and ideas is diluted if it does not include the right to pool money through contributions, for funds are often essential if advocacy is to be truly or optimally effective." 424 U.S. at 65-66 (citation omitted). Donors who desire anonymity "may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." McIntyre, 514 U.S. at 341-42. As a result of such fears, compelled disclosure can place a "substantial restraint" upon the exercise of the right to freedom of association. NAACP, 357 U.S. at 462. The "compelled disclosure of political associations and beliefs . . . can seriously infringe on privacy of association and belief guaranteed by the First Amendment." Socialist Workers '74 Campaign Comm., 459 U.S. at 91 (citation omitted).

There is no substantial relation between the requirement that the identity of donors to 501(c)(3)s be publicly disclosed

and any important government interest.  The government refers
briefly to the three interests identified in Buckley to support
disclosure laws -- the informational, corruption-deterrence, and
violation-detection interests -- but makes no developed argument
connecting those interests to § 172-e.  Cf. Buckley, 424 U.S. at
76 (connecting the disclosure requirement in FECA to the three
interests).  Disclosure laws that have been upheld based on a
showing that the disclosures furthered these interests, as
described above, have been drawn far more narrowly than § 172-e.
They have required disclosure of those contributing to
candidates, to campaigns supporting identified candidates, or to
direct lobbying of legislators or their staffs.  None have
approached the tangential and indirect support of political
advocacy at issue here.

Besides referring generally to the three interests
identified in Buckley, the government justifies the § 172-e
disclosure regime by arguing that it furthers the following
government interest:  Section 172-e

> will reveal the funders of issue advocacy
> communications and coordination among tax-exempt
> organizations (including donors who seek to funnel
> money to 501(c)(4)s and then to Super PACs through
> 501(c)(3)s.  This will accomplish the stated goals of
> providing the public with much-needed information on
> important issues before executive, legislative, and

administrative bodies, and helping to deter corruption and avoid the appearance of corruption.[17]

This informational goal does not justify the burden on First Amendment rights created by § 172-e.  The disclosure of the identity of a 501(c)(3) donor makes a poor fit with this informational interest.  The link between a 501(c)(3) donor and the content of lobbying communications by the 501(c)(4) is too attenuated to effectively advance any informational interest. Cf. Van Hollen, Jr. v. Fed. Election Comm'n, 811 F.3d 486, 497 (D.C. Cir. 2016) (noting the "intuitive logic" that persons who contribute to the general treasury of a nonprofit corporation "do not necessarily support the corporation's electioneering communications" (citation omitted)).  It bears emphasis that, under federal tax law, a 501(c)(3) by definition cannot engage in substantial lobbying activity.

The government places particular emphasis on Harriss, 347 U.S. 612.  Harriss is of little assistance to the government.

_____

[17] Plaintiffs argue that any justification for the statute that was not articulated in the legislative history may not be considered.  "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."  Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391 (2000).  Because consideration of each of the government's arguments does not alter the outcome here, it is unnecessary to further grapple with the issue of whether each of them may be properly considered.

There, the Court upheld a disclosure statute that it construed narrowly to encompass "direct" lobbying of legislators.  Id. at 620-21.  The statute upheld in Harriss required public disclosure of the identities only of those who made contributions to professional lobbyists for their lobbying work.  See 347 U.S. at 615 n.2; see also §§ 305, 308, 60 Stat. 840-42.  The New York Lobbying Act already requires similar public disclosure of those providing direct financial support of lobbying activity.  See N.Y. Legis. Law § 1-c(c) (defining "lobbying"); id. § 1-h to 1-j (requiring lobbying-related disclosures).[18]  Section 172-e is far broader in its impact than the statute at issue in Harriss or the disclosures required by the New York Lobbying Act.  It requires disclosure of the identities of donors to a 501(c)(3), an entity whose primary purpose must be something other than lobbying and that by definition cannot make lobbying a "substantial" part of its activities.

Finally, the government argues that § 172-e places no burden on plaintiffs' First Amendment rights at all because the Attorney General may provide an exemption from disclosure upon a showing that such disclosure may cause harassment.  See

---

[18] See also N.Y. State Joint Comm'n on Public Ethics, supra note 11.

Socialist Workers '74 Campaign Comm., 459 U.S. at 93-94; NAACP, 357 U.S. at 462.  The exemption mirrors the test adopted by the Court for as-applied challenges in donor disclosure cases.

This exemption does not remedy the statute's constitutional deficiencies.  First, it does nothing to remedy the poor fit between the statute and the identified government purpose of providing more information about the funding of lobbying. Second, an after-the-fact exemption procedure does nothing to ameliorate the chilling effect on 501(c)(3) donors.  The possibility that the Attorney General might in the future approve a disclosure exemption would provide cold comfort to a potential donor asked to run the risk of threats, harassment, or reprisals.

Third, the government speculates that the yet-to-be written exemption regulations may provide a mechanism for exemptions to be granted prior to the reporting period in which donations would be collected.  The most natural reading of the statute, however, is to the contrary.  See N.Y. Exec. Law § 172-e(3) (describing the exemption after stating a default rule in favor of publication "within thirty days of the close of each reporting period" (emphasis added)).  In any event, the chilling effect will exist for whatever period the exemption application is under review.  Without a more substantial relation between

the government purpose and the disclosure, § 172-e is an unconstitutional burden on First Amendment rights.

In sum, none of the government's arguments enable § 172-e to withstand exacting scrutiny. A "substantial number" of the applications of § 172-e are likely to result in interference with the rights to freely associate and speak. Citizens United II, 882 F.3d at 383. Plaintiffs' facial challenge therefore succeeds, and § 172-e is invalid.

IV.  Section 172-f

The plaintiffs contend that § 172-f unconstitutionally intrudes on donors' First Amendment privacy rights and associational interests, particularly those related to the right to express opinions anonymously. This challenge to the constitutionality of § 172-f is evaluated under the exacting scrutiny standard. Applying that standard, § 172-f must be stricken as unconstitutional on its face.

Section 172-f requires a 501(c)(4) to publicly disclose its donors if it makes a public statement that

> refers to and advocates for or against a clearly
> identified elected official or the position of any
> elected official or administrative or legislative body
> relating to the outcome of any vote or substance of
> any legislation, potential legislation, pending
> legislation, rule, regulation, hearing, or decision by
> any legislative, executive or administrative body.

61

N.Y. Exec. Law § 172(f)(1)(b), (2).  Thus, if the entity's
public statement refers to the position of an official regarding
any potential legislation, the disclosure of its donors is
required.

The First Amendment rights to publicly discuss and advocate
on issues of public interest, and to do so anonymously, have
long been recognized.  As explained in McIntyre, the "respected
tradition of anonymity in the advocacy of political causes . . .
is perhaps best exemplified by the secret ballot, the hard-won
right to vote one's conscience without fear of retaliation."
514 U.S. at 343; see also id. at 357; Talley, 362 U.S. at 65
("It is plain that anonymity has sometimes been assumed for the
most constructive purposes.").

Section 172-f sweeps far more broadly than any disclosure
law that has survived judicial scrutiny.  It is not confined to
disclosure where the entity engages in express advocacy for a
candidate or electioneering.  Cf. Buckley, 424 U.S. at 79-80
(construing disclosure statute "to reach only funds used for
communications that expressly advocate the election or defeat of
a clearly identified candidate" to ensure that the statute's
reach was not "impermissibly broad"), Citizens United I, 558
U.S. at 369 (upholding disclosure requirements that served the
public's "interest in knowing who is speaking about a candidate

62

shortly before an election"). It is not confined to disclosure where the entity engages in direct lobbying of elected officials. Cf. Harriss, 347 U.S. at 620 (construing statute to apply only to "direct communication with members of Congress on pending or proposed federal legislation"); N.Y. Comp. Codes R. & Regs. tit. 19, § 943.6(a)(1)(i) (reaching "communication or interaction directed to a Public Official"); id. § 943.7(a)(1)-(2) (reaching "attempts to influence a Public Official indirectly" by "solicit[ing] another to deliver a message to a Public Official").

Instead, § 172-f requires disclosure whenever a 501(c)(4) engages in pure issue advocacy before the public. As the government construes the statute, § 172-f applies to communications that "tak[e] a stance on a position espoused by an elected official." And that position need only "relat[e] to . . . potential legislation." N.Y. Exec. Law § 172-f(1)(b). Given that any matter of public importance could become the subject of legislation and given the range of positions taken by all elected officials, § 172-f reaches a far broader swath of communications than did the lobbying- and election-related statutes that the Supreme Court and Second Circuit have upheld.

The government does not shy away from acknowledging the breadth of the statute. In opposing the plaintiffs' motion for

63

summary judgment, the government acknowledges that the government interest at stake is the interest in revealing "the funders of issue advocacy."  The government further argues that its "information interest relates broadly to any undue influence in politics (not just elections) arising from undisclosed contributions."[19]  The cases upholding donor disclosure requirements have never recognized an informational interest of such breadth.  Indeed, the narrowing constructions adopted in Harriss and Buckley, combined with the protections for anonymous speech articulated in Talley and McIntyre, strongly suggest that compelled identity disclosure is impermissible for issue-advocacy communications.  See Harriss, 347 U.S. at 621 (suggesting that "broader application to organizations seeking to propagandize the general public" would be impermissible); Buckley, 424 U.S. at 79 (reading statute to avoid "encompassing both issue discussion and advocacy of a political result").

---

[19] The government argues that it bears only a "slight evidentiary burden" and need not "provide studies, reports, hearings, or testimony" to establish the interests served by §§ 172-e and 172-f, because it says the relevant interests have already been recognized by Buckley and its progeny.  As discussed above, New York asserts a far broader informational interest than that recognized in any of the relevant precedent.  The government has not provided a "quantum of empirical evidence" sufficient to justify such a novel form of disclosure requirement.  Shrink Mo. Gov't PAC, 528 U.S. at 391.

The government argues that the Supreme Court has rejected any distinction between electioneering communications and issue advocacy.  This argument rests on a misreading of the relevant cases.  In McDonnell, the plaintiffs argued that Buckley had limited disclosure requirements to "express advocacy" communications.  540 U.S. at 190.  The Court rejected this argument, finding BCRA's new definition of "electioneering" was sufficiently determinate to avoid the vagueness concerns that drove the interpretation in Buckley and that election-related interests justified the application of "disclosure requirements to the entire range of 'electioneering communications.'"  Id. at 194, 196; see also Citizens United, 558 U.S. at 368-69 (rejecting a similar attempt to narrow the definition of "electioneering communication"); Indep. Inst. v. Fed. Election Comm'n, 216 F. Supp. 3d 176, 187 (D.D.C. 2016) ("[I]t is the tying of an identified candidate to an issue or message that justifies the Bipartisan Campaign Reform Act's tailored disclosure requirement because that linkage gives rise to the voting public's informational interest in knowing who is speaking about a candidate shortly before an election." (citation omitted)), aff'd, 137 S. Ct. 1204 (2017).  These cases hold that issue advocacy need not be carved out of BCRA's definition of "electioneering communications."  They do not

65

support New York's argument that it can regulate issue advocacy untethered to any electioneering communication.

New York also argues that § 172-f imposes a limited burden on plaintiffs because the statute allows a 501(c)(4) to maintain a segregated bank account for covered communications and disclose only the donors who contribute to such an account.  See N.Y. Exec. Law § 172-f(1)(d), (2)(c).  But this does nothing to remedy the central flaw of § 172-f -- that it encompasses issue advocacy.  Even if a 501(c)(4) structured its activities to employ a segregated bank account for covered communications, it would still have to disclose donors who fund communications on nearly any issue of public concern.  Thus the segregated bank account provision cannot save § 172-f.

The government's remaining argument concerning § 172-f -- that the possibility of an exemption ameliorates any First Amendment burden -- has already been rejected.  As with § 172-e, a "substantial number" of the applications of § 172-f are likely to result in interference with the rights to freely associate and speak.  Citizens United II, 882 F.3d at 383.  Plaintiffs' facial challenge therefore succeeds, and § 172-f is invalid. Because §§ 172-e and 172-f are facially invalid, the Court need not reach plaintiffs' additional as-applied challenges.

## Conclusion

The plaintiffs' May 24, 2018 motion for summary judgment is granted, and defendant's June 25, 2018 cross-motion for summary judgment is denied.


Dated:     New York, New York
           September 30, 2019


                              _____
                                       DENISE COTE
                              United States District Judge